UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CAMBRIDGE CHRISTIAN SCHOOL,
INC.,

       Plaintiff,

v.                                     Case No: 8:16-cv-2753-T-36AAS

FLORIDA HIGH SCHOOL ATHLETIC
ASSOCIATION, INC.,

       Defendant.
_____/

## **O R D E R**

This cause comes before the Court upon the Report and Recommendation filed by
Magistrate Judge Amanda Arnold Sansone on February 3, 2017 (Doc. 50). The Magistrate Judge
recommends dismissal of Plaintiff Cambridge Christian School, Inc.'s ("Cambridge Christian")
Verified Amended Complaint (Doc. 8) and denial of Cambridge Christian's Motion for
Preliminary Injunction (Doc. 9). All parties were furnished copies of the Report and
Recommendation and were afforded an opportunity to file objections pursuant to 28 U.S.C. §
636(b)(1). Cambridge Christian filed an Objection (Doc. 55) to which Defendant Florida High
School Athletic Association, Inc. ("FHSAA") responded (Doc. 56).

Upon consideration of the Report and Recommendation, this Court's independent
examination of the file de novo, and a review of Cambridge Christian's Objection and the response
thereto, it is determined that the Report and Recommendation should be adopted, confirmed, and
approved.

## I.    BACKGROUND

The FHSAA is the nonprofit, governing organization for athletics in Florida's public schools. § 1006.20(1), Fla. Stat. (2016).  It is a state actor.  Private schools that wish to participate in high school athletic competitions with public high schools are permitted to become members of the FHSAA.  *Id.*  Cambridge Christian, whose athletic teams are referred to as the "Lancers", is an independent, co-educational, private Christian school that participates in the FHSAA.  Doc. 8 ¶¶ 10, 15, 25.  The school has the religious mission "[t]o glorify God in all that [it does]; to demonstrate excellence at every level of academic, athletic, and artistic involvement; to develop strength of character; and to serve the local and global community."  Doc. 8 ¶ 11.  Cambridge Christian's athletic department also has a mission statement, which states:  "The Cambridge Christian School Athletic Department's chief end is to glorify Christ in every aspect of [its] athletic endeavors while using the platform of athletics to:  Teach the Principles of Winning; Exemplify Christian Morals and Values in [its] Community; Achieve Maximum Physical, Moral and Spiritual Character Development; and Mentor Young Men and Women to Deeper Walk with Jesus."  Doc. 8 ¶ 14.

As alleged in its Verified Amended Complaint, "[b]y long-standing tradition, Cambridge Christian student-athletes, their parents, and fans are led in prayer by a parent or student or member of the school faculty or administration before every Cambridge Christian sporting event."  Doc. 8 ¶ 16.  They do so through use of its loudspeaker during home games, as well as at away games "when possible," and have done so in connection with Cambridge Christian's football program since it was founded in 2003.  Doc. 8 ¶¶ 16-17.  Use of the loudspeaker "allows the Cambridge Christian community to come together in prayer," which is not otherwise possible due to the size of the sports venues.  Doc. 8 ¶ 18.

During the 2015 football season, Cambridge Christian's football team succeeded in qualifying as a finalist for the FHSAA 2A division playoffs, competing against University Christian School, which has a similar mission and tradition of prayer to that of Cambridge Christian's. Doc. 8 ¶¶ 31, 34. This championship game was to be held at the Camping World Stadium (the "Stadium") in Orlando, Florida.[1] Doc. 8 ¶ 2. Prior to the championship game, Cambridge Christian participated in a conference call with the FHSAA and, together with University Christian School, requested to use the Stadium's loudspeaker "to lead their attending students, families, and fans in a joint pre-game prayer." Doc. 8 ¶ 38. Cambridge Christian indicated that the FHSAA allowed it and another Christian school to pray over the Stadium loudspeaker prior to the 2012 championship game. *Id.* The FHSAA denied the request. Doc. 8 ¶ 39.

Following the conference call, Cambridge Christian's Head of School, Tim Euler, e-mailed the executive director of the FHSAA, Roger Dearing, requesting that Cambridge Christian be allowed to "honor their Lord before the game and pray" over the Stadium's loudspeaker. Doc.8 Ex. C-1. Mr. Euler advised that he or the pastor from University Christian School would be willing to "lead the fans, players, and coaches in prayer," and stated that he "d[id] not believe, with two Christian Schools playing," that his request was "unreasonable." Doc. 8 Ex. C-1. The Head of School for University Christian School echoed this request. Doc. 8 Ex. C-2.

After consulting with the FHSAA's legal counsel, Dr. Dearing responded to the Heads of Schools, informing them that he could not permit the schools to use the loudspeaker to pray. Doc. 8 Ex. D. His reasoning included that: (1) because the Stadium is a public facility, it was "off

---

[1] The Stadium is also known as the Orlando Citrus Bowl.

limits"; and (2) the FHSAA is a state actor that could not "legally permit or grant permission for" prayer over the loudspeaker. Doc. 8 Ex. D.

The championship game was held on December 4, 2015, with approximately 1,800 people in attendance. Doc. 8 ¶ 45. Before the game began, Cambridge Christian and University Christian School met at the 50-yard line to pray together. Doc. 8 ¶ 50. The prayer was not permitted to be broadcast over the loudspeaker and, because of this, the prayer was not audible to those in attendance. Doc. 8 ¶ 52. According to Cambridge Christian, the denial of use of the loudspeaker prevented "the students, parents, and fans in attendance the right to participate in the players' prayer or to otherwise come together in prayer as one Christian community." *Id.*

Nonetheless, other speech was not prohibited inside the Stadium. For instance, messages promoting corporate sponsors of the FHSAA were displayed along the perimeter of the field and displayed on the Stadium's video screen. Doc. 8 ¶¶ 46-47. In addition, such messages were announced over the Stadium's loudspeaker. Doc. 8 ¶ 48. At halftime, cheerleaders for Cambridge Christian and University Christian School performed shows, and utilized the loudspeaker to broadcast music for their respective performances. Doc. 8 ¶¶ 53-54. The music played by Cambridge Christian was chosen by the school, and originated from the cheerleading coach's smart phone. Doc. 8 ¶ 54.

