## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CAMBRIDGE CHRISTIAN
SCHOOL, INC.,

    Plaintiff

v.                                                   Case No. 8:16-cv-2753-CEH-AAS

FLORIDA HIGH SCHOOL
ATHLETIC ASSOCIATION, INC.,

    Defendant.

_____

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Defendant, the Florida High School Athletic Association (the "FHSAA" or "Association"), asks the Court to enter summary judgment in Defendant's favor on all of Plaintiff's claims.

## **INTRODUCTION**

This dispute stems from the Association's denial of Plaintiff's request to pray over the PA system before the 2015 Class 2A FHSAA football championship final (the "2015 Final"). The Association denied the request, relying on the Supreme Court's Establishment Clause precedent, because it is a state actor and was hosting the 2015 Final at a state-owned stadium (the "Stadium"). The Association did, however, suggest that Plaintiff could pray voluntarily at the 50-yard line before the game, and Plaintiff did so. Nevertheless, Plaintiff asserts claims arising under the Free Speech and Free Exercise clauses of the United States and Florida Constitutions because it was not allowed free access to the PA system to conduct a pregame prayer before the 2015 Final.

Although Plaintiff's claims implicate several complex legal principles, the key issues are straightforward: (1) was the speech at issue government or private speech; (2) even if it was private speech, did the Association act arbitrarily by not allowing Plaintiff to use PA system for pregame prayer at the 2015 Final; and (3) does Plaintiff actually have a sincere religious belief in the need to pray over a PA system before sporting events. With discovery complete, there are several undisputed facts that make the answers to these questions clear.

First, after extensive discovery and the production of thousands of PA scripts from dozens of sports, there is only *one* that references prayer—the script for the Class 2A FHSAA football championship final in 2012 (the "2012 Final"). None of the other 70-plus football championship final scripts since 2012 references prayer, and there is no evidence of prayer over the PA system at any of these games. By contrast, *every* script shows the Association speaking directly to the audience.

Second, there is no evidence that the Association ever made the PA system available for indiscriminate use. Rather, speech over the PA system at football championship finals was tightly controlled through a combination of scripts, in which *every word* was inserted by an FHSAA employee, and a rigorous public-address protocol. The only time anyone other than the FHSAA announcer used the PA system was at halftime, but, even then, use was limited to the narrow purposes of introducing bands and providing musical accompaniments for traditional halftime performances. Otherwise, there is no evidence that anyone other than the PA announcer used or spoke over the PA system at football championship finals.

Third, it is undisputed that, despite professing a sincere belief in the need to pray over a PA system before sporting events, Plaintiff routinely played football games without pregame prayer over the PA system in the years leading up to the 2015 Final. In fact, Plaintiff did not so much as ask to pray over a PA system outside of its home stadium even one time before the 2015 Final. Remarkably, Plaintiff's corporate deponent admitted that the resulting inability to pray communally over a PA system before football games *did not* burden its free exercise of religion.

These undisputed facts weigh heavily on the issues in this case. For one, they show that the Association had long used the PA system to communicate to the public at football championship finals. They also show that the Association tightly controlled speech over the PA system at these games and never opened it up for private parties to say what they wanted. And they confirm the Eleventh Circuit's finding that reasonable observers would perceive messages over the PA system at FHSAA football championship finals as endorsed by the Association. Together, these conclusions show that PA system was used for government and not private speech.

The facts above also show that the Association did not act arbitrarily when it did not allow Plaintiff to use the PA system for prayer at the 2015 Final. To the contrary, the Association acted the same way it did at all but one other football championship finals. Under the forgiving test for the reasonableness of content-based regulation of nonpublic forums, this near-perfect record of consistency is more than enough to rebut any inference of arbitrariness. If anything, it is Plaintiff

that has arbitrarily selected the 2015 Final to be the first time it ever even asked to use another party's PA system for communal pregame prayer.

Plaintiff also cannot prove a sincere religious belief in—rather than a mere preference for—communal pregame prayer over a PA system away from its home field. Apart from lacking any written statement of this belief, Plaintiff never made any effort to live by it before the facts giving rise to this lawsuit. Plaintiff was content to play football games *without* pregame prayer over a PA system in deference to the host of the game and never felt that its religious beliefs were being burdened.

This case is about whether the Constitution required the Association, a state actor, to allow pregame prayer over the PA system at the 2015 football championship final. The Association has not denied Plaintiff the ability to express itself through prayer among themselves prior, during, or following the game, either in the locker room or outside on the athletic field. Plaintiff did not ask to pray using banners, signs, or social media posts, or to pray during a paid advertisement or halftime performance or at weightlifting final or tennis match. Based on the undisputed facts and well-established legal principles, Plaintiffs' free speech and free exercise claims fail, and the Association is entitled to judgment as a matter of law.

## BACKGROUND[1]

### I.    Facts

####    A. The Association is the small, non-profit corporation
####       responsible for high school athletics in Florida.

By statute, the Association is the designated governing nonprofit organization for high-school athletics in the State of Florida. Fla. Stat. § 1006.20(1). The Association has a limited budget and approximately 25 full-time employees to fulfill this mission. (*See* Doc. 110-8 ¶ 3.) Each year, high schools in Florida participate in thousands of events in more than thirty sports. (Doc. 25-1 ¶ 3.)

In football, schools play a number of regular-season games, after which qualifying schools participate in single-elimination tournaments called the "Championship Series" in eight classifications from 1A to 8A. (*See, e.g.*, Tomyn Dep. at 100:12–24.) Each Championship Series consists of a number of early-round games culminating in a championship final between the two prevailing teams. (*Id.*) The regular-season and early-round playoff games are hosted by member schools, whereas the finals are hosted by the FHSAA and its partners at neutral venues like the Stadium—i.e., Camping World Stadium (formerly the Citrus Bowl) in Orlando. (Rohrer Dep. at 90:10–25; Ex. 10 ¶ 4.) Given its staffing and budgetary limitations, FHSAA staff do not officially attend events other than championship finals and cannot supervise regular-season or early-round playoff events. (*Id.* ¶ 22; Dearing Dep. at 52:9–19.)

---

[1] In support of this motion, the Association relies on the exhibits set forth in the Index of Exhibits immediately following the Certificate of Service. The Association has contemporaneously filed a Notice of Filing attaching complete versions of each of the depositions relied upon herein.

The Association's Administrative Procedures include a "Public-Address Protocol" to govern PA announcers at FHSAA events, including football playoff games. (Doc. 8-1 § 3.1.8.) The protocol requires PA announcers to "maintain complete neutrality at all times" and make only specified game-related and promotional announcements set forth in scripts created by the Association. (*Id.*) While the Association expects PA announcers to follow these scripts, the FHSAA cannot monitor compliance with this expectation other than at championship finals. (Doc. 110-8 ¶ 4; *see also* Tomyn Dep. at 111:10–13, 136:2–7, 201:17–23.) Because the scripts are created by FHSAA staff, every word that makes it into a PA script is put there by the Association. (Ex. 10 ¶ 7; *see also, e.g.*, Rohrer Dep. at 59:10–11, 71:19–20, 83:15–18; Tomyn Dep. at 175:23–176:3; Sobers Dep. at 100:2–6; Young Dep. at 27:13–28:6, 67:3–7.)

