**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| Cambridge Christian School, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Florida High School Athletic Association, Inc.,<br><br>Defendant. | Civ. No. 8:16-cv-02753-CEH-AAS |

**PLAINTIFF CAMBRIDGE CHRISTIAN SCHOOL, INC.'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1
STATEMENT OF MATERIAL FACTS ..... 2
I. CCS's Belief in and Practice of Communal Prayer ..... 2
II. FHSAA Comprehensively Regulates High School Athletics ..... 3
III. The 2012 FHSAA Class 2A Championship Game ..... 7
IV. FHSAA Routinely Permitted and Broadcast Prayers and Religious Messages at Its Events and Over Its Platforms ..... 8
V. Prayers Over the PA System at CCS Games in 2015 ..... 11
VI. FHSAA's Denial of CCS's Request to Pray ..... 12
VII. Private Speech at FHSAA Championship Series Contests ..... 14
A. Private Speech over the PA System ..... 14
B. School Band and Cheerleader Speech Over the PA System ..... 18
C. FHSAA-Mandated/Organized On-field Team Media Interviews ..... 20
D. Sponsor Speech through Signs, Videos, and other Promotions ..... 20
E. Fan Signs and Banners ..... 21
F. Speech with Which FHSAA Did Not Intend to Associate ..... 22
VIII. FHSAA Transmitted Solemnizing Messages over the PA System ..... 23
ARGUMENT ..... 26
I. FHSAA's Prayer Ban Violates CCS's Free Speech Rights ..... 26
A. FHSAA Engaged in Illegal Viewpoint Discrimination. ..... 26
1. *The Sole Reason FHSAA Gave for Denying CCS's Request Was the Religious Viewpoint of the Speech.* ..... 26
2. *FHSAA Routinely Permitted Other Messages about the Same Topics in CCS's Pre-Game Prayers.* ..... 27
a. Secular/Religious Discrimination ..... 27
b. Denominational Discrimination ..... 29
B. FHSAA's Prayer Ban Was an Arbitrary, Unreasonable, and Inconsistent Regulation of Speech. ..... 29
C. The PA System Is Not a Forum only for Government Speech. ..... 32
1. *The History Factor Is in CCS's favor.* ..... 32

2. *The Endorsement Factor Is in CCS's Favor.* ..... 33

3. *The Control Factor Is in CCS's Favor.* ..... 35

II. The Prayer Ban Violates CCS's Free Exercise of Religion. ..... 36

A. FHSAA's Prayer Ban Substantially Burdened CCS's Exercise of a Sincerely Held Belief in Communal Prayer. ..... 37

B. FHSAA's Prayer Ban Targeted CCS's Religious Exercise and Fails Strict Scrutiny. ..... 38

CONCLUSION ..... 40

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Adler v. Duval Cty. Sch. Bd.*,
206 F.3d 1070 (11th Cir. 2000) (en banc), *opinion and judgment reinstated*, *Adler v. Duval Cty. Sch. Bd.*, 250 F.3d 1330 (11th Cir. 2001)....29, 35

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
897 F.3d 314 (D.C. Cir. 2018)....30

*Attwood v. Clemons*,
2021 U.S. Dist. LEXIS 49586 (N.D. Fla. March 17, 2021)....39

*Barrett v. Walker Cty. Sch. Dist.*,
872 F.3d 1209 (11th Cir. 2017)....26, 35

*Bd. of Educ. of Westside Cmty. Schs. v. Mergens*,
496 U.S. 226 (1990)....35

*Cambridge Christian Sch., Inc. v. Florida High Sch. Athletic Ass'n, Inc.*,
942 F.3d 1215 (11th Cir. 2019)....*passim*

*Chandler v. Siegelman ("Chandler II")*,
*230 F.3d 1313* (11th Cir. 2000)....35, 40

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)....36, 38, 39, 40

*Good News Club v. Milford Cent. Sch.*,
533 U.S. 98 (2001)....39

*HI Limited P'ship v. Winghouse of Fla., Inc.*,
No. 6:03-cv-00116, ECF No. 249 (M.D. Fla. Dec. 13, 2004)....22

*Holloman ex rel. Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004)....26

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993) .......... 27, 29, 39

*Larson v. Valente*,
456 U.S. 228 (1982) .......... 39

*Lindh v. Warden, Fed. Corr. Inst., Terre Haute, Ind.*,
No. 2:09-CV-00215-JMS, 2013 WL 139699 (S.D. Ind. Jan. 11, 2013) .......... 38

*Marsh v. Chambers*,
463 U.S. 783 (1983) .......... 1

*Minn. Voters All. v. Mansky*,
138 S. Ct. 1876 (2018) .......... 30

*Multimedia Publ'g Co. of S.C., Inc. v. Greenville-Spartanburg Airport Dist.*,
991 F.2d 154 (4th Cir. 1993) .......... 39

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983) .......... 26

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .......... *passim*

*Santa Fe Indep. Sch. Dist. v. Doe*,
530 U.S. 290 (2000) .......... 35

*Santa Fe Independent School District v. Doe*,
520 U.S. 290 (2000) .......... 13, 38

*Searcey v. Harris*,
888 F.2d 1314 (11th Cir. 1989) .......... 31

*Williamson v. Brevard Cty.*,
276 F. Supp. 3d 1260 (M.D. Fla. 2017) .......... 28

## INTRODUCTION

The Supreme Court begins each session with the prayer "God save the United States and this honorable Court." Congress opens with a prayer, as do hundreds of legislative bodies across the country. Even the annual Army-Navy football game opens with a prayer delivered by a chaplain over the stadium's public-address system.[1] Just as "legislative prayer presents no more potential for establishment than the provision of school transportation, beneficial grants for higher education, or tax exemptions for religious organizations," *Marsh v. Chambers*, 463 U.S. 783, 791, (1983), neither does permitting two Christian high schools to pray over a loudspeaker before their state-regulated football championship game. Yet, in 2015, when Cambridge Christian School ("CCS") asked to deliver such a prayer, the Florida High School Athletic Association ("FHSAA") denied the request, claiming it would violate the Establishment Clause (the "Prayer Ban"). This Prayer Ban is as striking as it is arbitrary, because the FHSAA has before and since permitted speech that conveys prayers, other religious messages, and similar secular messages on the same topics. Indeed, FHSAA expressly permitted two Christian teams to lead a pre-game prayer over the very same public address ("PA") system at the 2012 championship game. FHSAA's Prayer Ban violates the free exercise and free speech guarantees of the U.S. and Florida Constitutions.[2] Accordingly, CCS moves for summary judgment on all of its claims.

[1] The prayer before the 2015 game can be viewed here: https://youtu.be/n_DKwy-jRrQ.
[2] CCS's state claims are analyzed similarly to its federal claims. *See Cambridge Christian Sch., Inc. v. Florida High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1228 & n.2 (11th Cir. 2019).

## STATEMENT OF MATERIAL FACTS[3]

### I. CCS'S BELIEF IN AND PRACTICE OF COMMUNAL PRAYER

1. CCS has been an FHSAA member since 1989 and retains FHSAA membership through accreditation by Christian Schools of Florida. Ex. 6 ¶¶ 3, 5, 7; Ex. 9 ¶¶ 10-12. CCS's mission is: "To glorify God in all that we do; to demonstrate excellence at every level of academic, athletic, and artistic involvement; to develop strength of character; and to serve the local and global community." Ex. 6 ¶ 10.

2. Regular communal prayer is one way CCS implements its mission; the practice of communal prayer is a central belief of CCS's community. Ex. 6 ¶¶ 9, 10; Ex. 3 ¶¶ 7, 8, 9; Ex. 4 ¶¶ 7, 8; Minks Tr. 84:15-18; Ex. 5 ¶¶ 7, 8, 9; Ex. 7 ¶ 6.

3. CCS's Athletic Department's

> chief end is to glorify Christ in every aspect of our athletic endeavors while using the platform of athletics to: Teach the Principles of Winning; Exemplify Christian Morals and Values in our Community; Achieve Maximum Physical, Moral and Spiritual Character Development; and Mentor Young Men and Women to Deeper Walk with Jesus.

The CCS 2015-16 Student-Athlete Handbook called on spectators to "conduct themselves in a Christ-like manner—remembering that they are representing Cambridge Christian School at all times." Ex. 25 at CCS018063, -65.

4. CCS's football and cheerleading teams pray at every practice and game. Ex. 3 ¶ 7; Banales Tr. 32:21-33:4; Ex. 6 ¶ 30 Ex. 6-A; Ex. 26 at CCS018010

---

[3] Three Notices of Filing (NOF) accompany this Motion. The first NOF contains an appendix of all PA scripts that FHSAA produced in discovery, and is consecutively paginated. PA scripts are cited herein as "SA-#" to refer to the appropriate page in the appendix. The second NOF contains deposition transcripts, and citations are as follows: "<Last Name> Tr. <page>:<lines>." The two sessions of the FHSAA corporate deposition, which had two witnesses each are referred to as "FHSAA I (Tomyn)," "FHSAA I (Rohrer)," "FHSAA II (Tomyn)," and "FHSAA II (Rohrer)." The third NOF contains all other exhibits, cited herein as "Ex. #."

(instructing CCS coaches to pray before and after practices and games).

5. Since CCS began playing football in 2003, it has opened every home and playoff game with a prayer transmitted over the PA system. CCS also engages in pre-game communal prayer over the PA system at away games against other Christian schools and before other sporting events.[4]

6. CCS engages in pre-game prayer, among other reasons, to: solemnize and commemorate the occasion; recognize and thank God for the opportunity to participate; request God's protection for players; recognize and thank God for certain individuals' contributions to the CCS community; and request that God help participants and fans display good sportsmanship and attitudes towards each other and officials. While expressing a desire that the players would do their best, the prayer also reminds players that they were competing not primarily to win but to glorify God. Ex. 6 ¶¶ 12, 15, 19; Ex. 3 ¶¶ 8, 9; Ex. 7 ¶¶ 26, 27, 28, 29; Ex. 27.