After the championship game, Dr. Dearing e-mailed a second response to the Heads of Schools, indicating that the Establishment Clause of the First Amendment to the United States Constitution prevented the government from engaging in activities that could be viewed as endorsement or sponsorship of religion. Doc. 8 Ex. E. Dr. Dearing advised that allowing the schools to use the loudspeaker would be contrary to jurisprudence prohibiting schools from giving the impression of endorsing religion by allowing prayer over a public-address system. Doc. 8 Ex.

E.  He further noted that Cambridge Christian and University Christian School were permitted, both before and after the football game, to pray.  Doc. 8 Ex. E.

In addition, following the championship game, the FHSAA issued a statement regarding prayer over public-address systems.  Doc. 8 Ex. F.  The FHSAA advised that Cambridge Christian and University Christian school had requested to use the system for prayer, and stated that it denied the request pursuant to Florida and United States Supreme Court law, but "presented alternative options for team prayers, including on-field prayer," which was accepted by the schools, resulting in the teams participating "in a personally lead [sic] on-field organized prayer prior to and following" the championship game.  Doc. 8 Ex. F.  It further explained that the FHSAA, "as host and coordinator of the event, is statutorily a 'State Actor', and according to state and federal law, cannot legally permit or grant permission for the requested activity over the PA system."  Doc. 8 Ex. F.  This policy forms the basis for Cambridge Christian's claims in this action.

Additionally, the FSHAA Administrative Procedure, established by its Executive Director, includes a provision governing the "Public Address Protocol" during the state championship series.  Doc. 8 Ex. A.  The provision states that the announcer "shall be considered a bench official for all Florida High School State Championship Series Events," who "will follow the FHSAA script for promotional announcements, which are available from this association, player introductions and award ceremonies."  Doc. 8 Ex. A.  Other announcements over the public address system are limited to those delineated by the provision, which includes "[t]hose of a 'practical' nature (e.g., announcing that a driver has left his/her vehicle lights on)," and "[m]essages provided by host school management."  Doc. 8 Ex. A.

Based on the FHSAA's denial of its request to use the loudspeaker for prayer, and believing that the FHSAA's policy will affect it in the future, Cambridge Christian filed a seven-count

Amended Verified Complaint. In Count I, Cambridge Christian alleged that the FHSAA's conduct constituted impermissible content-based and viewpoint-based discrimination, denying its right to freedom of speech and placing a substantial burden on its sincerely held religious beliefs in contravention of the First Amendment. Doc. 8 ¶¶ 60-72. In Count II, Cambridge Christian sought declaratory relief regarding whether the FHSAA's policy prohibiting religious speech over the loudspeaker violated Cambridge Christian's rights to freedom of religious exercise and freedom of speech. Doc. 8 ¶¶ 73-81. Count III also sought declaratory relief as to whether the Establishment Clause requires the FHSAA to prohibit prayer over the loudspeaker. Doc. 8 ¶¶ 82-90. Counts IV through VI mirrored the previous counts, except that they were raised under the Florida Constitution's Establishment Clause and guarantees of freedom of religion and speech. Doc. 8 ¶¶ 91-121. Finally, Count VII alleged a violation of section 761.03, Florida Statutes, which is Florida's Religious Freedom Restoration Act, because the FHSAA's conduct intentionally placed a substantial burden on Cambridge Christian's sincerely held religious beliefs in the absence of any legitimate government interest and in a manner that was not narrowly tailored to the least restrictive means of furthering such interest. Doc. 8 ¶¶ 122-27.

Cambridge Christian filed the instant motion for preliminary injunction to enjoin the FHSAA from enforcing its policy of prohibiting religious speech over a loudspeaker during FHSAA-sponsored games. Doc. 9. The FHSAA moved to dismiss the Verified Amended Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6), alleging that Cambridge Christian could not state any claim for relief.[2] Doc. 26. The FHSAA also opposed Cambridge Christian's application for a preliminary injunction. Doc. 25.

---

[2] The FHSAA also moved to dismiss the Verified Amended Complaint under Federal Rule of Civil Procedure 12(b)(1), arguing that no First Amendment violation occurred that would constitute an injury-in-fact and Cambridge Christian, therefore, lacked standing. The Magistrate Judge

## II.     Standard

When a party makes a timely and specific objection to a Magistrate Judge's Report and Recommendation, the district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *Jeffrey S. v. State Bd. of Educ. of State of Ga.*, 896 F.2d 507, 512 (11th Cir. 1990). With regard to those portions of the Report and Recommendation not objected to, the district judge applies a clearly erroneous standard of review.  *See Gropp v. United Airlines, Inc*., 817 F. Supp. 1558, 1562 (M.D. Fla. 1993).  The district judge may accept, reject, or modify in whole or in part, the Report and Recommendation of the Magistrate Judge.  Fed. R. Civ. P. 72.  The district judge may also receive further evidence or recommit the matter to the Magistrate Judge with further instructions.  *Id*.

## III.     Discussion

Cambridge Christian objects to the Report and Recommendation ("R&R") for the following reasons:  (1) the Magistrate Judge erred in recommending dismissal of its claims under the First Amendment's Speech Clause (Counts I-II), and the Florida constitutional corollaries (Counts IV-V), because it incorrectly concluded that the Public-Address Protocol allowed only the FHSAA announcer to use the loudspeaker and impermissibly ignored Cambridge Christian's well-pleaded allegations that the FHSAA denied Cambridge Christian access to the loudspeaker based on its religious viewpoint; (2) the Magistrate Judge erred in recommending dismissal of its Free Exercise Clause claim (Counts I-II), and the corollary claim under the Florida Constitution (Counts IV-V) because it ignored that communal prayer is an essential part of Cambridge Christian's

---

recommended that Cambridge Christian sufficiently alleged an injury-in-fact. There is no objection to this recommendation.

religious practices; (3) the Magistrate Judge erred in recommending dismissal of its request for declaratory relief that neither the Establishment Clause nor the equivalent Florida Constitutional provision require the FHSAA to prohibit prayer from the loudspeaker (Counts III and VI) because Cambridge Christian's prayer would constitute private speech; (4) the Magistrate Judge erred in recommending its claim under the Florida Religious Freedom Restoration Act ("Act") be dismissed because by denying Cambridge Christian use of the Stadium's loudspeaker, the FHSAA substantially burdened Cambridge Christian's religious exercise without any compelling state interest or demonstrating that it adopted the least restrictive means of achieving that interest; and (5) the Magistrate Judge erred in recommending that the Court deny its motion for preliminary injunction because it demonstrated a substantial likelihood of success on the merits, a substantial threat of irreparable injury, that the injury outweighs any threatened harm of the injunction to the FHSAA, and granting the preliminary injunction will not disserve the public interest.  Doc. 55.  Upon de novo review, the Court agrees with the conclusions in the R&R.