To encourage sponsors to support the Association financially, the Association enters into sponsorship agreements that, in exchange for a sponsorship fee, allow certain statements to be read over the PA system at FHSAA events.[2] (Ex. 10 ¶ 8.) Sponsorship agreements must be approved by the Association's Executive Director. (*Id.* ¶ 9.) Sponsors typically draft the text of their desired announcements, but the Association retains final control of the scripts, and text cannot be

---

[2] For similar reasons, the Association also allows statements to be read over the PA system pursuant to agreements between its partner in hosting FHSAA events at neutral venues throughout the State of Florida and their "local sponsors." (Ex. 10 ¶¶ 16–18.) In its agreements with its partners, the Association retains the right to control agreements between its partners and their local sponsors and would not allow statements the Association disapproves to be inserted into PA scripts pursuant to such agreements. (*Id.*)

inserted into a script without FHSAA staff reading it and determining that it should be inserted. (*Id.* ¶¶ 7, 11–15.) Sponsors are typically experienced at preparing PA announcements and familiar with the kinds of announcements the Association would consider appropriate. (*Id.* ¶ 12.) For this reason, the Association almost never has to revise or reject proposed announcements. (*Id.*) However, the Association retains final control and would not allow statements the Association disapproves to be inserted into PA scripts pursuant to sponsorship agreements. (*Id.* ¶¶ 12–15.) This is consistent with the Association's general practice of controlling sponsorship messages at FHSAA events, for example, to avoid conflicts between sponsors with similar products. (*See generally* Ex. 11; *see also* Ex. 10-B at FHSAA-024006, § 14.b(1).)

When the Association hosts a football championship final, it controls the pregame festivities and use of the PA system more generally with several key purposes in mind. With respect to pregame proceedings, the Association tries to create an atmosphere of excitement and anticipation, adhere to its traditions for these events, and to promote patriotism and respect for the United States and its symbols. (Ex. 10 ¶ 5.) With respect to use of the PA system, the Association seeks to maintain an atmosphere of neutrality and inclusivity for all in attendance, to recognize and incentivize sponsors and business partners, and to administer the game in an orderly way. (*Id.* ¶ 6) Given its limited staff and resources, the Association also has an overarching goal of minimizing administrative and logistical burdens. (*Id.* ¶¶ 5–6.)

## B. Following the Supreme Court's decision in *Santa Fe*,[3] the Association consistently prohibits prayer over PA systems.

Roger Dearing, the Association's Executive Director in 2015, was the Superintendent of Indian River County schools in 2000 when the Supreme Court handed down its decision in *Santa Fe*. (Dearing Dep. at 17:23–18:3.) Prayer had previously been ubiquitous at high schools in Indian River County,[4] so *Santa Fe* made a strong impression on Dearing as the county's Superintendent. (*Id.* at 18:4–19:20.) When he later became the FHSAA's Executive Director, Dearing continued to be well aware of *Santa Fe*, which he understood to require the Association to disallow prayer over the PA system at FHSAA events. (*Id.* at 28:10–16.) Despite this policy, questions have arisen about prayer over the PA systems at (1) the 2012 Class 2A football championship final between University Christian and Dade Christian (the "2012 Final"), and (2) Plaintiff's early-round playoff games in 2015.

With respect to the 2012 Final, although no FHSAA employees have direct knowledge of prayer occurring over the PA system, the script for the 2012 Final does reference prayer. (*See, e.g.*, Doc. 103 at 4–5.) With respect to Plaintiff's early-round playoff games in 2015, Plaintiff claims to have conducted prayer over the PA system, but the PA script for those games does not call for prayer (*see* Ex. 12), and

---

[3] *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000). In *Santa Fe*, the Court held that a school district's policy permitting student-initiated and student-led prayer at football games violated the Establishment Clause. *Id.* at 301.

[4] When he taught at Winter Park High School, Dearing himself prayed regularly as sponsor of the local chapter of the Fellowship of Christian Athletes. (Dearing Dep. at 18:25–19:5.) Dearing thus has no personal hostility toward prayer or religion that influenced his decision in 2015. (*Id.*)

no FHSAA employee[5] attended those games or knows whether prayer occurred. (*See, e.g.*, Rohrer Dep. at 170:21–24.)

Other than at these four games, there is no evidence of prayer at any football championship final and no mention of prayer in any PA script for any FHSAA event other than the 2012 Final. (*See generally, e.g.*, Ex. 13.) Corroborating this lack of evidence, Plaintiff's former head of school, Tim Euler, testified that prayer at FHSAA football championship games would be "common knowledge," but he was unaware of any instances other than at the 2012 Final. (Euler Dep. at 54:2–15.)

### C. In 2015, for the first time in its history, Plaintiff asks to pray over a PA system outside of its home stadium.

Plaintiff operates an independent Christian school in Tampa, Florida. (Doc. 8 ¶ 5.) Plaintiff asserts a longstanding belief in the need to pray communally over a PA system before sporting events (*id.* ¶¶ 97, 110) but concedes these beliefs "are not all reduced to writing." (Ex. 14 at 8.) They do not appear in Plaintiff's 2015 coaching manuals. (*See* Ex. 15 at 2.) Plaintiff's cheer coach, for example, had not seen any document expressing a belief in the need to pray over a PA system (Banales Dep. at 27:8–11), and while she understood that she should pray with her cheerleaders before and after each practice and game (*id.* at 32:15–33:4), she had never heard that she should be praying with parents or fans (*id.* 28:22–29:6).

In fact, it turns out Plaintiff routinely played football games without conducting a pregame prayer over a PA system. (*See* Euler Dep. at 28:25–29:2; Minks

---

[5] The referees that officiate games are not FHSAA employees (*see* Ex. 16 § 102.04) and are tasked with enforcing rules of play, not administrative rules of the FHSAA. (Tomyn Dep. at 90:18–91:3.)

Dep. at 27:1–13, 29:2–6.) Even more remarkably, Plaintiff never even *asked* to pray using a PA system at any sporting event outside its home stadium before the 2015 Final. (*See* Euler Dep. at 29:3–23; Minks Dep. at 27:14–21.) When asked whether the resulting inability to pray communally burdened Plaintiff's free exercise of religion or freedom of speech, Plaintiff's head of school, Shawn Minks, testifying as Plaintiff's corporate representative, said it did not. (Minks Dep. at 27:22–28:13.) Both Minks and Plaintiff's head of school in 2015, Tim Euler, said Plaintiff's purported belief in communal pregame prayer over a PA system could be set aside in deference to the traditions of the host. (*Id.* at 27:1–21; Euler Dep. 28:25–29:2.)