7. In large venues, like stadiums, PA systems permit everyone in the CCS community in attendance to hear and participate in the prayer.[5]

## II. FHSAA COMPREHENSIVELY REGULATES HIGH SCHOOL ATHLETICS

8. FHSAA has Bylaws, Administrative Policies, and Administrative Procedures that govern its member schools' athletic programs and FHSAA

[4] Ex. 6 ¶¶ 17, 25; Minks Tr. 26:23-25, 117:7-16, 118:4-9, 131:11-15; Ex. 7 ¶¶ 11, 13, 16; Ex. 4 ¶¶ 7, 10, 12, 14, 15; Ex. 3 ¶¶ 7, 9, 10, 12; Ex. 5 ¶¶ 11, 13, 15; Ex. 2 ¶ 7.

[5] Ex. 6 ¶¶ 22, 29; Ex. 4 ¶¶ 13, 16, 17, 18; Ex. 3 ¶ 16; Ex. 5 ¶¶ 14, 17, 18; Ex. 7 ¶¶ 30, 32; Ex. 1 ¶ 12; FHSAA I (Tomyn) Tr. 109:20-22, 110: 7-14, 192:22-25; Sobers Tr. 194:10-18; Young Tr. 111:20-23.

contests.[6]

9. FHSAA's Football Finals Participant Manual governs FHSAA football state championship games. Ex. 13; Ex. 17 at FHSAA-023301; FHSAA I (Tomyn) Tr. 120:17-21.

10. FHSAA has no written policy prohibiting prayer over any PA system at any FHSAA event. FHSAA I (Tomyn) Tr. 138:14-21; Doc. 25-1 ¶ 18.

11. FHSAA comprehensively regulates the football regular season.[7]

12. For regular season games, the home school provides the PA announcer. Ex. 7 ¶ 7; FHSAA I (Tomyn) Tr. 175:13-15.

13. FHSAA designates the PA announcer, who is not an FHSAA employee or contractor, as a "bench official" who must "maintain complete neutrality at all times" and could "not be a 'cheerleader' for any team." Ex. 12 § 2.4.1; Dearing Tr. 53:4-6; Ex. 7 ¶ 10.

14. For regular season games, FHSAA prepares and provides to member schools a "Public Address - Pregame Sportsmanship Announcement" that the PA announcer is required to read during games. Ex. 28; Ex. Dearing Tr. 49:25-50:6; Ex. 7 ¶ 18 Ex. 7-A.

15. For the purpose of determining a state champion, FHSAA conducts a "Florida High School State Championship Series." Ex. 10 § 8.7.1. For Class 2A

---

[6] Ex. 10 §§ 2.5, 2.6, 3.5.1, 3.5.2; Exs. 11, 12, 14, 15, 16; FHSAA I (Tomyn) Tr. 34:3-35:11, 37:23-38:14, 39:1-10, 63:13-22, 64:3-4, 64:25-65:2, 70:3-6 75:17-77:5, 89:24-25, 92:13-23; Beasley Tr. 182:3-184:9; Ex. 9 ¶¶ 66-71, 92-94.
[7] *See ,e.g.*, Dearing Tr. 49:2-4; Ex. 10 §§ 2.3, 3.5.4, 7.1.1, 7.2, 7.2.7, 8.3, 8.9; Ex. 11 §§ 4.1.2, 4.1.3, 6.1.2, 6.1.1.2.1, 18.1, 18.2, 20.1, 27, 29.1, 30.1; Ex. 12 § 2.3.1, 4.7.1.

Football, the "Series" consists of four games: Regional Semifinal, Regional Final, State Semifinal (collectively, "playoffs"), and State Championship. Ex. 12 § 3.2.1.2.1; Beasley Tr. 20:10-24.

16. FHSAA comprehensively "regulated and promoted" its 2015 football playoff games. Dearing Tr. 49:5-7. Playoff games were subject to the general policies for football and additional policies.[8]

17. FHSAA required that playoff games "maintain[]" "an atmosphere of neutrality" because "[s]uch events are not 'home contests' for the host schools," and prohibited playoff games from having "[s]pecial festivities held as part of, or in conjunction with, regular season home contests." Ex. 11 § 10.8.1.

18. FHSAA required playoff game programs display "both the appropriate FHSAA sport logo and sportsmanship logo." Ex. 12 § 3.1.7.

19. For football playoff games, FHSAA required that the venue have a PA system, Ex. 11 § 14.4.2.5, and designated the PA announcer as a "bench official" who must "maintain complete neutrality at all times" and could "not be a 'cheerleader' for any team." Ex. 12 § 3.1.8. The PA announcer for playoff games was not an FHSAA employee or contractor and was not selected by FHSAA. Dearing Tr. 53:7-9; FHSAA (Tomyn) Tr. 175:13-18; Sobers Tr. 134:7-10; Ex. 7 ¶ 21.

20. FHSAA policy required PA announcers at playoff games to "follow the FHSAA script for promotional announcements, … player introductions and awards

[8] FHSAA I (Rohrer) Tr. 84:17-85:3; Ex. 12 §§ 3.1.3, 3.1.4, 3.1.6, 3.6.2, 3.8, 3.10, 3.11.1.1, 4.7.2.4.1, 4.7.2.4.2, 4.7.2.5.3 4.7.2.5.4(b)-(c); Ex. 11 §§ 9.10.1, 9.11.1, 14.2, 14.4.2, 15.1; Ex. 29 at 2-3; FHSAA I (Tomyn) Tr. 104:3-9, 106:11-16, 108:18-19, 109:2-5, 122:1-7, 167:1-168:3; Beasley Tr. 44:12-17.

ceremonies," and had a policy that "other announcements are limited to" a specific list, which did not include prayers. Ex. 12 § 3.1.8; FHSAA I (Tomyn) Tr. 176:1-3, 201:18-23.

21.  FHSAA created the scripts to be followed by the PA announcer for every playoff game for football and other sports. *See* SA-i-xiii (summarizing scripts produced in discovery); FHSAA I (Tomyn) Tr. 109:14-19, 175:23-176:3; FHSAA I (Rohrer) Tr. 83:1-3; Beasley Tr. 23:2-7; Sobers Tr. 29:3-4, 133:6-14, 134:4-6. FHSAA forwarded the scripts to playoff teams so that they would be used at the games. Ex. 29 at CCS000557, -60; Beasley Tr. 40:15-16, 42:21-43:2.

22. FHSAA playoff scripts contained messages from FHSAA's corporate sponsors. For example, the 2015 football script contained an ad for Champion, Ex. 7 ¶ 22 Ex. 7-B, and this announcement was "read on behalf of Champion" and was a message "from Champion." Sobers Tr. 135:21-22, 135:25-136:5.

23. Championship games are subject to the same FHSAA regulations as playoff games. Ex. 10 § 8.7.1; Ex. 12 §§ 3.1-3.11; Ex. 11 §§ 3.1, 3.3, 9.7-9.11, 10; FHSAA I (Rohrer) Tr. 84:17-85:3. Teams participating in championship games also receive a Participant Manual that governs the game. Ex. 17; Ex. 13.

24. All FHSAA football championship games from 2007 to 2018 occurred at the Citrus Bowl (now Camping World Stadium), a stadium with a seating capacity exceeding 50,000 in Orlando, Florida. The Citrus Bowl is publicly owned. Lastik Tr. 25:6-9; 28:13-15; Ex. 30; FHSAA I (Tomyn) Tr. 133:21-25; Ex. 9 ¶¶ 36-39.

25. Central Florida Sports Commission ("CFSC") is a "community partner"

of the Citrus Bowl that contracts with the Citrus Bowl for particular events. Lastik Tr. 27:12-21, 28:1-8. FHSAA and CFSC entered into an agreement under which CFSC hosted FHSAA football championships at the Citrus Bowl. Exs. 31, 32.

26. CFSC hired the PA announcer for the FHSAA championship games at the Citrus Bowl. Ex. 30 at -023992; Ex. 31 at FHSAA-024181; Lastik Tr. 95:4-8.

## III. THE 2012 FHSAA CLASS 2A CHAMPIONSHIP GAME

27. University Christian School ("UCS") played against Dade Christian School in the 2012 FHSAA Class 2A Football Championship Game, which was held at the Citrus Bowl. SA-0003.

28. During a conference call prior to the 2012 Class 2A Championship Game, UCS asked FHSAA's permission to lead a pre-game prayer over the Citrus Bowl PA system. Ex. 1 ¶ 5; Sobers Tr. 93:7-18, 94:4-6; Polansky Tr. 44:6-22; Young Tr. 55:22-56:18, 63:8-10; Ex. 32.

29. FHSAA approved inclusion of the prayer in the PA script. Polansky Tr. 44:9-24, 45:7-22, 46:20-24, 47:16-18, 48:1-10, 51:1-11; Young Tr. 71:11-73:13; Ex. 33; Lastik Tr. 117:5-9, 117:14-18.

30. Subsequently, CFSC created "Special Notes for 1st Weekend of FHSAA Football." The purpose of the document was to assist CFSC staff working the event. Lastik Tr. 112:1-3, 112:25-113:3. In that document, CFSC wrote:

> Dade Christian's princip[al] has been permitted to state a prayer over the PA system prior to the first game since it is two Christian schools participating.... Due to two Christian schools playing during Friday's 1pm game, the FHSAA has approved a prayer to be read over the PA system by Dade Christian[']s princip[al] Stan Stone. He will have a special credential and be escorted to the PA room prior to the prayer. This will happen

> pregame prior to the Orange Bowl awards and will be written in the script. Ex. 64 at GOSC 000001.

31. The script for the game included a prompt for the prayer: "University Christian and Dade Christian will lead a prayer over the PA system at this time. (This should take one minute or less.)" SA-0001; Ex. 8 ¶ 3. The script called for the prayer to occur 30 minutes prior to kickoff, a few minutes after the PA announcer read an FHSAA message about sportsmanship, Young Tr. 81:3-7, and just before he announced the Junior Orange Bowl awards. SA-0001-02.

32. Dade Christian delivered a pre-game prayer over the PA system at the 2012 FHSAA Class 2A game. Ex. 1 ¶ 9; FHSAA II (Tomyn) Tr. 39:5-9; Polansky Tr. 9:6-21, 63:19-64:3, 71:12-72:1, 72:17-75:3; Ex. 34 at FHSAA-161; Young Tr. 79:20-80:1, 89:8-13; FHSAA I (Rohrer) Tr. 21:11-14; Ex. 64 at 1.