### A.    The First Amendment[3]

The Establishment and Free Exercise Clauses of the First Amendment to the United States Constitution prohibit Congress from making any "law respecting an establishment of religion," or "prohibiting the free exercise thereof," respectively.  The First Amendment also contains the Free Speech Clause, which prohibits Congress from making any law "abridging the freedom of speech."  Although the First Amendment explicitly applies to the actions of Congress, the due process clause

---

[3] The parties agree that Cambridge Christian's claims under the Florida Constitution, Counts IV-VI, are analyzed consistent with the claims made under the First Amendment to the United States Constitution, Counts I-III.  Cambridge Christian's objections to the recommendation that its Florida constitutional claims be dismissed are identical to its objections to the recommendation that its First Amendment claim be dismissed.  The Florida constitutional claims, therefore, will not be separately addressed.

of the Fourteenth Amendment renders it equally applicable to the States. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1, 116 S. Ct. 1495, 1501 n.1, 134 L. Ed. 2d 711 (1996).

### 1. *The Free Speech Clause.*

The Free Speech Clause applies to government regulation of private speech. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (citing *Johanns v. Livestock Marketing Ass'n.*, 544 U.S. 550, 553, 125 S. Ct. 2055, 161 L. Ed. 2d 896 (2005). It does not, however, apply to the government's own expressive conduct. *Id.* Instead, the government "has the right to 'speak for itself,' " *id.* (quoting *Board of Regents of University of Wisconsin System v. Southworth*, 529 U.S. 217, 229, 120 S. Ct. 1346, 146 L. Ed. 2d 193 (2000)), and may "say what it wishes," *id.* (quoting *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 833, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995)). This is not curtailed by the fact that the government "receives assistance from private sources for the purpose of delivering a government-controlled message." *Id.* Government speech must, nonetheless, comport with the Establishment Clause. *Id.* Here, the FHSAA seeks dismissal because announcements over the Stadium loudspeaker are government speech and the Public Address Protocol is a neutral policy that avoids state entanglement with religion. Cambridge Christian disagrees, claiming that the prayer would be private speech.

Where the government is not the speaker, but instead supplies a forum where speech is conducted, the First Amendment and its Free Speech Clause do apply, and the degree of control that the government may exert over access to the forum depends on whether the forum is a public, designated public, limited public, or non-public forum.[4] *Cornelius v. NAACP Legal Def. & Educ.*

---

[4] A public forum is a place where, traditionally, there exists a free exchange of ideas. *Cornelius*, 473 U.S. at 800. *Cornelius*, 473 U.S. at 800. A designated public forum is one that is not traditionally public, but that the government has designated for such activities. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S. Ct. 2701, 2705, 120 L. Ed. 2d 541 (1992). In these forums, speech may be excluded only when it is necessary to serve a compelling

*Fund, Inc.*, 473 U.S. 788, 800, 105 S. Ct. 3439, 3448, 87 L. Ed. 2d 567 (1985). Cambridge Christian does not argue that the Stadium is a public or designated public forum. Instead, it contends that if a forum analysis applies, the Stadium is a limited public forum, which is one where the government has reserved "for certain groups or for the discussion of certain topics." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, -- U.S. --, 135 S. Ct. 2239, 2250, 192 L. Ed. 2d 274 (2015) (quoting *Rosenberger*, 515 U.S. at 829).

The FHSAA, by contrast, argues that the Stadium is a nonpublic forum. In a non-public forum, the government "act[s] as a proprietor," and "manag[es] its internal operations." *Walker*, 135 S. Ct. at 2251 (quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79, 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992)). The government may restrict speech based on content, but any restriction must be "reasonable and . . . not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius*, 473 U.S. at 800 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 954, 74 L. Ed. 2d 794 (1983)). Additionally, "[t]he restrictions may 'be based on subject matter and speaker identity so long as the distinctions are reasonable in light of the purposes served by the forum and are viewpoint neutral.' " *Searcey v. Harris*, 888 F.2d 1314, 1319 (11th Cir. 1989). Thus, regardless of whether a forum is a limited public or non-public forum, viewpoint discrimination against private speech is impermissible under the First Amendment. *Id.* at 1325.

Based on the above, the first relevant inquiry is whether all speech over the loudspeaker of the Stadium constitutes government speech, as was found by the Magistrate Judge. If it is not, and the Stadium loudspeaker is instead a forum provided by the government, then the Court must

---

state interest, and the exclusion must be narrowly drawn to achieve the compelling state interest. *Id.*

address whether the forum is a non-public or limited public forum, and whether the denial of access to the Stadium loudspeaker constituted viewpoint discrimination. *Lee*, 505 U.S. at 678 (explaining that a "forum based" approach is used "for assessing restrictions that the government seeks to place on the use of its property."). For the reasons set forth below, the Court agrees with the Magistrate Judge that the entirety of the speech over the Stadium loudspeaker was government speech and that, even if it were not, the Stadium loudspeaker is a non-public forum. Therefore, the FHSAA was permitted to deny Cambridge Christian's request to use it to broadcast prayer during a school sporting event organized and governed by a state entity.

a. Announcements Over The Stadium's Loudspeaker Are Government Speech.