Consistent with this longstanding practice of deferring to the host's tradition, when Plaintiff made it to the 2015 Final, it initially made no request to pray over the PA system. (*See* Ex. 17 at 1.) However, Plaintiff's opponent in the 2015 Final, University Christian, asked to do so, and Plaintiff joined in an e-mail the following day. (*Id.*) Adhering to its well-established traditions and understanding of its legal obligations under *Santa Fe*, the Association declined to allow prayer over the PA system at the 2015 Final. (*See* Ex. 18 at 1.) University Christian, having made the initial request, confessed that it did not like the decision but said it understood and respected it. (Ex. 19 at 1–2.) Indeed, in subsequent correspondence, University Christian's pastor and president explained that (much like Plaintiff's previous practice of deferring to the host's tradition), he thought the best course was to "respectfully submit" to the Association's decision. (Ex. 20 at 1.) University Christian's stance "was that [they] were never forbidden to call upon God and

therefore no right had been taken from [them]." (*Id.*) To the contrary, "[i]t was actually suggested by representatives of the FHSAA that [Plaintiff and University Christian] gather as teams and pray prior to the start of the game." (*Id.*) University Christian therefore did not feel it had been deprived of any right. (*Id.*) Plaintiff's own Athletic Director, Chad Goebert, likewise acknowledged that the Association "did not tell us not to pray, and we did pray." (Ex. 21 at 1.) Goebert did not see any difference between the 2015 Final and the other instances in which Plaintiff had not prayed over the PA system "because it was not our facility." (*Id.*)

Notwithstanding the fact that Plaintiff and University Christian eventually did pray on the field before the 2015 Final (*id.*), Euler had taken to social media to "bring knowledge to the fact that two Christian schools were being denied prayer." (Euler Dep. at 38:18–25.) In response to Twitter postings, the First Liberty Institute, a special-interest law firm, contacted Euler and made itself available to provide free legal services for Plaintiff to sue the Association. (Minks Dep. at 89:23–90:20.) Plaintiff sued the Association on September 27, 2016. (Doc. 1.) First Liberty asked University Christian to join the lawsuit, but it declined. (Ex. 20 at 1.)

## II.   Procedural History

### A. Pleadings & Dismissal

Plaintiff asserted claims for violation of the First Amendment, declaratory judgment under the Free Speech and Free Exercise Clauses, declaratory judgment under the Establishment Clause, parallel claims under the Florida Constitution, and violation of the Florida Religious Freedom Restoration Act ("FRFRA"). (*See*

*generally* Doc. 8.) The Association moved to dismiss, and the Court dismissed Plaintiff's claims in their entirety. (*See generally* Doc. 57.)

## B. Appeal

The Eleventh Circuit affirmed in part and reversed in part. The court affirmed dismissal of the FRFRA and Establishment Clause claims but held that Plaintiff had plausibly alleged First Amendment and Free Exercise claims. The Eleventh Circuit's analysis of these claims is set forth in greater detail below.

### 1. Free Speech Claim

To analyze Plaintiff's free speech claim, the Eleventh Circuit first assessed whether the speech at issue was *government* or *private* speech. Finding that the speech was plausibly private, the court then conducted a *forum-based* analysis of the restrictions the Association placed on the speech.

**Type of Speech.** The Eleventh Circuit considered three factors to classify the speech at issue: (1) history, (2) endorsement, and (3) control.

The <u>history</u> factor asks "whether the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the government." (Doc. 73 at 23 (citing *Walker v. Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015)). The Eleventh Circuit found this factor weighed against finding government speech because of Plaintiff's allegations that University Christian "had been allowed to pray over the loudspeaker before a 2012 championship game"—i.e., the 2012 Final—and that Plaintiff prayed before three 2015 early-round playoff games at its home field. (*Id.* at 24.) However, the court noted "significant uncertainty in the facts as pled"

because the court "[did] not know how closely the FHSAA administered or moni-
tored the early-round playoff games hosted by [Plaintiff] at their home field." (*Id.*)
Without this knowledge, the court found that the history factor "plausibly
weigh[ed] in favor" of private speech. (*Id.* at 25.)

On the <u>endorsement</u> factor,  the court found that the logic of its precedents
on banners and monuments applied to the speech at issue here and supported a
finding of government speech. (*Id.* at 26.) The court explained that the speech is
"tied to government spatially . . . because it occurs at a government-organized
event" and that one could "safely assume that . . . the FHSAA . . . would not allow
a public-address system to be used to convey messages [it] didn't want to be asso-
ciated with." (*Id.*) Moreover, the heads of both participating schools referred to the
event as the "*State* Championships," the PA system "was part of a stadium owned
by the government," and the "announcer was a representative of the government"
and required to "'maintain complete neutrality.'" (*Id.* at 26–27 (emphasis added).)

The court also emphasized three important features of Plaintiff's request.
First, "the prayer would have come at the start of the game, around when the Na-
tional Anthem and Pledge of Allegiance are traditionally performed." (*Id.* at 26.)
The court explained that "[t]hese pre-game rituals in particular are *inseparably
associated with ideas of government.*" (*Id.* (emphasis added).) Second, the game
"was held at a neutral location" such that there was no "'host school' in the tradi-
tional sense." (*Id.* at 27.) Third, the court noted that Plaintiff's allegations about
"messages from corporate sponsors [that] lined the perimeter of the field" or "were

displayed on the 'Jumbotron'" were irrelevant "because [Plaintiff] did not ask to pray by means of messages lining of the field or by using the Jumbotron." (*Id.* at 28 n.3.) The court thus found the *time* of the speech during the game, the *host* of the game, the *medium* over which the message was to be transmitted to be critical factors in evaluating whether the message was government speech.[6] (*Id.* at 26–28.)

Finally, on the <u>control</u> factor, the court acknowledged that "complete control is not required but found that this factor "d[id] not point clearly in either direction" because the limited record available did not disclose "whether [the Association] controlled the content of the speech that went out over the loudspeaker," "whether anyone other than the FHSAA announcer spoke over the loudspeaker," or what types of "messages provided by host school management" the Association would allow to be made. (*Id.* at 30–31 (internal editing marks omitted).) Constrained, as it was, to resolve uncertainties in Plaintiff's favor, the court found that the ambiguity of the control factor precluded a conclusive determination that the speech at issue was government speech at the pleading stage. (*Id.* at 31–32.)

**Forum-Based Analysis.** Unable to rule out private speech at the pleading stage, the Eleventh Circuit did a forum-based analysis, asking (1) "what kind of forum" was created, (2) "what type of restriction" was enforced and (3) "whether the restriction was constitutionally permissible." (*Id.* at 33.)

---

[6] The court stated advertisements read by the PA announcer "might be relevant" but found that "an announcer who guides the spectators through [the presentation of colors, the Pledge of Allegiance, the National Anthem, and the introduction of starters], and who maintains neutrality while calling plays would have been closely associated in the minds of spectators with the FHSAA" so that advertisements "would also likely be perceived as government-endorsed." (Doc. 73 at 28.)