33. The prayer was not a message from FHSAA, and FHSAA received no complaints about it. Young Tr. 81:8-11, 81:23-82:5, 87:2-19, 88:1-17.

## IV. FHSAA ROUTINELY PERMITTED AND BROADCAST PRAYERS AND RELIGIOUS MESSAGES AT ITS EVENTS AND OVER ITS PLATFORMS

34. At the 2012 FHSAA Class 2A Football Championship Game, when the UCS players were announced just prior to the game, they ran through an on-field banner held by UCS cheerleaders. FHSAA II (Rohrer) Tr. 12:17-20. The banner prominently displayed the team's season slogan: "One Victory One HeartBeat One God." The cheerleaders held the banner on the goal line of an end zone emblazoned with the large letters "FHSAA," and the banner was visible to spectators at the game. Exs. 35, 36, 37; FHSAA II (Rohrer) Tr. 11:25-16:15 ; Sobers Tr. 117:3-14,

121:4-122:5; Ex. 1 ¶¶ 7, 8; Ex. 38; Ex. 41. FHSAA did not review or approve, and did not prohibit, this on-field banner display, and it deemed this banner to be "a message from whomever created the banner," which was not FHSAA. FHSAA II (Rohrer) Tr. 14:5-6, 16:16-20, 17:5-12).[9]

35. After the 2015 FHSAA Class 2A Football Championship Game (the subject of this lawsuit), FHSAA's television broadcaster, Bright House, televised a UCS player during an on-field interview (which was organized by FHSAA). The player said: "I can't do it without God giving me the ability to do all these things." Polansky Tr. 143:18-145:11; Sobers Tr. 179:5-180:1; *see infra* ¶ 76.

36. In 2018, at the Class 7A football championship game, participating players and coaches from Lakeland High School[10] gathered near the wall separating the field from the stands and said a prayer, which included the words "Jesus" and "Amen." FHSAA broadcast that prayer live on its Facebook page. Ex. 39; FHSAA I (Rohrer) Tr. 29:15-34:5.

37. FHSAA also told the crowd to visit its official photographer's website to purchase game photos. SA-0012, -0029; Exs. 40, 41. Those websites sell images of religious speech and prayer. Exs. 35, 42.

38. FHSAA maintains publicly viewable social media accounts on Facebook,

---

[9] The 2015 Class 2A championship also featured "run-through" banners. *See* Exs. 36, 37; FHSAA II (Rohrer) 74:3-76:1. FHSAA deemed cheerleader-held signs on the field to be the cheerleaders' speech, but if the same sign was laying against a stadium wall, whose speech it was "would be in the eye of the beholder." FHSAA II (Rohrer) Tr. 73:3-21.
[10] *See* FHSAA I (Rohrer) Tr. 31:14-19;
https://fhsaa.com/documents/2020/9/11//rec_fb.pdf?id=250.

Twitter, Instagram, and Snapchat. Ex. 9 ¶¶ 146-166; Sobers Tr. 92:13-25. FHSAA uses these accounts as a "forum to communicate with [FHSAA] constituents" and to "promote what we do." Sobers Tr. 41:14-25; FHSAA I (Rohrer) Tr. 24:23-25:3. FHSAA considers social-media posts to be messages from FHSAA to its "fan base." Sobers Tr. 42:11-22; Young Tr. 35:12-14. FHSAA has the PA announcer encourage spectators at games to visit these social media accounts. For example, the script text at the 2015 Class 2A championship game read, in part: "The F-H-S-A-A is on Facebook and Twitter! Go to Facebook dot com slash F-H-S-A-A and become a fan and follow on Twitter at F-H-S-A-A." SA-0027.

39. FHSAA has repeatedly posted, on its social-media accounts, prayers and observances of religious holidays, including: (1) an Oct. 17, 2011 Facebook post conveying "thoughts and prayers" to a coach's family and friends; (2) a Dec. 25, 2013 tweet stating "Merry Christmas to all the parents, athletes, coaches, fans, administrators, media and sponsors that make HS athletics in Florida possible!"; (3) a Dec. 25, 2015 tweet: "Merry Christmas and Happy Holidays to all!"; (4) a July 26, 2016 Facebook post asking public to keep student-athlete "in your thoughts and prayers."; (5) a Dec. 20, 2017 tweet stating "Whether you're celebrating the last night of Hanukkah, preparing for Christmas, or getting the #Festivus pole ready, we are wishing everyone a very happy holidays! #FHSAA #HolidayTime."; (6) a Dec. 25, 2017 Facebook post and tweet stating "Wishing all of our student athletes, coaches, officials, and staff a Merry Christmas! We hope you had a great day filled with love, laughter, and family. #FHSAA."; and (7) an Aug. 20, 2020

retweet asking public to "keep [a] family [of someone who passed away] in your thoughts and prayers."[11]

## V. PRAYERS OVER THE PA SYSTEM AT CCS GAMES IN 2015

40. CCS played its home games at Skyway Park in Tampa, a facility owned and operated by Hillsborough County. Ex. 7 ¶ 8; Ex. 4 ¶ 11.

41. As is the case every season, during the 2015 regular season, a CCS representative led a prayer over the PA system before each home game. The CCS representative led these prayers while standing next to an FHSAA game official in the announcer's booth. The prayers were not reviewed, edited, or preapproved by anyone, including the game official in the announcer's booth. FHSAA has never objected to the transmittal of these prayers over the PA system—not prior to 2015, in 2015, or after 2015. Ex. 7 ¶¶ 9, 12, 13, 16, 17; Ex. 2 ¶ 7; Ex. 3 ¶ 10; Ex. 4 ¶ 12; Ex. 5 ¶¶ 13, 16; Ex. 6 ¶¶ 17, 18.

42. During CCS's home football games in 2015, the FHSAA's "Public Address - Pregame Sportsmanship Announcement" script was read over the PA system. Ex. 7 ¶¶ 18 Ex. 7-A, 22 Ex. 7-B; Ex. 28.

43. In the 2015 FHSAA Class 2A Football State Championship Series CCS won three playoff games: (1) against Northside Christian School on November 13, 2015, at Skyway Park; (2) against Admiral Farragut Academy on November 20, 2015, at Jefferson High School; and (3) against First Baptist Academy on

[11] FHSAA I (Rohrer) Tr. 35:1-37:16, 38:4-24, 39:4-41:11, 43:12-44:14, 56:23-57:14; Sobers Tr. 74:8-19, 75:4-13; Exs. 44-51.

November 27, 2015, at Skyway Park. Froelich was the PA announcer for all three of CCS's playoff games, and while standing next to an FHSAA game official in the PA booth, he led a prayer over the PA system at each game. The prayers that Froelich led were unscripted and were not reviewed, edited, or preapproved by anyone, including the game official in the announcer's booth. FHSAA did not object to the transmittal of these prayers over the PA system. Ex. 7 ¶¶ 16, 23; Ex. 3 ¶ 11; Ex. 5 ¶ 17; Ex. 4 ¶ 16; Ex. 6 ¶ 24; Ex. 9 ¶¶ 64, 85, 87, 89.

44. At these playoff games, Froelich received and read the FHSAA PA script. Ex. 7 ¶ 22 Ex. 7-B; Minks Tr. 24:16-19; FHSAA II (Tomyn) Tr. 111:10-12.

## VI. FHSAA'S DENIAL OF CCS'S REQUEST TO PRAY.

45. On December 2, 2015, CCS Head of School Euler, emailed FHSAA's Executive Director Dearing asking FHSAA to "allow two Christian schools to honor their Lord before the game and pray … over the loud speaker" at the 2015 Class 2A championship game. Ex. 18. Euler requested this so that the prayer could be "communal prayer in a stadium that size" and "for families and students to celebrate the time together with a prayer." Euler Tr. 41:15-21, 98:15-16.

46. UCS's head of school wrote to Dearing to offer "full support of having Mr. Euler pray before our competition over the loud speaker" and said the issue was of "utmost importance." Ex. 19.

47. Dearing denied the request, Ex. 20, stating:

> Although both schools are private and religious-affiliated institutions, the federal law addresses two pertinent issues that prevent us from granting your request. First is the fact that the facility is a public facility, predominantly paid for with public tax dollars, makes the facility "off limits"

> under federal guidelines and precedent court cases. Second, is the fact that in Florida Statutes, the FHSAA (host and coordinator of the event) is legally a "State Actor", we cannot legally permit or grant permission for such an activity.

48. Dearing did not consider any alternatives. Dearing Tr. 83:18-87:17.

49. At the Class 2A championship game on December 4, 2015, student-athletes, coaches, and some FHSAA game officials joined at midfield before the game to pray. Ex. 51; Euler Tr. 31:16-22, 32:2-9; Minks Tr. 57:17-58:7; Ex. 1 ¶ 12; Doc. 80 ¶ 50. Because the purpose of a PA system is to enable everyone inside to hear announcements, and because no prayer was delivered over the PA system, CCS community members were unable to hear and join in the team's prayer.[12]

50. FHSAA did not have a policy permitting a megaphone, bullhorn, or other amplification device to be used at a championship football game in 2015, and specifically banned all "artificial or mechanical noisemaking devices." FHSAA (Tomyn) Tr. 213:18-214:3; Ex. 12 § 3.1.4; Ex. 13 § I.7.C; Lastik Tr. 171:24-172:9; FHSAA I (Rohrer) Tr. 87:18-88:5.

51. On December 7, 2015, after the game had been played, Dearing emailed CCS and UCS stating that the denial of the request "is directly on point with the decision which was handed down by the Supreme Court of the United States in 2000," *Santa Fe Independent School District v. Doe*, 520 U.S. 290 (2000). Ex. 21; Dearing Tr. 92:20-24. Dearing was aware of *Santa Fe* at least by 2003. Dearing Tr. 17:4-6, 17:23-18:6, 18:10-15, 19:9-14.

---

[12] FHSAA I (Tomyn) Tr. 109:20- 110:14, 191:22-192:25; Sobers Tr. 194:10-18; Ex. 6 ¶¶ 29; Ex. 4 ¶¶ 13, 18; Ex. 5 ¶¶ 14, 18; Ex. 7 ¶¶ 30, 33-37; Ex. 1 ¶ 12; Euler Tr. 98:16-21.