In certain situations, it may be "difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech . . . ." *Summum*, 555 U.S. at 470. A forum is distinguished from government speech because government speech is expression by the government, and not simple provision of a forum. *Walker*, 135 S. Ct. at 2251. "The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider." *Id.*

The United States Supreme Court's decisions in *Pleasant Grove City, Utah v. Summum*, in which the Supreme Court considered whether monuments donated by private parties and erected in public parks were government or private speech, and *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, in which the Supreme Court examined whether specialty license plate designs constituted government speech, are instructive. In *Summum*, a public park contained several permanent displays, the majority of which were donated by private parties. 555 U.S. at 464. A religious organization, Summum, requested permission to erect a stone monument

containing seven tenets of the religion in the public park. *Id.* at 465. The city denied the request based on its then-unwritten policy to limit the monuments "to those that 'either (1) directly relate to the history of [the city], or (2) were donated by groups with longstanding ties to the [city's] community.' " *Id.* Summum argued that the monuments were private speech in a public forum, whereas the city took the position that they were government speech to which the First Amendment did not apply. *Id.* at 467. The Supreme Court held that the monuments were government speech and, in doing so, considered the following factors: (1) that governments have historically used monuments to speak to the public, even where the monuments are privately financed or donated; (2) that people understand monuments in a public park to be government speech; and (3) that the city had " 'effectively controlled' the messages sent by the monuments in the Park by exercising 'final approval authority' over their selection." *Id.* at 470-74.

Subsequently, in *Walker*, the Supreme Court relied on the factors analyzed in *Summum* to determine that messages on specialty license plates were government speech notwithstanding the fact that private parties submitted the designs. *Walker* arose from Texas laws requiring all vehicles to display a valid license plate, but allowing drivers to choose either a standard or specialty license plate. 135 S. Ct. at 2244. Specialty license plates could be developed in several ways, and one method allowed nonprofit entities seeking to sponsor a plate to submit an application and draft design to the Texas Department of Motor Vehicles Board ("Board"), which would accept or reject the application. *Id.* An application could be rejected for numerous reasons delineated by statute, including that the proposed plate would be offensive to any member of the public. *Id.* at 2245.

The Texas Division of the Sons of Confederate Veterans ("SCV") submitted an application and draft design, which included an image of the Confederate battle flag and the name Sons of Confederate Veterans. *Id.* Also included on the proposed plate was the state's name and

silhouette.  *Id.*  After accepting public comments, the Board rejected the application because members of the public found the design offensive.  *Id.*  The SCV filed a lawsuit claiming that the rejection of its application violated the Free Speech Clause.  *Id.*

In concluding that the Free Speech Clause did not apply because the license plates were government speech, the Supreme Court explained that in *Summum* it relied on several factors, including the historical use of monuments, that the public would reasonably interpret the monuments as conveying a government message, and the government's control over the selection of monuments.  *Walker*, 135 S. Ct. at 2247.  The Supreme Court then applied the same factors— history, perception, and control—to the Texas specialty license plates.  *Id.* at 2248-50.  Because license plates historically "communicated messages from the states," *id.* at 2248; were identified by the public as being connected with the state, *id.*; were issued and regulated by the state, and essentially constituted a form of government identification, *id.* at 2248-49; and were directly controlled and approved by the state, *id.* at 2249, they were government speech.

Additionally, despite applying the same factors articulated in *Summum*, the Supreme Court noted that other factors could come into play, and the relevant considerations should simply be weighed together.  *Walker*, 135 S. Ct. at 2249.  Thus, for example, the Supreme Court noted that in *Summum* it was persuaded in part by the permanent nature of the monuments, which did not apply in *Walker*.  *Id.*  It distinguished this by explaining that the government speech in *Summum* had occurred in what was a traditional public forum—a park—whereas the license plates were a non-public forum and "government-mandated, government-controlled, and government-issued IDs that have traditionally been used as a medium for government speech."  *Id.* at 2250-51.

After the Supreme Court decided *Walker*, the Eleventh Circuit, in *Mech v. School Board of Palm Beach County, Florida*, 806 F.3d 1070 (11th Cir. 2015), also evaluated whether speech

was that of the government or of a private entity. In *Mech*, a school board adopted a program allowing schools to hang banners on their fences that recognized sponsors for school programs. *Id.* at 1072. In codifying the policy, the school district "recognize[d] that athletic sponsors and other business partners provide a vital role in sponsorship of key programs," which resulted in an "increased need[] to visibly recognize these partners in the community." *Id.* It stated, however, that by allowing such banners, it was not creating a public forum for expressive activity, and did not intend "to create a venue or forum for the expression of political, religious, or controversial subjects which are inconsistent with the educational mission of the School Board or which could be perceived as bearing the imprimatur or endorsement of the School Board." *Id.* Moreover, business partners were selected and approved by the individual schools, and any banners that would be visible from the road were required "to use a uniform size, color, and font; to include a message thanking the sponsor; and to forego photographs and large logos." *Id.*

A math tutor, who used the name "The Happy/Fun Math Tutor" applied to hang a banner, complied with all the requirements, and was approved. *Id.* at 1072-73. However, several parents discovered that the tutor previously worked as an actor in pornographic films and owned a company that had produced pornographic films, and requested that the school remove the banners for The Happy/Fun Math Tutor. *Id.* at 1072-73. The school did so, informing the tutor that his connection to the pornography company, which used the same principal place of business and mailing company as the tutoring company, "create[d] a situation that [wa]s inconsistent with the educational mission of the [school district] and community values." *Id.* at 1073. The math tutor filed a lawsuit, claiming that the school board violated his First Amendment rights and that the banners constituted private speech in a limited public forum. *Id.* at 1074. The school board argued

that the banners were either government speech, or that their removal was reasonable and viewpoint neutral.  *Id.*