The court first agreed that the Association created, at most, a <u>nonpublic forum</u>, observing that "[n]othing in the complaint suggest[ed] that the loudspeaker system was open to 'indiscriminate use' by the student body, the public at large, or any other broad population of speakers" or that any "'minority views' would be heard." (*Id.* at 38.) Finding no basis to infer that the FHSAA intended to open the loudspeaker to a broad range of discourse by private speakers," the court held that Plaintiff "plausibly alleged only a nonpublic forum and no more." (*Id.* at 42.)

The court then concluded that, assuming the Association was regulating private speech, its regulation was <u>content based</u>, not viewpoint based. (*Id.* at 44.) That is, the decision was based on "the nature of the proposed message as a prayer," not that it was Christian rather than Jewish or Muslim prayer.[7] (*Id.* at 47.)

Finally, the court analyzed the Association's actions for <u>reasonableness</u>. (*Id.* at 48.) While acknowledging that this is a "forgiving test" that requires only "some sensible basis" for distinguishing between prohibited and permissible speech, the court found that, "at this preliminary stage of litigation [it] lack[ed] any record evidence to explain the FHSAA's restriction" or the apparently inconsistent enforcement. (*Id.* at 48, 54.) The court explained it could not simply *infer* reasonableness from a vacant record. (*Id.* at 54.) Thus, while the court "d[id] not foreclose that a

---

[7] The court left open the possibility that discovery could show that the Association barred religious viewpoints on topics that were otherwise permitted and "could otherwise have been discussed in a nonreligious way" but reaffirmed that "[n]othing in the complaint . . . suggest[ed] that the state's restriction was imposed on the basis of viewpoint, rather than content." (*Id.* at 47–48 n.8.)

court may later conclude on a fuller record . . . that the restriction was reasonable," it nevertheless allowed Plaintiff's free speech claim to proceed. (*Id.* at 55.)

### 2. Free Exercise Claim

In analyzing the Free Exercise claims, the Eleventh Circuit said Plaintiff had to allege (1) "a belief, not a preference, that is sincerely held and religious in nature, not merely secular," and (2) a law that "impacts [its] ability to either hold that belief or act pursuant to that belief." (*Id.* at 56 (internal quotation marks omitted).)

On the first element, the court explained that that "harder question" was whether "communal pre-game prayer" is "more than a preference" and "rises to the level of a sincerely held belief." (*Id.* at 58.) The court was "reluctant to say on so limited a record that communal prayer was not [for Plaintiff] a sincerely held religious belief" and, consequently, found Plaintiff's allegations sufficient at the pleading stage. (*Id.* at 61.) "Even so," the court predicted "discovery may well shed light" on whether Plaintiff's desire for communal prayer at the 2015 Final truly reflected a belief rather than merely a preference. (*Id.*)

On the second element, the court found that, although "[i]t may well be . . . that a bullhorn or prayer cards would unite the players, coaches, and fans in communal prayer," "it [did] not jump off the page . . . that there was a readily available alternative to accessing the loudspeaker system." (*Id.* at 62.) The court thus held that Plaintiff plausibly alleged burden and allowed the claims to proceed. (*Id.*)

## C. Proceedings on Remand

On remand, the parties have completed discovery exhaustively exploring the open factual issues highlighted in the Eleventh Circuit's Opinion. In light of this discovery, the Association now moves for summary judgment.

## LEGAL STANDARDS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Because Plaintiff has the burden of proof at trial, the Association need not negate Plaintiff's claims but, instead, "simply may show—that is, point out . . . that there is an absence of evidence to support [Plaintiff's] case." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (internal editing marks omitted).

## ARGUMENT

I. **Undisputed evidence shows that the speech at issue is government speech and, regardless, that the Association had "some sensible basis" to deny Plaintiff's request.**

A. **Messages transmitted over the PA system at the 2015 Final were government speech.**

At the close of discovery, the undisputed facts show that each factor discussed by the Eleventh Circuit weighs in favor of finding that messages over the PA system at FHSAA football championship finals are government speech.

### 1. History

As the Eleventh Circuit noted, the history factor asks "whether the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the government." (Doc. 73 at 23 (citing *Walker*, 576 U.S. at 210–11).) Applying this factor, courts have held that monuments, license plates, flags, and guides displayed at rest areas all qualify as government speech in part because governments have traditionally used these mediums to communicate to the public.[8] Importantly, courts have not required that the type of speech at issue be used *exclusively* for government speech. The question is simply whether there is a history of the medium being used for that purpose. *See, e.g.*, *Walker*, 576 U.S. at 210–11; *see also Mech v. Sch. Bd. of Palm Beach Cnty., Fla.*, 806 F.3d 1070, 1075–76 (11th Cir. 2015) ("A medium that has long communicated government messages is more likely to be government speech."); *Higher Soc'y of Ind. v. Tippecanoe Cnty., Ind.*, 858 F.3d 1113, 1117 (7th Cir. 2017) (asking "whether governments have traditionally spoken to the public in the manner at issue"). By contrast, when courts have found that the history factor cuts against finding government speech, it has been because the medium at issue "had *never* been a medium for government speech," *Walker*, 576 U.S. at 218 (emphasis added), or has been "traditionally available for

---

[8] *Summum*, 555 U.S. at 470 ("Governments have long used monuments to speak to the public."); *Walker*, 576 U.S. at 210–11 ("[T]he history of license plates shows that . . . they long have communicated messages from the States."); *Shurtleff v. City of Bos.*, 986 F.3d 78, 88 (1st Cir. 2021) ("[G]overnments have used flags throughout history to communicate messages and ideas."); *Vista-Graphics, Inc. v. Va. Dep't of Transp.*, 682 F. App'x 231, 236 (4th Cir. 2017) ("[T]he Commonwealth historically has used rest areas to disseminate information to visitors and to promote tourism generally.").

private speech." (*Id.*) Thus, vanity plates, trademarks, the names of food trucks participating in a government-sponsored lunch program, adoption, and private events held on courthouse grounds are not government speech—there is simply no history of governments using these methods to communicate to the public.[9]

Applying the same logic here, the history factor strongly points in favor of government speech. It is undisputed that "the type of speech under scrutiny"—i.e., the PA system at FHSAA football championship finals—"has traditionally been used to communicate messages on behalf of the [FHSAA]." (Doc. 73 at 23.) Every PA script for more than a decade's worth of finals, including the 2015 Final, features statements directly from the FHSAA to those in attendance. (*See, e.g.*, Ex. 22 at 1 ("The [FHSAA] promotes good sportsmanship . . . . We request your cooperation . . . . The [FHSAA] reminds you . . . ."); *id.* at 2 ("The [FHSAA] is proud to present . . . .); *id.* at 10 ("The [FHSAA] recognizes its corporate partners, who help make the [FHSAA] football championships possible . . . .").) The PA system at football championship finals is therefore a "medium that has long communicated government messages," and the history factor points in favor of government speech. *Mech*, 806 F.3d at 1075–76.