52. On January 26, 2016, FHSAA's PR specialist emailed a reporter, stating: "The FHSAA has no issue with praying in public. Both schools prayed before and after the game on the field and that is of no concern to the FHSAA." Sobers Tr. 180:23-184:9; Ex. 52 at FHSAA-017874-76.

53. In December 2015 and January 2016, FHSAA issued three public statements, entitled "Statement Regarding Prayer Over PA System." Exs. 22-24; Ex. 9 ¶¶ 109, 111, 113. One statement included photographs of players, coaches, and cheerleaders, identified as engaging in on-field prayer. Ex. 55.

## VII. PRIVATE SPEECH AT FHSAA CHAMPIONSHIP SERIES CONTESTS

54. FHSAA and other speakers use various modes of expression at FHSAA championship series events, including messaging on signs and banners, digital and video messages displayed throughout the venue, speech over the PA system, music, dancing, individual speakers, and more. *See supra and infra* ¶¶ 22, 29-36, 41, 57, 61, 62, 63, 65-67, 69-83, 88-90, 94-98.

55. FHSAA recognizes that not all the speech conveyed at its championship series events is speech of FHSAA. It can differentiate, and has differentiated, between its own speech and the speech of other parties. *See supra and infra* ¶¶ 22, 33, 34, 43, 58, 63, 65, 67, 70, 73, 76-80, 84.

### A. Private Speech over the PA System

56. FHSAA prepares PA scripts for FHSAA championship series events—both playoff contests and championship contests. Sobers Tr. 28:19-29:17; FHSAA I (Tomyn) Tr. 175:23-176:3; *see generally* SA.

57. These scripts contain copy to be read by the PA announcer, but some scripts contain prompts for other speakers. SA-0001 (prompt for school representative to deliver a prayer); SA-4280, -4494, -4915, -5113, 5883 (prompts for unscripted remarks by school principal and mayor). FHSAA turns the PA microphone over to school representatives to give welcoming remarks "periodically often" and does not review or approve those remarks in advance. FHSAA II (Tomyn) Tr. 99:16-20, 100:4-11. Script text often states it is on behalf of an entity other than FHSAA. *See, e.g.*, SA-0007, -0012, -0013, -0130, -0134, -1460, -1866, -2635, -4903.

58. FHSAA and its employees do not consider some of the script copy read by the PA announcer at FHSAA events to be speech of FHSAA.[13]

59. Scores of PA scripts from 2014 to 2019, including scripts for multiple football championship games, direct the PA announcer to "improvise" over the PA system.[14]

60. FHSAA prepared a script for the PA announcer at the 2015 Class 2A championship game. SA-000018; Ex. 9 ¶ 121; Polansky Tr. 100:6-14. The PA announcer at that game was not employed, hired, or paid by FHSAA. Ex. 53 at 19; FHSAA I (Tomyn) Tr. 125:22-126:6; Beasley Tr. 146:23-24. The script does not

[13] FHSAA II (Tomyn) Tr. 139:9-12; Sobers Tr. 126:3-9, 131:3-132:4, 135:21-22; Young Tr: 81:8-11; Ershock 55:25-56:1, 56:18-21, 56:24-25, 62:18-20; Polansky Tr. 112:6-18, 114:17-19.

[14] *See, e.g.*, SA-0011, -0028, -0133, 0475, -0685, -0702, -0719, -0736, -0754, -0791, -1203, -1219, -1235, -1251, -1267, -1283, -1649, -1666, -1682, -1699, -1716, -1733, -1750, -1767. Many scripts instruct PA announcers to play music, for example pre-game and during awards ceremonies, leaving the music choice entirely to the discretion of the PA announcers. *See, e.g.*, SA-1531, -1532, -1533, -1549; FHSAA II (Tomyn) Tr. 124:19–125:1.

indicate the PA announcer introduced himself as having any FHSAA affiliation. SA-0018, 0034.

61. The PA script for the 2015 Class 2A football championship game included several announcements from corporate sponsors, the rights to which the sponsors purchased, and the purpose of which was for the sponsors to promote themselves. SA-0018-0034 (over 15 corporate sponsor announcements); Ex. 9 ¶¶ 196, 171-72; Ex. 54; Ershock Tr. 39:21-25, 131:8-14; Young Tr. 51:7-10.

62. Many of the sponsorship announcements did not mention FHSAA, nor was there a requirement that they do so. Ex. 57; Ershock Tr. 40:6-11. The sponsorship agreements gave the sponsors the right to the PA announcement but did not reserve to FHSAA the right to draft or modify those announcements. Ex. 55 at 2, 10 (Bright House); Ex. 56 at 1, 10 (Champion); Ex. 57 at 1, 5 (Gatorade); Exs. 58, 59 (Balfour); Ex. 60 at 1, 7 (Pinch-a-Penny); Ex. 61 at 1-2 (Spalding); Ex. 62 at 1, 7 (Sports Authority).[15]

63. FHSAA permitted sponsors to draft PA messages and FHSAA employees considered these script portions to be speech of the sponsors, not FHSAA.[16]

64. FHSAA considered other portions of the script to be its own speech, such

---

[15] On the other hand, the Sports Authority agreement *did* reserve for FHSAA the right to approve Sports Authority's content for social-media promotions. *Id.*

[16] FHSAA II (Tomyn) Tr. 120:14-22, 139:9-12; Ershock Tr. 54:13-55:7 (¶ 1, Team IP), 55:25-56:1 (¶ 2, Bright House), 56:18-20, 56:24-25 (¶ 15, Champion), 58:3-8 (¶ 20, Gatorade), 60:19-23 (¶ 20, Balfour), 61:13-16 (¶ 23, Champion), 62:18-20 (¶ 24, Pinch-a-Penny), 63:1-6 (¶ 28 Spalding), 63:11-17 & 62:20-22 & 63:8-17 (¶ 32, Sports Authority); Polansky Tr. 114:17-19 (¶ 20, Gatorade), 115:11-24 (¶ 20, Balfour), 116:14-20 (¶23, Champion), 117:24-118:3 (¶ 28 Spalding); Sobers Tr. 132:8-12.

as: ¶ **3 "Sportsmanship**," *see* Polansky Tr. 104:11-18; FHSAA I (Tomyn) Tr. 198:7-23; FHSAA II (Tomyn) Tr. 47:21-23; Sobers Tr. 126:15-21; ¶ **6 "Welcome to Orlando,"** *see* Polansky Tr. 107:19-21), Ershock Tr. 30:13-20; ¶ **19 "F-H-S-A-A Website,"** *see* Polansky Tr. 113:20-21; ¶ **25 "Officials Recruitment,"** *see* Polansky Tr. 117:3-4; ¶ **29 "FHSAA On Facebook/Twitter,"** *see* Polansky Tr. 87:13-19; ¶ **40 "Sportsmanship,"** *see* Ershock Tr. 26:13-18; and ¶ **50 "So Long, Farewell,"** *see* Sobers Tr. 163:6-11, which included FHSAA's wish for "happy holidays," referring to the religious holidays of Hanukkah and Christmas, *see* Polansky Tr. 123:3-17; Sobers Tr. 130:19-131:2, 163:13-164:2; Young Tr. 103:9-13, 104:9-10.

65. Per the FHSAA script, the PA announcer introduced the color guard, led the Pledge of Allegiance, and introduced the National Anthem. SA-0020. FHSAA did not select the National Anthem performer. Ex. 12 § 4.7.2.5.4(b); Ex. 64; Lastik Tr. 157:1-20, 159:2-10, 160:18-161:20; Ex. 65; Ex. 66; Sobers Tr. 159:21-24. And FHSAA did not consider the National Anthem performance to be its own performance. FHSAA I (Tomyn) Tr. 189:21-190:9.

66. The seventeenth announcement in the 2015 was entitled "Local Sponsors." SA-0025. The FHSAA-CFSC agreement permitted CFSC to solicit sponsors, subject to FHSAA approval, and compatibility "with the educational dignity and propriety of" the FHSAA and member schools. Ex. 30 at 25. Yet FHSAA never actually reviewed local sponsors for this reason. Ershock Tr. 78:13-79:15.

67. CFSC, not FHSAA, drafted the "Local Sponsors" announcement, and

FHSAA considered this a message from CFSC, not FHSAA. Ershock Tr. 65:20-66:9; Polansky Tr. 111:2-18; FHSAA I (Rohrer) Tr. 126:3-9.

68. FHSAA often accepted PA script copy from sponsors as written by the sponsors, without editing it.[17]

69. FHSAA allowed sponsors to promote causes other than their own business, as several PA scripts state, for example: "Hudson Pump and Equipment asks fans to give generally to VISTE, Volunteers in Service to the Elderly, and LVIM, Lakeland Volunteers in Medicine." SA-1541, -1829, -5365-66, -5703-04.

B. School Band and Cheerleader Speech Over the PA System

70. At championship football games, including 2015, cheerleaders performed along the sidelines. Ex. 13 § I.6.B.e; Banales Tr. 15:19-22, 18:20-25; Ex. 101. FHSAA did not prescreen or approve the cheers performed and considered those cheers to be speech of the school, not of FHSAA. FHSAA I (Tomyn) Tr. 187:21-188:7; Beasley Tr. 140:22-141:4.