After looking to the three factors considered by the Supreme Court in *Summum* and *Walker*—history, endorsement, and control—the Eleventh Circuit concluded that the banners were government speech.  *Id.* at 1075-79.  As to the history of banners, the Court determined that there was no long history that the government has communicated to the public through them, a factor weighing in favor of the math tutor, but which could be "overcome by other indicia of government speech."  *Id.* at 1075.  The endorsement factor, by contrast, strongly weighed in favor of the school board.  *Id.* at 1076.  The Court noted that a school would not hang banners on their property for long periods of time if they "contain[ed] 'message[s] which the[ school] d[id] not wish to be associated.' "  *Id.* (quoting *Summum*, 555 U.S. at 471).  Additionally, the banners on their face identified the sponsors as being partners with the school, indicating a close relationship, and it was likely that an observer would discern the banners as an endorsement by the school of the tutoring services.  *Id.* at 1076, 1078.  The control factor also weighed in favor of concluding the banners were government speech.  *Id.* at 1078-79.  As with the license plates in *Walker*, the schools in *Mech* controlled the design, typeface, and color of the banners, and also dictated their size, location, and content.  *Id.* at 1078.  Thus, the schools effectively controlled the messages in the banners, and could choose how to present themselves to the community.  *Id.*  The simple fact that the sponsors provided their logos, phone numbers, and web addresses did not alter the schools' control or the governmental nature of the speech.  *Id.*

The Court in *Mech* was not persuaded by the math tutor's argument that the banners were essentially advertisements inviting the reader to do business with the sponsor and, therefore, private speech.  *Id.* at 1076.  Notably, the banners were not like purely private advertising because

they were printed in school colors, were required to comply with the schools' uniform design requirements, bore the initials of the school, and stated the sponsors were partners with the school. *Id.* at 1077. This, together with the fact that the banners were formally approved by and marked with the endorsement of the schools, distinguished them from private advertising. *Id.* The banners, instead, were a means for the schools to recognize and thank their sponsors, and such "gestures of gratitude" are common forms of government speech. *Id.* at 1077. Accordingly, the Eleventh Circuit concluded that the banners were government speech to which the First Amendment did not apply. *Id.* at 1079.

The factors articulated in *Summum* and *Walker*, and applied by the Eleventh Circuit in *Mech*, weigh in favor of the conclusion that speech over the Stadium's loudspeaker is government speech not subject to the First Amendment's viewpoint restrictions. At this stage in the proceedings, there is little to no evidence of whether announcements broadcast over a loudspeaker at a government-sponsored high school sporting event are historically government or private speech. However, given that the FHSAA had previously allowed a school to broadcast a prayer prior to such an event, the Court concludes that this factor weighs in favor of such speech being private. Nonetheless, the remaining two factors—endorsement and control—weigh in favor of a finding of government speech.

The Public Address Protocol contemplates that announcements will be made by the public-address announcer, who is a state actor. Cambridge Christian does not allege that the loudspeaker was used during the championship game by anyone other than the public-address announcer, with the exception of the music played for the half time performances. Halftime performance by either a school band or cheerleading squad is contemplated by the FHSAA Administrative Procedures. Doc. 8-1. Nothing in the Public Address Protocol contemplates that the loudspeaker will be open

to indiscriminate use by the public or even the schools. Instead, the announcer is the only individual identified by the Public Address Protocol, and he or she may only make those announcements that are approved and contemplated by the Public Address Protocol. It is clear that if the prayer was offered by the public-address announcer, this would be viewed as an endorsement by the state, which would be impermissible. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308, 120 S. Ct. 2266, 2278, 147 L. Ed. 2d 295 (2000) (holding that a school policy favoring broadcast of a religious message prior to sporting events would be perceived as state approval of that message and violated the Establishment Clause).

Cambridge Christian argues that it never requested the public address announcer to give the prayer, but that it instead sought access to the loudspeaker so that a representative of either school could pray over the loudspeaker. This, however, amounts to a request that the FHSAA open its loudspeaker, which otherwise is not accessible to private parties, to allow for prayer to be broadcast during a government controlled and hosted event. This would likewise be perceived as state endorsement of Cambridge Christian's religious message.

Nor does the fact that the public-address announcer broadcasts messages submitted by FHSAA sponsors alter the fact that speech over the loudspeaker is perceived as government speech. The messages must first be approved by the FHSAA, and are made by a state actor. As the Eleventh Circuit previously found in *Mech*, such "gestures of gratitude" by the state towards program sponsors are a common form of government speech. 806 F.3d at 1077. Accordingly, the endorsement factor weighs heavily in favor of the FHSAA.

The control factor also weighs heavily in favor of the FHSAA. For promotional announcements, the public-address announcer was required to follow a pre-approved script. Additionally, other than promotional announcements, the Public-Address Protocol specifically

limits the types of announcements that the public-address announcer may make. *Cf. Adler v. Duval Cty. Sch. Bd.*, 250 F.3d 1330, 1337 (11th Cir. 2001) (noting that "[t]he ability to regulate content of speech is a hallmark of state involvement."). The Administrative Procedures specifically direct that "all Florida High School State Championship Series shall be conducted in accordance with the policies established by the Board of Directors and shall be under the direction and supervision of the FHSAA Office." Doc. 8-1.

Moreover, the prayer would be broadcast during a school event in a program established and controlled by the state. The Administrative Procedures for the FHSAA and the 2015 Florida High School Athletic Association Football Finals Participant Manual demonstrate an overall government control of the inter-scholastic athletic program and championship event. The FHSAA Administrative Procedures and the Participant Manual outline, among other things, the eligibility and registration procedures for students and schools, qualifications for coaches, what sports will be recognized, how the games will proceed, how tickets to events may be obtained, where spectators may sit, the duration of halftime shows, and what and by whom announcements may be made. The entirety of the circumstances lead to the conclusion that speech over the loudspeaker at the Stadium during the championship game was government speech. Therefore, the government was not required to open its loudspeaker to allow Cambridge Christian to broadcast its prayer. Its decision not to do so is not subject to the Free Speech Clause. Accordingly, Cambridge Christian cannot state a claim under these constitutional provisions.

> b. Even If The Speech Were Private, The Stadium Loudspeaker Is A Non-Public Forum.