---

[9] *Mitchell v. Md. Motor Vehicle Admin.*, 148 A.3d 319, 326 (Md. 2016) ("[T]he State has not used vanity plates to communicate any message at all."); *Matal v. Tam*, 137 S. Ct. 1744, 1760 (2017) ("Trademarks have not traditionally been used to convey a Government message."); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 35 (2d Cir. 2018) (finding no "evidence of a well-established history of [the agency] controlling the names of Lunch Program vendors . . . to tailor a government message."); *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 174 (2d Cir. 2020) ("[A]doption has not historically been treated by government as a means for it to communicate with the public . . . ."); *Higher Soc'y*, 858 F.3d at 1117–18 ("[T]he record does not indicate any history of the courthouse grounds being used for government speech, nor is there any history of governments using events conducted by private groups to deliver their own messages.").

At the pleading stage, the Eleventh Circuit previously found that the history factor could plausibly cut against government speech based on inferences arising from Plaintiff's allegations of prayer over the PA system at the 2012 Final and early-round playoff games Plaintiff hosted. (Doc. 73 at 23–25.) However, these inferences are no longer plausible in light of the evidence yielded by discovery for at least two reasons. First, while, at the pleading stage, the allegations of prayer over the PA system at other games may have made it plausible that the PA system was "traditionally available" for prayer, the evidence shows this was not the case for the football championship finals hosted by the FHSAA. *Walker*, 576 U.S. at 219. Indeed, other than the one instance of prayer alleged in the complaint at the 2012 Final—there is no evidence of any other instance of prayer at any of the other football championship finals hosted by the FHSAA over nearly a decade of games.[10] One instance out of 70-plus games does not establish a *tradition* of private use.

Second, even at the pleading stage, the Eleventh Circuit expressed doubt about the significance of the three alleged instances of prayer at Plaintiff's early-round playoff games in 2015 because the court "[did] not know how closely the FHSAA administered or monitored the early-round playoff games hosted by [Plaintiff] at their home field." (Doc. 73 at 24.) Discovery has revealed that the Association does not monitor these games at all, because it lacks the resources to do

---

[10] In fact, there is no evidence of prayer at any of the other hundreds of championship finals in sports other than football.

so. (*See, e.g.*, Doc. 110-8 ¶ 4; Minks Dep. at 29:7–17.) As the Eleventh Circuit suspected, the alleged prayers at these games should be discounted—they are qualitatively different than championship finals and do not reflect how the PA system is traditionally used at finals, which are hosted by the FHSAA at a neutral site.

In sum, there is no genuine dispute that the Association has traditionally used the PA system at football championship finals to speak. Under the Supreme Court's precedents, this is all that is required to find that the history factor supports government speech.[11] *Walker*, 576 U.S. at 210–11; *Summum*, 555 U.S. at 470.

### 2. Endorsement

The Eleventh Circuit found that speech over the PA system at FHSAA championship finals "would be closely identified in the public mind with the government," and discovery has only bolstered this finding. (Doc. 73 at 29 (internal quotation marks omitted).) All of the facts supporting the Eleventh Circuit's initial conclusion—i.e., that the FHSAA organized the event and league, all parties referred to the game as the "State Championships," the Stadium is state owned, the PA announcer is an FHSAA official required to maintain complete neutrality, and the National Anthem and Pledge of Allegiance were performed around the same time the prayer would have occurred—remain undisputed. (Doc. 73 at 26–27.) Plaintiff has searched through scripts for nearly every football championship final over the last decade—more than 70 games—and has not been able to identify any

---

[11] In any event, "a long historical pedigree is not a *prerequisite* for government speech," so the remaining two factors, both of which weigh heavily in favor of government speech, are sufficient on their own. *Mech*, 806 F.3d at 1076.

instance besides the 2012 Final when anyone except the PA announcer had access to the PA system during pregame.

The Eleventh Circuit referenced a distinction between advertisements that are *promotional* and those phrased as *thank yous*. (Doc. 73 at 28 (citing *Mech*, 806 F.3d at 1076–77).) While both types of advertisements were read over the PA system, the Association submits that this distinction is not particularly relevant here. In *Mech*, a "retired porn star" who had since become a math tutor sought to participate in a program offered by the school board whereby sponsors, for "a minimum donation of $250 to $650," could have banners displayed on school fences. 806 F.3d at 1072–73. After parents complained, the school board learned of the tutor's connection to pornography and removed the banners as "inconsistent with the [school board's] educational mission . . . and the community values." *Id.* at 1073. The Eleventh Circuit held that the school board was free to remove the tutor's banner because the banners were government speech. *Id.* at 1079.

Here, Plaintiff is not asking to *pay* to have its speech read over the PA system the way FHSAA sponsors do. To the contrary, Plaintiff is asking for *free*, unfettered access to the PA system to give a message of its own choosing regardless of whether the FHSAA approves of it. Plaintiff's proposed speech is therefore unlike any of the sponsor messages read over the PA system and unlike the paid banner at issue in *Mech*. Thus, even if purely promotional advertisements read throughout a game could be less likely to be perceived as endorsed by the Association, an *unpaid* message given at the beginning of the game by someone who is not an FHSAA sponsor

22

or business partner would clearly be perceived differently. As the Eleventh Circuit recognized, Plaintiff asked to use the PA system at a time traditionally reserved for "rituals . . . inseparably associated with ideas of government." (Doc. 73 at 27.) This context is critical to the endorsement factor—*see, e.g.*, *Shurtleff*, 986 F.3d at 89 (explaining that, even if a Christian flag, by itself, would not be seen as government-endorsed, it would be seen this way when flown in proximity to government flags)—and shows that comparisons to paid advertisements are inapt.

For these reasons, the undisputed evidence confirms the Eleventh Circuit's analysis, and this Court should find that the endorsement factor continues to weigh in favor of government speech.