71. During halftime, schools' bands and/or cheerleaders performed on the

[17] *See, e.g.* **USMC:** Ex. 67 (contract entitling USMC to PA announcement), Ex. 68 at -30-31 (letter from USMC with script copy), SA-1936 (PA script with script copy as transmitted by USMC), Ershock Tr. 102:3-5, 102:8-14, 103:4-7; **Resilite:** Ex. 69 (contract entitling Resilite to PA announcement), Ex. 70 (correspondence from Resilite with script copy), Ex. 71 (internal FHSAA email instructing inclusion of script copy), SA-2538 (PA script with script copy as transmitted Resilite); **Nike:** Ex. 72 at FHSAA-014517, -22 (contract entitling Nike to PA announcement), Ex. 73 (email from Nike with script copy), SA-4991 (PA script with script copy as transmitted by Nike); **Pinch-a-Penny:** Ex. 74 (contract dated June 2010 entitling Pinch-A-Penny to PA announcement), Ex. 75 (Oct. 2012 email from Pinch-a-Penny with revised script), Ex. 76 (email from Ershock giving instructions to revise PA script), SA-2012 (PA script copy as transmitted by Pinch-A-Penny); **Pinch-a-Penny:** Ex. 77 (contract executed July 2016 entitling Pinch-A-Penny to PA announcement), Ex. 78 (email from Ershock requesting changes to Pinch-A-Penny's script), Ex. 79 (new Pinch-A-Penny script), SA-3192 (PA script as transmitted with only punctuation changes).

field and FHSAA did not review, edit, or preapprove the music the schools performed, and a band could have played songs with religious messages. Ex. 12 § 4.7.2.5.4; Ex. 13 § I.7.E & pp. 31-32; Ex. 9 ¶¶ 126, 142, 143; FHSAA I (Rohrer) Tr. 102:23-103:10, 103:17-25; FHSAA I (Tomyn) Tr. 184:8-185:9.

72. Schools participating in football championships, including at the Citrus Bowl in 2015, could use their own PA "half time announcer" to accompany the band performance with amplified speech, and this person could be "anybody the team designated" and "sometimes the whole halftime show they'd be speaking." Ex. 13 at 32; FHSAA I (Rohrer) Tr. 108:24-109:6; Polansky Tr. 131:15-132:20; Lastik Tr. 123:14-124:3; Ex. 64 at 2 ("Port St. Joe has a separate band announcer."). FHSAA did not select, review, edit, or approve any speech or messages made by halftime PA announcers for school marching bands. Ex. 9 ¶¶ 144-45; Ex. 13 at 31-32.

73. FHSAA considered marching band performances to be expression of the band, band members, band director, or the school, but not of FHSAA. FHSAA I (Tomyn) Tr. 185:10-15.

74. During halftime of the 2015 Class 2A game, CCS's cheerleading team performed on the field to music of its choosing, and FHSAA did not review, edit, or preapprove that music. Banales Tr. 17:20-23, 20:12-18; Euler Tr. 86:12-14, 87:8-13, 87:20-21; Doc. 80 ¶ 54; Ex. 9 ¶¶ 130-139; FHSAA I (Rohrer) Tr. 104:22-105:1.

75. To play the music, CCS's coach entered the PA booth, where her phone was plugged into the Citrus Bowl's audio system and played music over the PA system. Banales Tr. 20:23-21:25.

C. FHSAA-Mandated/Organized On-field Team Media Interviews

76. For the football playoffs and finals, FHSAA mandated that the head coach of each team, and permitted players to, participate in post-game, on-field media interviews just prior to the on-field awards ceremony. FHSAA deemed comments made to the be speech of the coaches and players, not FHSAA's speech. Ex. 12 § 3.6.2; Ex. 13 at 17, 22; FHSAA I (Tomyn) Tr. 177:9-180:13; Sobers Tr. 140:7-18, 180:2-8; Polansky Tr. 145:24-146:4.

D. Sponsor Speech through Signs, Videos, and other Promotions

77. FHSAA permitted private sponsors to design their own banners—without editing from FHSAA—and display them at FHSAA events, including the 2012 and 2015 Class 2A championship games, so that spectators could see them.[18] Some sponsor banners were hung close to or next to FHSAA banners. A banner for Pizza Hut, which was a CFSC sponsor and not an FHSAA sponsor, was hung directly adjacent to an FHSAA banner. Ex. 81; Lastik Tr. 46:22-48:18, 49:12-25, 50:6-51:10, 52:12-15, 52:22-25, 56:6-58:17, 152:21-154:19. FHSAA employees did not consider these banners to be speech of FHSAA. Sobers Tr. 150:6-10; 151:6-18.

78. FHSAA permitted sponsors to set up tables or booths along the Citrus Bowl's concourse during football championships (including 2015), and these contained sponsors' promotional speech (including written materials and staff members speaking to spectators), which FHSAA considered sponsor (not FHSAA)

[18] Ex. 9 ¶¶ 180, 183; Ex. 60 at 7; Ex. 59 at 3; Ex. 62 at 7; Ex. 80; Ex. 102; Ershock Tr. 136:19-21, 137:14-19; Polansky Tr. 61:21-62:2; Young Tr. 47:12-19, 100:14-16, 116:16-22; Lastik Tr. 43:13-44:-21, 52:22-25, 55:16-25; Sobers Tr. 110:19-111:2, 150:6-10, 151:3-5.

speech and did not edit or monitor. Ex. 9 ¶¶ 187-89; Ershock Tr. 149:10-153:12; Polansky Tr. 58:6-60:1, 95:13-18, 96:6-96:24; Lastik Tr. 89:12-90:20, 91:5-24.

79. FHSAA permitted private sponsors to create their own videos—without editing from FHSAA—and transmit them over the Citrus Bowl "jumbotrons" (or video screens) at FHSAA events (including at the 2012 and 2015 Class 2A championship games), so that spectators could see and hear the videos. FHSAA considered these videos to be messages of the sponsor.[19]

80. FHSAA permitted private sponsors to create their own logos—without revision from FHSAA—and have them painted onto the field at the Citrus Bowl at FHSAA events (including the 2012 and 2015 Class 2A championship games) so that spectators could see the stencils. FHSAA considered these logos to be messages of the sponsor. Ex. 9 ¶ 204; Ex. 56 at 1, 10; Ex. 85; Ershock Tr. 139:17-140:10.

81. FHSAA permitted sponsors to create flyer inserts for "coaches packets" that FHSAA distributed to coaches participating in FHSAA events (including the 2015 Class 2A Football Championships). FHSAA did not revise the flyers. Ex. 9 ¶ 178; Ershock Tr. 147:21-25, 148:13-25); Young Tr. 48:4-12.

E. Fan Signs and Banners

82. FHSAA allowed spectators attending football championship games to create their own signs and display them in the Citrus Bowl. Ex. 12 § 3.1.3; Ex. 13 at 10-11; FHSAA I (Tomyn) Tr. 167:1-168:3.

[19] Ex. 9 ¶¶ 119, 203; Doc. 80 at ¶ 47; Ex. 82; Lastik Tr. 62:18-63:20, 66:17-67:9, 71:19-22; Ershock Tr. 140:18-141:12; Beasley Tr. 160:16-23; Ex. 83; Ex. 84 at GOSC000260.

83. Spectators displayed signs and banners at both the 2012 and 2015 FHSAA Class 2A football championship games. Some were hung over the railing and onto the lower bowl wall, including adjacent to sponsor banners.[20]

84. FHSAA did not edit any signs, banners, placards, or similar items that were displayed by spectators at football championship games in 2015 and considered these fan signs and banners to be private speech.[21]

85. These signs could, and did, have religious messages. FHSAA I (Tomyn) Tr. 204:6-207:18; FHSAA II (Rohrer) Tr. 54:16-19; Ex. 87 at 1.

F. Speech with Which FHSAA Did Not Intend to Associate

86. At FHSAA championship events, including the 2012 and 2015 Class 2A games, speech was transmitted over the PA system with which FHSAA did not want to be associated. One of the local sponsors listed in the 2015 PA script was Hooters. SA-0025. According to publicly available judicial records, Hooters' business model promoted "vicarious sexual recreation." *HI Limited P'ship v. Winghouse of Fla., Inc.*, No. 6:03-cv-00116, ECF No. 249, at 4 (M.D. Fla. Dec. 13, 2004) (memorandum decision). "Vicarious sexual recreation" is not something with which FHSAA would want to associate. Yet, despite its right to reject local sponsors, FHSAA did not reject the inclusion of Hooters in the PA script. Ershock

[20] Ex. 9 ¶ 124; Beasley Tr. 131:18-132:6; Sobers Tr. 152:12-15; Exs. 86-89; FHSAA II (Rohrer) Tr. 52:9-53:23, 57:4-59:25, 61:5-24, 72:1-73:20, 87:18-89:12; Ex. 41. Another example is from the 2015 FHSAA Class 8A Football Championship Game, where a spectator at the Citrus Bowl hung a hand-painted banner next to an FHSAA sponsor banner. Ex. 90; Lastik Tr. 59:15–62:6.
[21] Ex. 9 ¶ 73; FHSAA I (Tomyn) Tr. 166:8-167:6, 168:4-11, 169:11-16; FHSAA II (Rohrer) Tr. 54:20-55:3, 57:4-60:5; 60:11-61:19, 72:16-73:1; Exs. 87, 88.

Tr. 81:25-82:18, 90:14-19; FHSAA II (Tomyn) Tr. 149:16-151:25.

87. FHSAA did not want to be associated with alcohol. It "strictly prohibited" alcoholic beverages at the football championship games in 2012 and 2015, prohibited CFSC from engaging "alcoholic beverage companies" as local sponsors, and would not itself promote alcohol or have an alcohol company as a sponsor because it "had a responsibility [for] no alcohol, drugs, tobacco products, so on, so forth." Ex. 13 § I.7.C; Ex. 17 § I.7.C; Ex. 30 at 25; Dearing Tr. 98:18-21; FHSAA II (Rohrer) Tr. 38:7-9, 39:3-6, 39:14-17, 39:22-25. Yet, at the 2012 and 2015 championship games, advertisements for alcohol were prominently displayed inside the Citrus Bowl, both as permanent and electronic signs, and adjacent to FHSAA signs.[22]

88. During the 2015 game, the Citrus Bowl "ribbon boards" were used to display messages from companies (Buffalo Wild Wings, Coca-Cola, SeaWorld) that are not FHSAA sponsors. Lastik Tr. 78:4-79:18, 84:15-85:6, 86:23-87:21, 88:5-89:3, 151:25-152:14; Exs. 97-100.

## VIII. FHSAA TRANSMITTED SOLEMNIZING MESSAGES OVER THE PA SYSTEM

89. FHSAA has included moments of silence and moments of silent reflection in dozens of PA scripts.[23] PA scripts have included moments of silence

[22] Ex. 91 (2012 Bud); Ex. 92 (2015 Coors); Ex. 93 (2015 Bud); Ex. 94 (2015 Bud); Ex. 95; Ex. 38; Ex. 96; Lastik Tr. 75:3-23, 76:24-77:8, 81:9-81:24, 82:6-83:12; Polansky Tr. 55:5-7; FHSAA (Rohrer) Tr. II 36:12-38:14, 44:11-15, 45:10-15, 84:10-22, 85:2-20, 86:7-13.