As an initial matter, Cambridge Christian attempts to avoid the forum analysis by reliance on *Gilio ex rel. J.G. v. School Board of Hillsborough County, Florida*, 905 F. Supp. 2d 1262, 1271 (M.D. Fla. 2012), in which this Court recognized that a forum analysis is not required in

circumstances where the school has restricted a student's speech during school hours on school property.[5] That is not the circumstance here. Here, the championship game is an extracurricular activity that bears the imprimatur of the FHSAA. Thus, a forum-analysis is appropriate. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270-71, 108 S. Ct. 562, 569-70, 98 L. Ed. 2d 592 (1988) (conducting a forum analysis and distinguishing school tolerance of speech from school sponsorship of speech, which "concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.").

The Stadium loudspeaker is a non-public forum because the FHSAA has not opened it to use for any purpose for the public. Any limited use by the cheerleading squads does not open it up as a public forum because "selective access does not transform government property into a public forum." *Perry Educ. Ass'n*, 460 U.S. at 47; *see also Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390, 113 S. Ct. 2141, 2146, 124 L. Ed. 2d 352 (1993) (stating that "there is no question" that a government entity "may legally preserve the property under its control for the use to which it is dedicated." (citing *Cornelius*, 473 U.S. at 800)).

Cambridge Christian attempts to analogize this case to the limited public forum cases of *Rosenberger*, 515 U.S. at 819, and *Lamb's Chapel*, 508 U.S. at 384. In *Rosenberger*, the University of Virginia denied funding to a student group that published a magazine that promoted religious expression and fostered sensitivity to and tolerance of Christian viewpoints. 515 U.S. at 825-26. The magazine published articles on both religious and non-religious topics, such as

---

[5] In circumstances involving tolerance of student speech within the school, the analysis delineated in *Tinker v. Des Moines Independent Community School District*, 39. U.S. 503, 509, 89 S. Ct. 733, 738, 21 L. Ed. 2d 731 (1969), applies. Under *Tinker*, schools may not restrict speech on school premises without reason to believe that the speech would "substantially interfere with the work of the school or impinge on the rights of the other students."

racism, crisis pregnancy, stress, prayer, authors, homosexuality, missionary work, and eating disorders. *Id.* at 826. The basis for the school's denial of funding was its conclusion that, because of the magazine's religious perspective, providing funding would violate the Constitution. *Id.* at 827. The student activity fund, however, was a limited public forum that the school had created. *Id.* at 830. The Supreme Court held that denial of funds to a magazine that provided a religious perspective or standpoint on a variety of subjects constituted impermissible viewpoint discrimination. *Id.* at 831.

Similarly, in *Lamb's Chapel*, a law allowed school properties to be used for limited permitted purposes, including for social, civic, or recreational use, while the property was not in use for school purposes. 508 U.S. at 386. However, the school property was not allowed to be used by any group for religious purposes. *Id.* at 387. A church within a school community sought to use school facilities to screen a film series by a licensed psychologist discussing his "views on the undermining influences of the media that could only be counterbalanced by returning to traditional, Christian family values instilled at an early stage." *Id.* at 388. Its request was denied based on the religious nature of the film series. *Id.* at 389. Because the school had opened the property for social and civic use, it was not permitted to exclude speech on these topics based on the viewpoint from which a private speaker wished to address such topics. *Id.* at 392-93. In holding that the school improperly denied the church's request, the Supreme Court explained that because a lecture or film on the subject of child rearing and family values would be a social or civic use of the property, the school was not permitted to exclude speech on those topics simply because it was made from a religious viewpoint. *Id.* at 393-94. In other words, having opened the forum to these topics, it could not exclude certain viewpoints within the scope of the limited public forum.

Unlike the government entities in *Rosenberger* and *Lamb's Chapel*, which specifically created forums where private entities could speak, the FHSAA did not allow speech over the Stadium loudspeaker by anyone other than itself. The Stadium loudspeaker, therefore, remained a nonpublic forum and the FHSAA was permitted to restrict speech over it based on content, as long as any restriction was "reasonable and . . . not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius*, 473 U.S. at 800 (quoting *Perry Educ. Ass'n*, 460 U.S. at 45).

Despite the above, Cambridge Christian would have this Court accept its legal conclusion that exclusion of prayer from the Stadium loudspeaker by the FHSAA was impermissible viewpoint discrimination because religion is a viewpoint. During the hearing before the Magistrate Judge, Cambridge Christian argued that the messages submitted by the FHSAA's sponsors were commercial speech, and that exclusion of its prayer—non-commercial speech—was viewpoint discrimination. As an initial matter, this Court concluded that the messages as to the FHSAA sponsors were government speech. Regardless, exclusion of noncommercial speech where commercial speech is permitted is a content-based restriction, not a viewpoint-based restriction. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271 (11th Cir. 2006) (stating that a policy that favored commercial speech over noncommercial speech was a content-based restriction). Accordingly, Cambridge Christian has failed to plead that the FHSAA engaged in impermissible viewpoint discrimination in violation of its rights under the Free Speech Clause of the First Amendment.

Accordingly, because the speech over the Stadium's loudspeaker was government speech, or, alternatively, was private speech in a nonpublic forum and Cambridge Christian's prayer was

not excluded based on its viewpoint, Counts I-II and IV-V fail to state a claim for violation of Cambridge Christian's rights to free speech.

### 2. *The Free Exercise Clause*

To state a claim under the Free Exercise Clause, a plaintiff must allege that he or she has a sincere religious belief, and that "the law at issue in some way impacts the plaintiff's ability to either hold that belief or act pursuant to that belief." *GeorgiaCarry.Org, Inc. v. Ga.*, 687 F.3d 1244, 1256-57 (11th Cir. 2012). In other words, the plaintiff must allege that the government impermissibly burdened a sincerely held religious belief. *Id.* (citing *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1294 (11th Cir. 2007)). Additionally, "[t]he Free Exercise Clause does not permit the State to confine religious speech to whispers or banish it to broom closets." *Chandler v. Siegelman*, 230 F.3d 1313, 1316 (11th Cir. 2000) (*Chandler II*). In the school setting, "the State [must] tolerate genuinely student-initiated religious speech," but may cross the line to improper state action if it "participates in or supervises the speech." *Chandler v. James*, 180 F.3d 1254, 1258 (11th Cir. 1999) (*Chandler I*).