### 3. Control

Following discovery, the control factor also weighs in favor of government speech. When assessing control, the question is whether the government retains *ultimate authority* over the content of the speech. (*See* Doc. 73 at 30.) The government need not "control every word or aspect of speech" (*id.* at 32) or create it. *Mech*, 806 F.3d at 1078–79. Nor must the government show it has actually rejected or modified proposed speech to establish control, because it may be that "applicants have successfully self-selected" and submitted only acceptable messages. *Shurtleff v. City of Bos.*, 986 F.3d 78, 91–92 (1st Cir. 2021). What matters is whether the government has "'effectively controlled' the messages . . . by exercising 'final approval authority.'" *Summum*, 555 U.S. at 472–73 (quoting *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 560–61 (2005)). By contrast, the control

factor tips the other way if the government "open[s] up" the medium "for . . . whatever [speech] might be offered." *Id.*

Here, there is no evidence that the FHSAA ever opened up the PA system for whatever messages private parties might offer. To the contrary, the Association controlled speech over the PA system by (1) creating scripts for which Association employees approved *every word*[12] (Ex. 10 ¶ 7) and (2) otherwise limiting the PA announcer to narrow categories of speech directly relevant to the events on the field (*see* Doc. 8-1 at 14, § 3.1.8). There is simply no evidence that the Association ever allowed the PA system to be used to make statements that an Association employee had not approved and manually inserted into a script, or that violated the Public-Address Protocol. More to the point, there is no evidence that the Association ever gave up its final authority to approve or reject speech over the PA system or to intervene if the PA system were used for an improper purpose.[13]

At the pleading stage, the Eleventh Circuit was unsure about certain facts relevant to the control factor, such as whether people other than the PA announcer were permitted to make announcements over the PA system or whether the PA announcer would "simply read *any* statement provided by a host school." (Doc. 73

---

[12] Plaintiff has made much of the fact that the Association rarely needed to modify the content of messages suggested by the Association's sponsors. (*See* Doc. 128-1 at 12:5–14.) But a minimum rejection rate is not required to show effective control. *Shurtleff*, 986 F.3d at 91–92. Moreover, sponsor messages were *paid* advertisements, meaning that the Association controlled them at least by requiring payments for the statements to be read. The Eleventh Circuit has recognized that governments frequently exercise control over speech so as to "provid[e] current and putative sponsors an incentive to contribute." *Mech*, 806 F.3d at 1077.

[13] Although the Association has rarely had to exercise its authority to intervene for improper use of the PA system, it has done so when "filler music" with uncensored profanity the Association did not wish to be associated with was played over the PA system during a game. (Ex. 10 ¶ 25.)

at 31–32.) After extensive discovery, the only direct evidence of someone other than the PA announcer speaking over the PA system at a football championship final was the script which provided for prayer at the 2012 Final. (*See* Ex. 23.) With respect to "host-school messages," these were not given at football championship finals because they are not hosted by a school. (Ex. 10 ¶ 19.)

The Eleventh Circuit was also uncertain about halftime and whether schools could play any kind of music or convey any messages they wished over the PA system at this time. (Doc. 73 at 31.) It is now clear that any access provided to schools at halftime was for the limited purpose of introducing a band or playing music for traditional halftime performances. (*See, e.g*., Polansky Dep. at 131:15–133:14.) Plaintiff's own cheer coach testified it was understood that any music played at halftime would have to be "G-rated." (*See* Banales Dep. at 24:1–23.) There is no evidence that the PA system was ever used at halftime to convey messages the Association disapproved, and, if this had occurred, the Association would have intervened. (Ex. 10 ¶ 23–24.)

With respect to sponsor messages, the Association had the authority to decide whether to enter into a sponsorship agreement with any entity, and any sponsorship agreement had to be approved by the Association's Executive Director. (Ex. 24 § 10.10.) Whereas Plaintiff wanted free access to the PA system, sponsor messages required payment of a sponsorship fee as a condition to having an announcement read over the PA system. (*Id*. § 4.1.) In this way, the Association used its control over the PA system to incentivize financial support. *Mech*, 806 F.3d at

1077. The Association also retained final authority to approve local sponsors of its partners in hosting football championship finals. (*See, e.g.*, Ex. 10-B § 14.b(1)–(5).)

The bottom line is that, when a message goes out over the PA system at an FHSAA football championship final, it is because the FHSAA approved it—either word-for-word by putting it into the scripts, or by controlling the purpose for which the PA system could be used and retaining the right to stop any use if the Association disapproved of it. *See Shurtleff*, 986 F.3d at 91. This "final approval authority . . . suffices to show effective control." *Id.*; *see also Summum*, 555 U.S. at 473.

### Conclusion on Government Speech

The government-speech doctrine boils down to "whether a government entity is speaking on its own behalf or is providing a forum for private speech." *Summum*, 555 U.S. at 470. Under this rubric, messages over the PA system at FHSAA football championship finals, particularly during pregame, easily qualify as government speech. The Association has long used this medium to speak to the public, and, as the Eleventh Circuit recognized, messages in this context would likely be perceived as FHSAA approved. There is no evidence the Association ever "open[ed] up" the PA system for "whatever [speech] might be offered" or ceded its ultimate approval authority. *Summum*, 555 U.S. at 472–73. This is especially true of unpaid messages at the beginning of the game, which is what Plaintiff requested. For these reasons, the Association was well within its rights to require Plaintiff to conduct its prayer "on its own time and dime," *Agency of Int'l Dev. v. Alliance for Open Soc. Int'l, Inc.*, 570 U.S. 205, 218 (2013), and Plaintiff's First-Amendment claim fails.

### B. The Association's decisions regarding use of the PA system were reasonable, not arbitrary and haphazard.

Even if the PA system were considered a forum for private speech, it would be a <u>nonpublic forum</u> because there is no evidence it was offered for "indiscriminate use" by any "broad population of speakers." (Doc. 73 at 38.) As the Eleventh Circuit held, Plaintiff has not even plausibly alleged anything more. The Eleventh Circuit similarly explained that the Association's regulation of the PA system was <u>content based</u>, not viewpoint based. (*Id.* at 44.) It remains undisputed that the Association rejected the request because it was for *prayer*, not because it was a certain *type* of prayer or expressed any particular viewpoint.[14] (*Id.* at 47.)

---

[14] Plaintiff may argue that the Association allowed some "solemnizing" messages and not others, but reliance on solemnization jurisprudence would be misplaced. Analysis of solemnization has arisen in the context of finding a secular purpose for ceremonial prayer—if the purpose is to *solemnize* rather than to *advance religion*, ceremonial prayer may be permitted. *See, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 693 (1984) (O'Connor, J., concurring); *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2088 (2019). Football games are not solemn occasions, nor did the Association ever solicit messages for the purpose of conveying gravity or seriousness at the beginning of football championship finals. Rather, as the Eleventh Circuit recognized, pregame festivities were focused chiefly on traditional patriotic exercises "inseparably associated with ideas of government." (Doc. 73 at 27.) These rituals serve the legitimate government purpose of instilling patriotism and national pride. (*See* Tomyn Dep. at 193:1–18.) A prayer would plainly be inconsistent with these purposes. *See, e.g.*, *Myers v. Loudon Cnty. Pub. Schs.*, 418 F.3d 395, 407 (4th Cir. 2005) ("[T]he Pledge, unlike prayer, is not a religious exercise or activity, but a patriotic one.").