[23] *See* SA-0617, -2217, -2233, -2286-87, -2348, -2370, -4122, -4134, 4153-54, -4176-77, -4255, -4256, -4268, -4280, -4318, -4329, -4340, -4393, -4406-07, -4432, -4511, -4526, -4571, -4585, -4599, -4617, -5199, -5903, -6034, -6045, -6056-57, -6077, -6101, -6122, -6133, -6146, -6170-71, -

"for those who have sacrificed for us to enjoy the freedom we have," SA-0617; in memory of an athletic director and a cross-country coach, SA-2286-87; and in memory of an athletic director and principal, SA-2233. Some of these moments of silence appear in 2015 PA scripts. FHSAA II (Tomyn) Tr. 79:3-7; SA-2217, -2233, -2286-87, -2348, -2370.

90. In 2018, FHSAA included a version of the following announcement in many of its PA scripts, SA-6056-57:

> Ladies and Gentlemen, please stand and remove cover. {Pause} As we stand here today, <Name of Host School> and <Name of Visiting School>, along with the Florida High School Athletic Association and its members, together with the entire State of Florida and this great country, mourn the senseless loss of life following the February 14th tragedy at Marjory Stoneman Douglas High School. At this time, let's join together in a moment of silent reflection in honor of the lives lost and all those affected. {20-30 second pause} Thank you. Your positive thoughts for Marjory Stoneman Douglas High School are appreciated.

91. FHSAA did and does not know of any difference between calling for a prayer and calling for positive thoughts. FHSAA II (Tomyn) Tr. 61:24-62:15.

92. FHSAA's purposes in leading fans and athletes in moments of silence included "saying we're … unified as a people in this building to mourn the senseless loss of life," and to honor and recognize individuals. FHSAA II (Tomyn) Tr. 60:3-6, 70:3-8, 71:4-11, 87:12-16.

93. FHSAA would "probably not" permit a moment of silence to recognize God. 81:22-82:4; 82:20-84:7. The reason FHSAA would permit a moment of silence for a person and not God is because "they're known entities" and "easily

6193-94, -6209, -6221, -6232, -6239, -6251, -6271, -6272, -6285, -6299, -6308-09, -6321, -6331, -6344, -6359, -6372, -6382, -6396, -6415; FHSAA II (Tomyn) Tr. 49:16-50:3.

identifiable specific individuals" that "other people know about." FHSAA II (Tomyn) Tr. 84:8-20; 87:1-11.

94. Dozens of FHSAA PA scripts contain messages extolling the virtues of "hard work, perseverance and dedication." *See, e.g.*, Ex. 7 ¶ 22 Ex. 7-B; SA-0851, -0310.

95. Dozens of FHSAA PA scripts asked the crowd to "publicly recognize and thank [educators] for [their] dedication, commitment and passion." *E.g.*, SA-4004.

96. Many FHSAA PA scripts contain statements of appreciation for veterans and state that the pledge and the National Anthem were to honor America and service men and women. *See, e.g.*, SA-3468.

97. At least four FHSAA scripts contain text asking the crowd to repeat the Special Olympics Oath: "Let me win. But if I cannot win. Let me brave the attempt." *See, e.g.*, SA-6077. The PA announcer was speaking on behalf of the Special Olympics, not FHSAA. FHSAA II (Tomyn) Tr. 120:14-22. FHSAA is unable to explain how an oath is different than a prayer. *Id.* 92:5-7.

98. Dozens of FHSAA PA scripts contain messages promoting "kindness," asking fans to "love one another," and stating "Let's be kind to each other and treat one another with respect. We are all [mascot of visiting school]. We are all [mascot of home school]. We are all Floridians. We are all fans. We are all human!" *See, e.g.*, SA-4551, -4634, -5461-62, -5476. FHSAA believes this is "a message about ethical behavior." FHSAA II (Tomyn) Tr. 129:8-21, 131:19-22.

99. Scripts state "we all lose when all we care about is wining, when we're

not kind to one another in competition." *See, e.g.*, SA-4551, -5147. FHSAA believes this is an ethical message. FHSAA II (Tomyn) Tr. 146:16-147:15, 148:16-19.

## ARGUMENT

### I. FHSAA'S PRAYER BAN VIOLATES CCS'S FREE SPEECH RIGHTS.

#### A. FHSAA Engaged in Illegal Viewpoint Discrimination.

"The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). This prohibition applies regardless of forum. *See id.*; *Cambridge*, 942 F.3d at 1240.[24] The Eleventh Circuit in this case noted that "discovery might reveal that the FHSAA barred the schools from speaking because the prayer would have expressed an impermissibly religious *viewpoint* on a topic that was included in the ambit of the forum and could otherwise have been discussed in a nonreligious way." *Cambridge*, 942 F.3d at 1242 n.8. This is precisely what the undisputed evidence has now revealed: FHSAA denied CCS's request to pray based on the religious viewpoint of the message, while it routinely allowed similar content from other viewpoints.

##### 1. *The Sole Reason FHSAA Gave for Denying CCS's Request Was the Religious Viewpoint of the Speech.*

In denying CCS's request, FHSAA offered no reason other than the speech's

---

[24] *See also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983); *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1224–25 (11th Cir. 2017); *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1280 (11th Cir. 2004).

religious viewpoint. SMF ¶¶ 47, 51, 53. These candid and undisputed statements alone suffice to show unconstitutional discrimination against CCS's religious viewpoint. *See Rosenberger*, 515 U.S. at 832; *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993).

### 2. *FHSAA Routinely Permitted Other Messages about the Same Topics in CCS's Pre-Game Prayers.*

a. Secular/Religious Discrimination

CCS's pre-game prayers are meant to solemnize and commemorate the occasion; recognize and thank God for the opportunity to participate; request God's protection for the players; and request that God help all participants and fans display good sportsmanship and attitudes towards each other and game officials. SMF ¶ 6. FHSAA has routinely permitted similar messages from a secular viewpoint to be conveyed over the PA system and similar channels.

First, FHSAA has routinely permitted solemnizing and memorializing messages over the PA system. SMF ¶ 89 (over 40 scripts asking audiences to engage in a thirty-second "moment of silent reflection in honor of the lives lost and all those affected" at MSDHS and thanking audience for "positive thoughts"); ¶ 90 (other moments of silence in PA scripts). This is precisely the type of evidence that the Eleventh Circuit held would establish impermissible viewpoint discrimination. *See Cambridge*, 942 F.3d at 1242 n.8 ("If a secular act of solemnization or invocation of some sort would have been permitted by the state at the outset of the game, [CCS's] case for discrimination against a religious viewpoint would be

stronger."); *see also Rosenberger*, 515 U.S. at 831.[25]

Second, FHSAA has routinely transmitted over the PA system messages concerning ethics and morality. For example, the "kindness" messages appear in many PA scripts and implore the listening audience to "be kind to each other and treat one another with respect" because "we are all human!" SMF ¶ 98. *See also* SA-5147 ("We all lose when all we care about is winning, when we're not kind to one another in competition…").

Third, messages about good sportsmanship appeared in every championship series PA script, in varying forms. SMF ¶¶ 13, 18, 31, 42, 64. At the 2015 Class 2A championship, FHSAA conveyed that "sportsmanship is the most important lesson taught through participation in high school athletics" and urged the crowd to act in a "positive manner," show respect, and display "pride in your school, your team and yourself." SA-0018, -0020, -0030.

Fourth, FHSAA "periodically often" allows schools to give unscripted welcoming remarks over the PA system. SMF ¶ 57.

Fifth, FHSAA PA scripts routinely encouraged athletes to "excel in competition the old-fashioned way—through hard work, perseverance and dedication" and to avoid the "tempting" use of steroids. SA-0851, -0310.

Sixth, FHSAA PA scripts frequently expressed gratitude to and recognition for corporate sponsors, service members, educators, and others. SMF ¶¶ 95-96.

---

[25] *Cf. Williamson v. Brevard Cty.*, 276 F. Supp. 3d 1260, 1282 (M.D. Fla. 2017) (moment of silence "fit[s] within the purposes [often ascribed to legislative prayer]—to solemnize the meeting, 'lend gravity to the occasion and reflect values long part of the Nation's heritage.'").

All of these categories of messages are similar to the messages CCS conveys in its pre-game prayers, just from a different, mostly secular, viewpoint. By permitting the secular viewpoint but prohibiting the religious viewpoint about the same content, FHSAA has engaged in impermissible viewpoint discrimination "in the name of secular purity." *Adler v. Duval Cty. Sch. Bd.* ("*Adler I*"), 206 F.3d 1070, 1081 (11th Cir. 2000) (en banc), *opinion and judgment reinstated*, *Adler v. Duval Cty. Sch. Bd.* ("*Adler II*"), 250 F.3d 1330, 1332 (11th Cir. 2001); *see also Lamb's Chapel*, 508 U.S. at 393; *Cambridge*, 942 F.3d at 1240-42 & n.8.

b. Denominational Discrimination

Separate from the above secular/religious viewpoint discrimination, the denial of CCS's 2015 request constituted impermissible inter-denominational discrimination. *See Cambridge*, 942 F.3d at 1241. FHSAA has permitted and would permit other religious messages and prayers over the PA system—e.g., the prayer at the 2012 championship (SMF ¶¶ 29-33) and religious music over the PA system at halftime (SMF ¶ 71).[26] Yet FHSAA denied CCS's request to convey a similar message from its own religious perspective.

### B. FHSAA's Prayer Ban Was an Arbitrary, Unreasonable, and Inconsistent Regulation of Speech.

Regardless of whether the PA system is a limited public forum or a nonpublic forum,[27] the state may not engage in unreasonable, haphazard, or arbitrary

[26] FHSAA also permitted religious messages through other in-game speech channels similar to the PA system. *See* (SMF ¶¶ 36, 39, 83, 85).