The Magistrate Judge determined, and this Court agrees, that the Verified Amended Complaint is devoid of any allegations that the FHSAA impacted Cambridge Christian's ability to hold or act pursuant to its sincerely held religious beliefs. Instead, the Complaint alleges that Cambridge Christian and University Christian School were permitted to pray at the most central location of the Stadium. Accordingly, the FHSAA did not banish Cambridge Christian's religious speech to broom closets, but freely permitted it to engage in its privately-initiated prayer without restriction.

Cambridge Christian, in its Objection, focuses on its desire to engage in communal prayer, which it states is integral to its religious mission. It contends that the FHSAA and Magistrate

Judge have "run[] roughshod over the Free Exercise Clause" by "decid[ing] what elements of a religious practice are important [to Cambridge Christian] and which ones the government may abridge." Doc. 55 at 13. Nonetheless, the Verified Amended Complaint is devoid of any allegation that the spectators were discouraged or prevented from engaging in prayer, or that Cambridge Christian was in any way prevented from broadcasting its prayer through any method other than use of the government-controlled loudspeaker. Thus, the Verified Amended Complaint, at most, alleges that the *manner* of pursuing communal prayer was restricted, but not the *ability* to hold communal prayer, as is required to state a claim under the Free Exercise Clause.

Although Cambridge Christian relies on *Lindh v. Warden, Federal Correctional Institution, Terre Haute, Indiana*, No. 2:09-cv-215, 2013 WL 139699 (S.D. Ind. Jan. 11, 2013), that case is not comparable. In *Lindh*, a prison inmate had a sincerely held religious belief that congregational religious prayer was mandatory, but the correctional facility banned communal prayer. *Id.* at *6. In doing so, the warden did not indicate that he reviewed alternatives to a complete ban, which had not always been in place, and there had not previously been any problems. *Id.* at *7. Here, by contrast, there was no ban on communal prayer. Instead, the FHSAA simply declined to sponsor Cambridge Christian's prayer, which is not a violation of the Free Exercise Clause. *Chandler I*, 180 F.3d at 1258. Accordingly, Counts I-II and IV-V fail to state a claim under the Free Exercise Clause and the counterpart of the Florida Constitution.

### 3. The Establishment Clause.

Under the Establishment Clause, the "government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.' " *Santa Fe*, 530 U.S. at 302 (quoting *Lee v. Weisman*, 505 U.S. 577, 587, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992). The Establishment Clause "prohibits a

school district from taking affirmative steps to create a vehicle for prayer to be delivered at a school function." *Chandler II*, 230 F.3d at 1315.

The Magistrate Judge recommended that Cambridge Christian's Establishment Clause claim be dismissed because Cambridge Christian does not allege that any Establishment Clause violation has occurred. But Cambridge Christian seeks a declaration of whether its requested relief of a content-neutral policy that does not discriminate against religious speech would violate the Establishment Clause. The Magistrate Judge correctly concluded that there is no actual controversy as to this claim. Doc. 50 at 19-20. Instead, the Magistrate Judge recommended that Cambridge Christian's allegations as to the Establishment Clause were more appropriately addressed in the context of its claims under the Free Exercise and Free Speech Clauses of the First Amendment. Doc. 50 at 20. Cambridge Christian objects to this recommendation, stating that "the Magistrate Judge erred by improperly conflating the Public Address Protocol with FHSAA's discriminatory decision to deny [Cambridge Christian] access to the loudspeaker . . . , which the FHSAA admitted was based on the religious viewpoint [Cambridge Christian] intended to express." Doc. 55 at 14.

Cambridge Christian's Objection as to this claim simply highlights the Magistrate Judge's recommendation that it does not relate to the Establishment Clause, but instead is another claim under the Free Exercise and Free Speech Clauses. Throughout its argument on this point, Cambridge Christian relies either on cases alleging that an existing policy allowing for religious speech violates the Establishment Clause, such as *Santa Fe* and *Adler v. Duval County School Board*, 250 F.3d 1330 (11th Cir. 2001), or cases where an existing policy violates the Free Exercise and Free Speech Clauses, such as *Chandler II*. Doc. 55 at 14-21. Indeed, in its Objection as to this claim, Cambridge Christian addresses the Free Speech analysis of whether the speech is

private or public.  Doc. 55 at 21-22.  This simply highlights that this case contemplates whether Cambridge Christian can state a claim for violation of its Free Exercise and Free Speech Clause rights.  Accordingly, Cambridge Christian fails to state a claim entitling it to declaratory relief based on the Establishment Clause, or Florida's constitutional counterpart.

### B.     Florida's Religious Freedom Restoration Act.

Section 761.03(1) of the Florida Statutes, known as Florida's Religious Freedom Restoration Act, states as follows:

> The government shall not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, except that government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person:
> (a)     Is in furtherance of a compelling governmental interest; and
> (b)     Is the least restrictive means of furthering that compelling governmental interest.

The statue also provides for a cause of action for violation of the Act.  § 761.03(2).  The Florida Supreme Court examined the protection offered by the Act in *Warner v. City of Boca Raton*, 887 So. 2d 1023, 1032 (2004), and held that to state a claim under it, "a plaintiff must only establish that the government has placed a substantial burden on a practice motivated by a sincere religious belief."  It further defined what a "substantial burden" under the Act is, holding that "a substantial burden on the free exercise of religion is one that either compels the religious adherent to engage in conduct that his religion forbids or forbids him to engage in conduct that his religion requires." *Id.* at 1033.

Applying this test, for example, this Court has previously held that the government placed only a "significant" and not a "substantial" burden on a church for the homeless by requiring the church to obtain a permit to use the park for an event involving a "large group feeding" and limited such permits to two per year.  *First Vagabonds Church of God v. City of Orlando, Fla.*, No. 6:06-

cv-1583-Orl-31KRS, 2008 WL 2646603, at *1-2. A Florida court has held that a law requiring a Muslim woman to remove her veil for the photograph for her driver's license "merely inconvenienc[ed]" her religious beliefs, and did not substantially burden them. *Freeman v. Dep't of Highway Safety & Motor Vehicles*, 924 So. 2d 48, 57 (Fla. 5th DCA 2006).