Plaintiff may also attempt to conjure viewpoint discrimination by pointing to the Association's use of the PA system for moments of silence or to speak out in support of other policies the Association favors. (*See* Doc. 113 at 3–4 & n.1) But the Association is perfectly free to discourage the use of steroids (Doc. 113-7 at 17), encourage good citizenship (Doc. 113-5 at 3), or mourn horrific acts of violence at member schools (Doc. 113-4 at 5), and to use the PA system to announce these views to the public. Doing so does not open the PA system to private persons to give their views on these subjects or to restate the Association's views in a religious framework. *See Matal*, 137 S. Ct. at 1758 (explaining that, during the Second World War, the government was free to speak out in support of the war effort without balancing its speech with anti-war messages). This is not a case where the Association invited private speakers to speak on certain subjects but prohibited them from doing so using religious language. The Association spoke for itself on the subjects it deemed worth addressing, which is entirely consistent with the First Amendment. *Id.*

Given these findings, all that remains is to determine whether the Association acted reasonably in declining to allow prayer over the PA system before the 2015 Final. (*Id.* at 48.) All that is required is for the Association to show "some sensible basis" for distinguishing between prohibited and permissible speech. (*Id.*) The restriction need not be narrowly tailored. (*Id.*)

On a vacant record, the Eleventh Circuit could not determine the reason prayer allegedly occurred at Plaintiff's home playoff games and the 2012 Final but was not allowed at the 2015 Final. (*Id.* at 50.) With the benefit of discovery there are straightforward answers to these questions. First, with respect to the alleged prayers at Plaintiff's early-round playoff games, it was previously unclear how closely the Association monitored these games. (Doc. 73 at 24.) It is now known that the Association does not have the means to monitor these games at all. (*See, e.g.*, Doc. 110-8 ¶ 4; Minks Dep. at 29:7–17.) Therefore, the "sensible basis" for why prayers were allegedly permitted at Plaintiff's early-round playoff games is that the Association simply lacked the resources to prevent it. (*Id.*)  Further, there is no evidence that  the FHSAA was even aware it occurred.

With respect to the 2012 Final, the simple explanation is that prayer being included in the PA script was a mistake.[15] While any lapse in enforcement of the

---

[15] The record is unclear on how a reference to prayer was added to the PA script for the 2012 Final. Roger Dearing, who was the Association's Executive Director at the time and had an established position on prayer dating back to his time as Superintendent of Indian River County schools in 2000 (*see* Dearing Dep. at 17:23–1920, 28:10–16), was adamant that he did not approve its addition (*id.* at 65:14–21, 67:17–19, 68:3–7). However, Seth Polansky, a former FHSAA employee, testified that, "[t]o [his] recollection," he "believe[d]" Dr. Dearing told him to add the reference to prayer. (Polansky Dep. at 44:9–45:3, 45:20–22.) Although these facts are disputed, it remains undisputed that (1) the Association had final control over whether prayer was added to the script

Association's policies is unfortunate, "perfect clarity and precise guidance have never been required." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). The reasonableness inquiry is inherently flexible, *id.*, and, when analyzing government action for arbitrariness, courts have never required flawless consistency. *See, e.g.*, *S. Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 103 (1st Cir. 2002) ("Although patently inconsistent applications of agency standards to similar situations are by definition arbitrary, the law does not demand perfect consistency . . . ."). Otherwise, any erroneous decision would doom the government to repeat its mistake *ad infinitum*. Forcing the Association to allow prayer on request simply because it mistakenly did so *once* in 70-plus games would transform what is intended to be a "forgiving test" into a punitive one that would override every regulation that has not been perfectly applied. *Minn. Voters Alliance v. Manksy*, 138 S. Ct. 1876, 1888 (2018); *see also United States v. S. Union Co.*, 643 F. Supp. 2d 201, 214 (D.R.I. 2009) (refusing to find arbitrariness based on "only one agency decision" that was "at odds with the other decisions," even through the reasoning of the decisions was "less than perfectly seamless"). The Court should decline to do so.

The Eleventh Circuit noted that speech restrictions are reasonable when "wholly consistent with the government's legitimate interest in preserving the property for the use to which it is lawfully dedicated." (Doc. 73 at 51 (editing marks omitted).) While this degree of consistency is not *required*, *see Minn. Voters*, 138

---

for the 2012 Final, and (2) there is no other instance in which the Association allowed prayer to be added to a script the decade of football championship finals leading up to this action.

S. Ct. at 1888 ("[T]here is no requirement of narrow tailoring . . . ."), it is satisfied here. Allowing new segments and unscripted elements to be added to pregame for individual games would increase the Association's administrative and logistical burdens and diminish its ability to establish and adhere to its own traditions. (Ex. 10 ¶ 5.) In addition, prayer is associated with solemnity and a distinctly religious exercise, *see Am. Legion*, 139 S. Ct. at 2088; *Myers*, 418 F.3d at 407, so conducting a prayer would detract from the Association's efforts to build excitement for the impending kickoff and to instill patriotism and national pride. (Ex. 10 ¶¶ 5–6.) Prayer also cuts against the neutral, inclusive atmosphere the Association uses the PA system to create because, unlike activities founded in a national identity shared by most all in attendance, prayer is an activity only some attendees would practice or participate in. (*Id.*) And, as Dr. Dearing first noted (Ex. 18 at 1), allowing prayer over the PA system would open the Association up to legal entanglements and potentially violate the Establishment Clause under *Santa Fe*, 530 U.S. 290.

It was therefore entirely consistent with the Association's purposes in organizing pregame activities and controlling the PA system for the Association to deny a request for an *ad hoc* departure from its pregame rituals for a solemn, religious activity observed by only some of those in attendance and unrelated to the Association's other purposes. The Association's near-perfect record of prohibiting prayer over the PA system at football championship finals and its legitimate purposes in regulating pregame activities at these events are sufficient to rebut any inference of arbitrariness. For this additional reason, Plaintiff's free speech claim fails.

## II.   Plaintiff's free exercise claims fail because the undisputed evidence shows it lacked a sincerely held religious belief.

For its free exercise claim, Plaintiff must show a "sincerely held belief" that is more than a preference. (Doc. 73 at 56.) "While courts may not inquire into the *verity* of a religious belief, it is entirely appropriate, indeed necessary, for a court to engage in analysis of . . . *sincerity*." *Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 136–37 (3d Cir. 1986) (emphasis added and internal quotation marks omitted); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014) (asking whether the asserted belief "reflects 'an honest conviction'"); *Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 833 (1989) ("States are clearly entitled to assure themselves that there is an ample predicate for invoking the Free Exercise Clause."); *United States v. Seeger*, 380 U.S. 163, 185 (1965) ("[T]he threshold question of sincerity . . . must be resolved in every case."). Indeed, in this very case, the Eleventh Circuit suspected discovery would "shed light on . . . whether communal pregame prayer is indeed a protected 'belief' rather than a mere 'preference.'" (*Id.*)