[27] Undisputed facts demonstrate that FHSAA designated its PA system and similar channels of speech at its sporting events as a limited public forum. FHSAA permitted many private speakers

restrictions on speech. *See Rosenberger*, 515 U.S. at 829 (in "limited forum" exclusion must be "reasonable"); *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018) (in nonpublic forum "State must draw a reasonable line" and "be able to articulate some sensible basis for distinguishing what may come in from what must stay out"). The Eleventh Circuit held that the Prayer Ban is impermissible if it was "exercised in an arbitrary or haphazard manner" or was "too indeterminate and haphazardly applied," and it noted that CCS's allegations about inconsistent application were "troubling." *Cambridge*, 942 F.3d at 1240, 1243, 1246.[28]

Discovery has confirmed these allegations and more. FHSAA expressly permitted the pre-game prayer over the PA at the 2012 game. SMF ¶ 29-33. It permitted CCS's pre-game prayers over the PA at the 2015 playoff games and allowed prayers delivered before the 2020 playoff games, as well as at every CCS home game and many away games for as long as CCS has been an FHSAA member

to convey messages over the PA system, on scoreboards and ribbon boards, through banners hung along the lower bowl, and on the field through performances and signage. SMF ¶¶ 54-88. For example, the 2015 Class 2A football championship script included messages from at least eleven corporate sponsors, the National Anthem performer, and the CFSC and its local sponsors. SMF ¶ 22, 61, 66. And the FHSAA permitted CCS to use the PA system to transmit music of its own choosing, and would have permitted the school to use the PA system for its own unscripted halftime announcer. SMF ¶ 54, 71-72, 74-75. At other FHSAA sporting events, schools were permitted to use the PA system to provide unscripted welcoming remarks. SMF ¶ 60. Thus, the FHSAA granted a class of speakers—sponsors and participating schools—access to the PA system (and similar in-game platforms) so that they could convey messages of their choosing. At each individual sporting event, this often constituted at least a dozen private speakers, and aggregated across sports each season, the FHSAA opened the PA system (and similar in-game platforms) to hundreds of speakers. *See Cambridge Christian*, 942 F.3d at 1237 ("limited public forum … exists where a government has reserve[ed a forum] for certain groups or for the discussion of certain topics") (quotations omitted) (alterations in original).

[28] *See also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 330 (D.C. Cir. 2018) ("[A] challenged regulation may be unreasonable, regardless of the reasons for its adoption, if it is inconsistently enforced.").

school. SMF ¶¶ 5, 36, 41, 43. It would permit schools to play religious songs over the PA system at halftime. SMF ¶ 71. It uses the PA system to direct the audience to its social-media accounts and photographer's websites, which feature many posts with prayers and religious messages and photographs with religious imagery. SMF ¶¶ 36, 37, 39. It permits religious messages on the field and in the stands. SMF ¶¶ 34-36, 85. And, despite all these inconsistencies, the FHSSA *still* "hasn't told us why" the Establishment Clause—FHSAA's *only* explanation for the Prayer Ban, SMF ¶¶ 47, 51, 53—"barred speech at the 2015 championship game when it didn't bar" this other religious speech. *Cambridge*, 942 F.3d at 1244.[29]

Nor can FHSAA claim that the Prayer Ban was "wholly consistent" with the forum's purpose. Discovery has confirmed what the Eleventh Circuit suspected: "some pregame solemnizing messages of a different sort … were considered appropriate for the forum," including moments of silence, presentation of the colors, the National Anthem, moralizing messages (SMF ¶¶ 65, 89, 90, 96, 98); "FHSAA saw [and sees] no problem with … teams praying together at the 50-yardline" (SMF ¶¶ 49, 52, 53) or making other religious displays visible to the crowd (SMF ¶¶ 34-36, 85); and, "most significantly," FHSAA permitted pre-game prayer over the PA system on many occasions (SMF ¶¶ 5, 29, 32). *Cambridge*, 942

---

[29] *See also Searcey v. Harris*, 888 F.2d 1314, 1322 (11th Cir. 1989) (school board speech restriction unreasonable upon "no evidence which even arguably explain[ed] the Board's change in position"). FHSAA has failed to consistently apply other supposed policies barring speech at its games. *See* SMF ¶¶ 54-88 (permitting alcohol advertisements despite policy against alcohol sponsors); ¶¶ 86-87 (permitting Hooters PA announcements despite not wishing to associate with Hooters' values and business model).

F.3d at 1244, 1246.

### C. The PA System Is Not a Forum only for Government Speech.

The FHSAA has claimed that its Prayer Ban is permissible because all messages conveyed over the PA system are government speech. Discovery has proven that contention incorrect. The Eleventh Circuit considers three non-exhaustive factors to separate government speech from private speech: 1) "the *history* of the government's use of the medium for communicative purposes"; 2) "the implication of government *endorsement* of messages carried over that medium," and 3) "the degree of government *control* over those messages." *Cambridge*, 942 F.3d at 1223 (emphases in original). All three factors point decidedly to the conclusion that the PA system, along with similar channels of speech at FHSAA events, are used extensively for private speech.

#### 1. ***The History Factor Is in CCS's favor.***

The record now confirms this Court's initial assessment that the PA system at FHSAA events has historically been used for private speech. First, schools themselves have frequently used the PA system to convey their own messages: **(1)** CCS and other schools have prayed, and continue to pray, over the PA system during FHSAA regular season games and FHSAA State Championship Series playoff games[30] and, once, at a final game (SMF ¶ 5); **(2)** schools have used their

[30] Upon reviewing the preliminary record, the Eleventh Circuit stated it did "not know how closely the FHSAA administered or monitored the early-round playoff games hosted by Cambridge Christian at their home field." *Cambridge*, 942 F.3d at 1232. Discovery has shown that the FHSAA comprehensively regulates the playoffs as part of the FHSAA State Championship Series, that it provides the PA scripts for those games, that an FHSAA official is in the PA booth, and that playoff games are neutral sites. SMF ¶¶ 11-12, 16, 19.

own halftime PA announcer to accompany band performances, and cheerleading teams have used the PA system to transmit music of their own choosing, and FHSAA considered all of this to be the speech of the school, not FHSAA (SMF ¶¶ 70-75); and **(3)** FHSAA "periodically often" turned over the PA system to school officials to offer unscreened and unscripted welcoming remarks (SMF ¶ 57). Second, every PA script contains numerous messages from private sponsors authored by the sponsors and included without edits by the FHSAA. FHSAA employees consider these messages to be the speech of the sponsor, not FHSAA. SMF ¶ 63. Third, the PA announcer often speaks "on behalf of" someone other than the FHSAA, such as host organizations or the venue. SMF ¶ 19.

All of this private speech over the PA system is consistent with speech at FHSAA events more generally. There is a healthy mix of FHSAA speech and private speech across mediums: **(1)** on the playing field, where FHSAA logos are intermixed with sponsor logos, where cheerleaders display banners with their own (not FHSAA's) messages, and where FHSAA-mandated press conferences feature speech of individual coaches; **(2)** on the scoreboards and ribbon boards, where FHSAA speech is intermixed with speech of its own sponsors and entities that the FHSAA has nothing (and wants nothing) to do with, such as alcohol companies; and **(3)** on the walls of the lower bowl, which feature FHSAA banners, sponsor banners, and homemade fan banners. SMF ¶¶ 70-75, 80, 81, 88.

### 2. *The Endorsement Factor Is in CCS's Favor.*

The second factor for distinguishing between government and private

speech is "the implication of government *endorsement* of messages carried over that medium." *Cambridge*, 942 F.3d at 1223 (emphasis in original). The indisputable record facts on this factor, too, are decisively in CCS's favor.

First, FHSAA employees themselves distinguish between FHSAA speech and the speech of others on the PA system. They recognize the sponsor ads as messages of the sponsor, not FHSAA. SMF ¶ 63.[31] They recognize the school's halftime PA announcer and cheerleader musical selection as speaking on behalf of the school, not FHSAA. SMF ¶¶ 70-75. The FHSAA recognizes the National Anthem performer as speaking on his or her own behalf, not the FHSAA's. SMF ¶ 65. Moreover, the FHSAA's ability to distinguish among speakers at its events is not limited to the PA system; it does so for signage, too. SMF ¶¶ 82-85.

Second, the PA announcer is not an FHSAA employee or contractor and does not introduce himself as such. And the scripts the PA announcer reads often distinguish between FHSAA as speaker and other speakers. SMF ¶¶ 58, 60, 65, 70, 79, 80, 84, 86-88. Indeed, the scripts contain lengthy promotional announcements from sponsors, which do not identify an association with FHSAA. They were not mere "thank yous" from the FHSAA. *Cambridge*, 942 F.3d at 1234. Messages such as these communicate to listeners that FHSAA is not the only one speaking over the PA system.

[31] The Eleventh Circuit "assume[d] that the organizers of a sport event ... generally would not allow a public-address system to be used to convey messages they didn't want to be associated with." *Cambridge*, 942 F.3d at 1233. As it turns out, FHSAA did just this for both the PA system and scoreboard. SMF ¶¶ 86-88.

Third, the 2015 prayer, as in 2012, would have been delivered by a school representative, not the PA announcer. FHSAA received no complaints after the 2012 prayer regarding confusion about who was praying, SMF ¶ 33, nor has it identified any confusion from prayers at its playoff games. And for good reason: high school students "are capable of distinguishing between State-initiated, school-sponsored, or teacher-led religious speech on the one hand, and student-initiated, student-led religious speech on the other." *Bd. of Educ. of Westside Cmty. Schs. v. Mergens,* 496 U.S. 226, 250-51 (1990).[32]

### 3. *The Control Factor Is in CCS's Favor.*

The remaining government-speech factor is "the degree of government *control* over those messages." *Cambridge*, 942 F.3d at 1223 (emphasis in original). Like the first two factors, this factor firmly weighs against a finding of government speech. The indisputable facts in the record now show the FHSAA did not "maintain[] direct control over the messages conveyed" through the speech in question. *Walker*, 576 U.S. at 213.