Cambridge Christian does not allege in its Verified Amended Complaint that by denying it use of the loudspeaker, the FHSAA forbade it from engaging in conduct required by its religion. Instead, it alleges that it was not allowed "to partake in its tradition of pre-game prayer over the loudspeaker as required by its religious *mission*." Doc. 8 ¶ 124. Cambridge Christian's religious mission is "[t]o glorify God in all that [it does]; to demonstrate excellence at every level of academic, athletic, and artistic involvement; to develop strength of character; and to serve the local and global community." Doc. 8. ¶ 11. The allegations of the Verified Amended Complaint, therefore, allege only that Cambridge Christian was denied its traditional method of advancing the school's mission during sporting events, and that the mission is a religious one. The mission itself, however, is not a religious belief, nor is broadcasting a prayer over a loudspeaker. As previously noted, the FHSAA did not prevent or discourage Cambridge Christian or the spectators at the Stadium from praying, or from disseminating that prayer to all in attendance. Moreover, even if denial of access to the loudspeaker did burden a religious belief of Cambridge Christian, such a burden did not amount to a substantial one, but simply inconvenienced the belief, because Cambridge Christian was not denied alternate means of engaging in communal prayer. Accordingly, Cambridge Christian has failed to state a claim under Florida's Religious Freedom Restoration Act.

## C. The Motion for Preliminary Injunction.

Injunctive relief may be granted only where the moving party demonstrates that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). Because a preliminary injunction is a drastic and extraordinary remedy, such relief will not be granted unless the moving party clearly establishes the burden of persuasion of each of the four elements. *Id.* Indeed, should the moving party fail "to show any of the four factors," such failure "is fatal." *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

The most important factor in the analysis of whether a preliminary injunction should be granted is the first—whether the moving party establishes a likelihood of success on the merits. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) ("The first of the four prerequisites to temporary injunctive relief is generally the most important."). This requires the moving party to show that success is likely or probable, but not necessarily certain. *Id.* However, the failure to meet this prong may defeat the moving party's claim, "regardless of its ability to establish any of the other elements." *Haitian Refugee Ctr., Inc. v. Christopher*, 43 F.3d 1431 (11th Cir. 1995) (citing *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994)). Here, Cambridge Christian is not likely to succeed on the merits because the allegations of the Verified Amended Complaint fail to state a claim. Instead, based on the allegations, this Court concludes that the Establishment Clause was not implicated, and the FHSAA was not required by the Free

Speech Clause, Free Exercise Clause, or Act to open the Stadium's loudspeaker to Cambridge Christian to allow it to broadcast prayer prior to the championship game.

Cambridge Christian likewise has not established that it will be irreparably injured if the preliminary injunction is not issued. To establish irreparable harm, the moving party must show that the asserted injury is "neither remote nor speculative, but actual and imminent." *Siegel¸* 234 F.3d at 1176 (quoting *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). Although "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), the allegations of the Verified Amended Complaint do not state a claim for violation of any First Amendment rights. Thus, any future denial by the FHSAA to broadcast a private prayer over a government-controlled sound system reserved for government speech will not irreparably injure Cambridge Christian.

Moreover, Cambridge Christian did not qualify for the championship game in 2016, and there is no indication of whether its teams will qualify for the 2017 championship games.[6] Because of this, Cambridge Christian's speculative injury, for which it has failed to state a First Amendment claim, does not outweigh the potential harm to the FHSAA. Should the FHSAA be required to open speakers it otherwise controls to indiscriminate use by member schools, it could likewise open itself to lawsuits.

Finally, the Court cannot determine that the injunction would not be adverse to the public interest. FHSAA championship games are government organized and run events for school students. While the Free Exercise Clause guarantees people the right to freely exercise their

---

[6] The FHSAA Planning Calendar attached to the Verified Amended Complaint indicates that the championship games for the 2016-17 year have occurred. Doc. 8-8. There are championship games scheduled for the 2017-18 school year. *Id.*

religion, others may not be coerced into participating in religious practices. *Santa Fe*, 530 U.S. 290 at 310-11. As the Supreme Court recognized in *Santa Fe*, "in a school context," a request that a believer may find to be reasonable "may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy." *Id.* at 312. Accordingly, Cambridge Christian has not met its burden of persuasion as to the public interest factor.

## IV. Conclusion

While viewing the allegations of the Verified Amended Complaint in the light most favorable to Cambridge Christian, it has failed to sufficiently allege any basis for relief. The Court will, therefore, overrule Cambridge Christian's objections and adopt the R&R.

Accordingly, it is **ORDERED AND ADJUDGED**:

1. Plaintiff Cambridge Christian School, Inc.'s Objection (Doc. 55) to the Magistrate Judge's Report and Recommendation (Doc. 50) is **OVERRULED**.

2. The Report and Recommendation of the Magistrate Judge (Doc. 50) is **ADOPTED, CONFRIMED,** and **APPROVED** in all respects and is made a part of this Order for all purposes.

3. Defendant's Motion to Dismiss Plaintiff's Verified Amended Complaint for Declaratory and Injunctive Relief and Incorporated Memorandum of Law in Support (Doc. 26) is **GRANTED**.

4. Plaintiff's Motion for Preliminary Injunction and Incorporated Memorandum of Law In Support Thereof (Doc. 9) is **DENIED**.

5. Although the Court questions whether the deficiencies to its claims can be cured by amendment, the Court will allow Cambridge Christian one opportunity to amend its complaint to cure the deficiencies addressed in the Report and Recommendation

and in this Order.  If Cambridge Christian chooses to file an Amended Complaint, it shall be filed on or before June 21, 2017. Failure to file an Amended Complaint within this time period will result in the dismissal and closure of this action without further notice.

**DONE AND ORDERED** in Tampa, Florida on June 7, 2017.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any