The Eleventh Circuit's suspicion was correct. The evidence yielded through discovery could not be clearer that Plaintiff had no sincerely held belief in the importance of communal pregame prayer at the time of the 2015 Final. To the contrary, before belatedly joining University Christian's request, Plaintiff had *never once* asked to pray over a PA system away from its home stadium. (*See, e.g.*, Euler Dep. at 29:3–23; Minks Dep. at 27:14–21.) Plaintiff's baseless allegation that it engaged in pregame communal prayer before every sporting event whenever possible is simply false. (Doc. 8 ¶¶ 16–17.) Plaintiff now admits it routinely played football

games without making any effort to use a PA system for communal pregame prayer. (*See* Euler Dep. at 28:25–29:23; Minks Dep. at 27:1–21, 29:2–6.) In other sports, Plaintiff's coaches were unaware they were even supposed to be making any effort to pray with parents or fans rather than just the participants. (Banales Dep. at 27:8–11.) And Plaintiff's own Athletic Director, who oversaw all of Plaintiff's athletics in 2015, was also unaware of any belief in the need to pray over the PA system before football games and did not see any difference between the 2015 Final and other games when "we did not pray . . . over the loud speaker . . . because it was not our facility." (Ex. 21 at 1.) Far from having a "longstanding practice and tradition" of praying communally before athletic events whenever possible (Doc. 73 at 61), the evidence thus shows that key members of Plaintiff's athletics department did not even know this was something Plaintiff believed in. Most remarkable of all is the admission of Plaintiff's head of school, testifying on Plaintiff's behalf, that not being able to pray over a PA system outside of its home stadium in deference to the host's tradition *did not* burden Plaintiff's right to exercise religious freedom. (Minks Dep. at 27:22–28:13.)

This startling admission makes more sense when viewed in light of the testimony of Plaintiff's head of school in 2015, Tim Euler, on what actually motivated the request to pray over the PA system at the 2015 Final. Euler spoke not of a religious belief in pregame communal prayer, but of a desire to "celebrate the large moment of making it to a State Championship Game." (Euler Dep. at 104:24–105:5.) This celebratory rationale is not what Plaintiff alleged (*see* Doc. 8 ¶¶ 16–

17), and it amounts to a "personal preference," not a religious conviction.[16] *See, e.g.*, *Brown v. Pena*, 441 F. Supp. 1382, 1384 (S.D. Fla. 1977) ("The Supreme Court has characterized a religious belief or practice entitled to constitutional protection as not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living.").

Sincerity does not require perfect observance, but surely a plaintiff must at least be aware of the belief to sincerely believe in it. Moreover, "an adherent's belief [is not] sincere if he acts in a manner inconsistent with that belief." *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 482 (2d Cir. 1985) (internal quotation marks omitted); *see also Gardner v. Riska*, 444 F. App'x 353, 355 (11th Cir. 2011) (finding a professed belief in a kosher diet insincere *as a matter of law* because the plaintiff routinely ate non-kosher items). Here, given Plaintiff's lack of written materials discussing the importance of pregame communal prayer,[17] its allegation of a "longstanding practice and tradition" was critical. (Doc. 73 at 61.) As it turns out, that allegation was false, and, without it, Plaintiffs' free exercise claim fails.

---

[16] Plaintiff's decision to bring this action came after the First Liberty Institute, a special-interest law firm, contacted Plaintiff to make itself available to provide free legal services. (*See* Minks Dep. at 90:14–20.) First Liberty appears to fundraise in part through lawsuits like these. *See* firstliberty.org/cases-status/active/ (last visited April 9, 2021) (entry of November 14, 2019, referencing "Cambridge Christian School" and stating "Government Refuses to Allow Christian Students to Pray Before Championship Football Game"); *see also* firstliberty.org/cases/cambridge (last visited April 9, 2021) (soliciting donations).

[17] *See Brown v. Dade Christian Schs., Inc.*, 556 F.2d 310, 312 (5th Cir. 1977) ("[T]he absence of references to [a purported belief] in written literature stating the church's beliefs . . . is strong evidence that [the purported belief] is not the exercise of religion.").

## CONCLUSION

For the foregoing reasons, the Association asks the Court enter summary judgment on all of Plaintiff's claims.

Dated: April 9, 2021

HOLLAND & KNIGHT LLP

*/s/Judith M. Mercier*
Judith M. Mercier (Fla. Bar No. 32727)
judy.mercier@hklaw.com
Daniel Mahfood (Fla. Bar No. 94879)
daniel.mahfood@hklaw.com
200 South Orange Avenue, Suite 2600
Orlando, Florida  32801
Telephone:  (407) 425-8500
Facsimile:   (407) 244-5288

*-and-*

CLAYTON-JOHNSON, P.A.

Leonard E. Ireland, Jr.
(Fla. Bar No. 104630)
Lireland@Clayton-Johnson.com
Tbrehm@Clayton-Johnson.com
18 Northwest 33rd Court
Gainesville, Florida  32607
Telephone:  (352) 376-4694
Facsimile:   (352) 371-7366

*Counsel for Defendant, Florida High
School Athletic Association, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on April 9, 2021, I electronically filed the foregoing using the Court's CM/ECF system, which will cause a copy to be served on counsel of record.

*/s/Judith M. Mercier*
Attorney

34

## INDEX OF EXHIBITS

Exhibit 1     Excerpts of Deposition of George Tomyn (October 20, 2020)

Exhibit 2     Excerpts of Deposition of Jamie Rohrer (October 21, 2020)

Exhibit 3     Excerpts of Deposition of Roger Dearing (November 5, 2020)

Exhibit 4     Excerpts of Deposition of Shanell Young (November 9, 2020)

Exhibit 5     Excerpts of Deposition of Timothy L. Euler, II (November 13, 2020)

Exhibit 6     Excerpts of Deposition of Dr. Marianne Banales (November 19, 2020)

Exhibit 7     Excerpts of Deposition of Seth Polansky (December 1, 2020)

Exhibit 8     Excerpts of Deposition of Corey Sobers (December 2, 2020)

Exhibit 9     Excerpts of Deposition of Shawn Minks (December 3, 2020)

Exhibit 10     Second Supplemental Declaration of Jamie Rohrer (with Exhibits A–B)

Exhibit 11     E-mails reflecting control over sponsor speech (Composite)

Exhibit 12     2015 FHSAA Football Championships Regional Tournament Script

Exhibit 13     FHSAA Football Championship Final Scripts (Composite)

Exhibit 14     Cambridge Christian's Responses to FHSAA's First Set of Interrogatories

Exhibit 15     Cambridge Christian School's Coaches Athletic Manual

Exhibit 16     FHSAA's Officials Guidebook

Exhibit 17     E-mail from Tim Euler to Roger Dearing dated December 2, 2015

Exhibit 18     E-mail from Roger Dearing to Tim Euler, Heath Nivens (December 2, 2015)

Exhibit 19     E-mail from Roger Dearing to Heath Nivens, *et al.* (December 7, 2015)

Exhibit 20     E-mail from Frank Ciresi to Justin Harrison (January 28, 2016)

Exhibit 21     E-mail from Chad Goebert to Tim Euler (December 14, 2015)

Exhibit 22     2015 Class 2A Football Championship Script

Exhibit 23     2012 Class 2A Football Championship Script

Exhibit 24     Sponsorship Agreement between FHSAA and Champion (January 1, 2014)