First, FHSAA turned the PA system over to school speakers for prayers,

[32] *See also Chandler v. Siegelman ("Chandler II") , 230 F.3d 1313,* 1317 (11th Cir. 2000) ("a [school] policy which *tolerates* religion does not improperly endorse it"); *Adler II*, 250 F.3d at 1333 ("[S]chools do not endorse all speech that they do not censor."); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000) (even when "invocations are authorized by a government policy and take place on government property at government-sponsored school-related events … not every message … is the government's own"); *Mergens*, 496 U.S. at 251 (explaining that "students [can] understand that the school's" decision to permit the conduct "evinces neutrality toward, rather than endorsement of, religious speech"); *Adler I*, 206 F.3d at 1081 ("[A] per se rule that all speech on a state-controlled platform is state speech, raises core free expression concerns and would likely run afoul of the Free Exercise and Free Speech clauses."), *opinion and judgment reinstated, Adler II*, 250 F.3d at 1331.

welcoming remarks, and halftime performances, without prescreening, approving, editing, or otherwise controlling those messages. SMF ¶ 43, 57, 71-73. And just as the PA announcer did not always control the microphone, neither did FHSAA's script always "control" the PA announcer, who was neither an FHSAA employee, nor contractor. SMF ¶¶ 12, 19. For example, scripts often directed the PA announcer to "improvise" during half-time or to "play music," with no apparent review of the content of that music SMF. ¶¶ 19, 55 & n.14.

Second, FHSAA rarely edited the PA scripts that sponsors submitted. Sponsors purchased advertising rights and submitted their messages to FHSAA, who simply added their message, verbatim, to the script. SMF ¶¶ 57, 62, 66, 68, 69. Indeed, the FHSAA was so hands-off with scripts that it permitted the CFSC to thank Hooters over the PA system, even though the FHSAA thought Hooters was inconsistent with the FHSAA's values. SMF ¶ 86.

## II.   THE PRAYER BAN VIOLATES CCS'S FREE EXERCISE OF RELIGION.

A "law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Government action targeting religion "is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Id.* at 533. Here, the Prayer Ban substantially burdened CCS's strongly held religious belief that communal prayer is central to a relationship with God and a strong faith community. And the FHSAA cannot demonstrate a compelling interest in barring CCS's exercise of this belief.

### A. FHSAA's Prayer Ban Substantially Burdened CCS's Exercise of a Sincerely Held Belief in Communal Prayer.

Communal prayer is a fundamental belief and practice of the CCS community. Such prayer is one way CCS implements its religious mission to "[t]o glorify God in all that *we* do" and "to serve the local and global community." SMF ¶ 2. Accordingly, nearly every group activity at the school—the start of the school day, during classes, chapel services, performing arts events, graduations, staff meetings, parent-teacher nights, athletic practices, athletic contests, and trustee meetings—are solemnized with a communal prayer. SMF ¶¶ 2-4. This undisputed record is more than sufficient to demonstrate the sincerity and centrality of CCS's belief in communal prayer. *See Cambridge*, 942 F.3d at 1248-49 (noting that it is not a court's job to define for religion its sincerely held beliefs).

The FHSAA's Prayer Ban substantially burdened CCS's exercise of its foundational belief in communal prayer because, without the PA system's amplification, the CCS community in the stands could not hear or participate in the prayer that their athletes and coaches engaged in on the field. SMF ¶¶ 49, 50; Exs. 2-7. The burden was especially significant because, as the FHSAA itself says, for "student athletes … coaches and spectators in attendance, [the state championship game] is one of the most memorable experiences of their lives." Ex. 54; FHSAA I (Tomyn) Tr. 122:8-123:14, 208:15-209:20. For a religious community that opens just about *every* group event with communal prayer, from the mundane to the momentous, it goes without saying that being denied communal prayer at

"one of the most memorable experiences of their lives" constituted a substantial burden on the exercise of religion. *See Lindh v. Warden, Fed. Corr. Inst., Terre Haute, Ind.*, No. 2:09-CV-00215-JMS, 2013 WL 139699, at *11 (S.D. Ind. Jan. 11, 2013) (finding that an individual's free exercise rights were violated when he was prohibited from engaging in his sincerely held religious belief in group prayer).

**B. FHSAA's Prayer Ban Targeted CCS's Religious Exercise and Fails Strict Scrutiny.**

Because "the object of [FHSAA's Prayer Ban was] to … restrict practices because of their religious motivation, the law is not neutral." *Lukumi*, 508 U.S. at 533. FHSAA admittedly denied CCS's request to pray over the PA system solely because of its religious nature. SMF ¶¶ 47, 51. Such a policy, which "in a selective manner[,] impose[s] burdens only on conduct motivated by religious belief," cannot be "generally applicable." *Lukumi*, 508 U.S. at 543. Because FHSAA's Prayer Ban was neither neutral nor generally applicable, it is subject to strict scrutiny and FHSAA must show that it serves "'interests of the highest order' and [is] narrowly tailored in pursuit of those interests." *Id.* at 546 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978) (plurality opinion)).

FHSAA can show neither. FHSAA's "only explanation for the new restriction … was that prayer was not permitted by the Establishment Clause and the Supreme Court's decision in *Santa Fe*." *Cambridge*, 942 F.3d at 1244. First, the justification falters because "both of these were on the books when prayer was allowed in the championship game in 2012 and again in the first three playoff rounds in 2015,"

and "FHSAA hasn't told us why this explanation barred speech at the 2015 championship game when it didn't bar the high schools from offering the same form of speech at three earlier semifinal games and one final game." *Id.* Nor has FHSAA explained why this restriction did not bar a school's cheerleaders from displaying a "One God" banner at the 2012, or bar the FHSAA from posting "prayers" and other religious messages on its government-owned and controlled social media accounts. Accordingly, the FHSAA's claimed interest is not compelling. *See Multimedia Publ'g Co. of S.C., Inc. v. Greenville-Spartanburg Airport Dist.,* 991 F.2d 154, 162 (4th Cir. 1993) (speech ban did not survive strict scrutiny because "governmental interests asserted as justification for the ban were post hoc, pretextual creations"); *Lukumi,* 508 U.S. at 546-47 (law did not further a compelling interest when interests it advanced were pretext for religious discrimination); *Attwood v. Clemons,* 2021 U.S. Dist. LEXIS 49586 at *32-33 (N.D. Fla. March 17, 2021) (pretextual, post-hoc justification in censoring speech not a compelling interest).

Second, the Supreme Court has repeatedly rejected the argument equating nondiscrimination or neutral accommodation with endorsement. *See, e.g.*, *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 114 (2001) (allowing a religious club to speak on school grounds after school hours "would ensure neutrality, not threaten it"); *Rosenberger*, 515 U.S. at 837-46; *Lamb's Chapel*, 508 U.S. at 395.

Third, FHSAA permitted other prayers but prohibited CCS's championship game prayer—preferential treatment that is not permitted. Such denominational

discrimination is never permissible. *See Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").

Finally, even if FHSAA had met its burden on compelling interest, FHSAA made no meaningful effort to tailor its policy to otherwise allow CCS to join in a communal pregame prayer. SMF ¶ 48. "A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. Given the lack of any attempt—much less a successful one—of narrow tailoring, this is not one of those "rare cases."

"The Establishment Clause does not require the elimination of private speech endorsing religion in public places. The Free Exercise Clause does not permit the State to confine religious speech to whispers or banish it to broom closets. If it did, the exercise of one's religion would not be free at all." *Chandler II*, 230 F.3d at 1316. Similarly, free exercise does not allow FHSAA to silence religious speech by selectively denying access to the PA system and confining CCS's practice of communal prayer to a few students gathered at midfield, seen but not heard by their friends, families, and larger religious community.

**CONCLUSION**

CCS respectfully requests that the Court grant summary judgment on all of its claims and enter judgment consistent with the relief requested in the Amended Complaint.

Dated: April 9, 2021

Respectfully submitted,

**Adam M. Foslid**
Florida Bar No. 0682284
afoslid@sfslaw.com
STUMPHAUZER FOSLID SLOMAN ROSS & KOLAYA, PLLC
Two South Biscayne Boulevard,
Suite 1600
Miami, FL 33131
T: (305) 614-1404
F: (305) 614-1425

**Hiram S. Sasser**
Texas Bar No. 24039157 (*Pro Hac Vice)*
hsasser@firstliberty.org
**Jeremiah G. Dys**
Texas Bar No. 24096415 (*Pro Hac Vice*)
jdys@firstliberty.org
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075
T: (972) 941–4444
F: (972) 941–4457

*Counsel for Cambridge Christian School, Inc.*

**Jesse Panuccio**
Florida Bar No. 31401
jpanuccio@bsfllp.com
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard,
Suite 1200
Fort Lauderdale, FL 33301
T: (954) 356-0011
F: (202) 237-6131

By: /s/ Jesse Panuccio
JESSE PANUCCIO

**Eliot Pedrosa**
Florida Bar No. 182443
epedrosa@jonesday.com
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, FL 33131
T: (305) 714-9717
F: (305) 714-9799

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of April, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Adam M. Foslid* ADAM M. FOSLID

**SERVICE LIST**

***Cambridge Christian Sch., Inc. v. Florida High School Athletic Ass'n, Inc.*, Civ No. 8:16-cv-02753-CEH-AAS, United States District Court, Middle District of Florida**

HOLLAND & KNIGHT LLP
200 S. Orange Ave., Suite 2600
Orlando, FL 32801
(407) 425-8500 (Telephone)
(407) 244-5288 (Facsimile)
Judith M. Mercier (FBN 32727)
judy.mercier@hklaw.com
Daniel Mahfood (FBN 94879)
Daniel.mahfood@hklaw.com
50 N Laura Street, Suite 3900
Jacksonville, FL 32202
(904) 353-2000 (Telephone)
(904) 358-1872 (Facsimile)

*Counsel for Defendant Florida High School Athletic Association, Inc.*

CLAYTON-JOHNSTON, P.A
18 Northwest 33rd Court
Gainesville, FL 32607
(352) 376-4694 (Telephone)
(352) 371-7366 (Facsimile)
Leonard E. Ireland, Jr.
Florida Bar No. 104630
Primary: Lireland@Clayton-Johnston.com
Secondary:Tbrehm@Clayton-Johnston.com

*Counsel for Defendant Florida High School Athletic Association, Inc.*