**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| Cambridge Christian School, Inc.,<br><br>*Plaintiff,*<br><br>v.<br><br>Florida High School Athletic Association, Inc.,<br><br>*Defendant.* | Civ. No. 8:16-cv-02753-CEH-AAS |

**NOTICE OF APPEAL**

Notice is hereby given that Plaintiff Cambridge Christian School, Inc. appeals to the United States Court of Appeals for the Eleventh Circuit the summary-judgment order entered in this case on March 31, 2022, (Doc. 167) and the final judgment entered that same day (Doc. 168). The order granted Defendant Florida High School Athletic Association, Inc.'s Motion for Summary Judgment (Doc. 136) and denied Plaintiff Cambridge Christian School, Inc.'s Motion for Summary Judgment (Doc. 137). A copy of the March 31, 2022, order is attached hereto as Exhibit A, and a copy of the final judgment is attached hereto as Exhibit B.

Dated: April 14, 2022

Respectfully submitted,

/s/ *Jesse Panuccio*

**Adam M. Foslid**
Florida Bar No. 0682284
afoslid@sfslaw.com
STUMPHAUZER FOSLID SLOMAN ROSS & KOLAYA, PLLC
Two South Biscayne Boulevard,

**Jesse Panuccio**
Florida Bar No. 31401
jpanuccio@bsfllp.com
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard,
Suite 1200

Suite 1600
Miami, FL 33131
T: (305) 614-1404
F: (305) 614-1425

**Hiram S. Sasser**
Texas Bar No. 24039157 (*Pro Hac Vice*)
hsasser@firstliberty.org
**Jeremiah G. Dys**
Texas Bar No. 24096415 (*Pro Hac Vice*)
jdys@firstliberty.org
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, TX 75075
T: (972) 941-4444
F: (972) 941-4457

Fort Lauderdale, FL 33301
T: (954) 356-0011
F: (202) 237-6131

**Eliot Pedrosa**
Florida Bar No. 182443
epedrosa@jonesday.com
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, FL 33131
T: (303) 714-9717
F: (303) 714-9799

*Counsel for Cambridge Christian School, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of April, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Jesse Panuccio*
Jesse Panuccio

**SERVICE LIST**

HOLLAND & KNIGHT
Judith M. Mercier (FBN 32727)
Judy.mercier@hklaw.com
200 S. Orange Ave., Ste. 2600
Orlando, FL 32801
T: (407) 425-8500
F: (407) 244-5288
Daniel Mahfood (FBN 94879)
Daniel.mahfood@hklaw.com
50 N Laura Street, Ste. 3900
Jacksonville, FL 32202
T: (904) 353-2000
F: (904) 358-1872

CLAYTON-JOHNSTON, P.A.
Leonard E. Ireland, Jr. (FBN 104630)
Lireland@Clayton-Johnston.com
18 Northwest 33rd Court
Gainesville, FL 32607
T: (352) 376-4694
F: (352) 371-7366

*Counsel for Defendant Florida High School Athletic Association, Inc.*

# EXHIBIT A

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

CAMBRIDGE CHRISTIAN SCHOOL, INC.,

Plaintiff,

v. Case No: 8:16-cv-2753-CEH-AAS

FLORIDA HIGH SCHOOL ATHLETIC ASSOCIATION, INC.,

Defendant.
__________________________________/

**ORDER**

This matter comes before the Court on Defendant Florida High School Athletic Association, Inc.'s Motion for Summary Judgment (Doc. 136), Plaintiff Cambridge Christian School, Inc.'s Motion for Summary Judgment (Doc. 137), the parties' responses in opposition (Docs. 148, 151), the replies (Docs. 153, 155), the Amended Joint Stipulation of Material Facts (Doc. 158), and Plaintiff's Notice of Supplemental Authority (Doc. 157). The Court heard oral argument on the cross motions for summary judgment on December 21, 2021. Having considered the motions and being fully advised in the premises, the Court will grant Defendant's motion for summary judgment and deny Plaintiff's motion for summary judgment.

## I. BACKGROUND[1]

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations, depositions, and exhibits (Docs. 135, 136-1–

**A. Statement of Undisputed Facts (Doc. 158)**

Plaintiff, Cambridge Christian School, Inc. ("CCS"), is an independent, co-educational, private Christian school in Tampa, Florida. Doc. 158 ¶ 1. Since 1989, CCS or its predecessor entity has continuously been a member of the Florida High School Athletic Association ("FHSAA"). *Id.* ¶ 2. Tim Euler was CCS's Head of School in 2015. *Id.* ¶ 3. Shawn Minks was CCS's Assistant Head of School in 2015 and is currently CCS's Head of School. *Id.* ¶ 4. Dr. Marianne Banales served as CCS's varsity cheerleading coach from 2012 to 2016. *Id.* ¶ 5. In 2015, Chad Goebert served as Athletic Director of CCS. *Id.* ¶ 6.

Defendant FHSAA is a state actor and a non-profit organization that governs high school athletics in Florida. *Id.* ¶ 7. Dr. Roger Dearing served as the FHSAA's Executive Director from 2009 to 2017. *Id.* ¶ 8. Dr. Dearing was the superintendent of Indian River County schools in 2000 and was aware of *Santa Fe Independent School District v. Doe*, 520 U.S. 290 (2000), by at least 2003. *Id.* ¶ 9. George Tomyn has served as the FHSAA's Executive Director since 2017. *Id.* ¶ 10. Frank Beasley was the Coordinator of Athletics and Football Administrator for the FHSAA from December 2019 until the middle of March 2021. *Id.* ¶ 11. From the time he joined the FHSAA in 2015 until December 2019, Beasley held the title of Director of Athletics and oversaw the sport of football, among others. *Id.* Quinten Ershock is the Assistant Director of Marketing for the FHSAA and was a Marketing Specialist from December 2011 to

136-28, 138, 139, 142, 149, 152, 154, 157), as well as the parties' Amended Joint Stipulation of Material Facts (Doc. 158).

September 2020. *Id.* ¶ 12. Justin Harrison was the FHSAA's Assistant Executive Director for Athletics in June 2012, and all sport administrators reported to him. *Id.* ¶ 13. Starting in the summer of 2015, Harrison became Associate Executive Director for Athletic Services. *Id.* He reports directly to the Executive Director. *Id.* Seth Polansky was a member of the FHSAA's communications staff as Membership and Web Director from April 2009 to January 2016. *Id.* ¶ 14. Jamie Rohrer is the FHSAA's Associate Executive Director for Administrative Services. *Id.* ¶ 15. In 2015, Rohrer was the FHSAA's Assistant Executive Director for Administrative Services. *Id.* In both roles, Rohrer reports directly to the Executive Director. *Id.* Shanell Young has worked at the FHSAA since 2003. *Id.* ¶ 16. From 2003 to 2005, Young was an assistant, and, around 2005, she became an Assistant Director of Athletics. *Id.* Young was then a Director of Athletics at the FHSAA for ten years, beginning around 2010. *Id.* In 2012 and 2015, Young was a Director of Athletics. *Id.* In 2016, Young became Coordinator of Technology. *Id.*

The FHSAA's membership includes public and private schools. *Id.* ¶ 17. As the governing authority for high school athletics in Florida, the FHSAA administers more than two dozen sports (including at least thirty championships during the 2015–16 academic year). *Id.* ¶ 18. The FHSAA has Bylaws, Administrative Policies, and Administrative Procedures that govern the FHSAA, its member schools' athletic programs, and all FHSAA sporting events, including FHSAA State Championship Series events. *Id.* ¶ 19; *see* Docs. 142-10 through 142-12 and 142-14 through 142-16.

Additionally, the FHSAA has Football Participation Manuals for each school year. *See* Doc. 142-17 (2012 FHSAA Football Finals Participant Manual); Doc. 142-13 (2015 FHSAA Football Finals Participant Manual).

The FHSAA divides its member schools into classes primarily based upon student population counts of the member schools. Doc. 158 ¶ 21. For football, there are eight classes. *Id.* At the conclusion of the regular season, and for the purpose of determining the official state champion in each Class, the FHSAA conducts a Florida High School State Championship Series (the "State Championship Series"). *Id.* ¶ 22. In 2012 and 2015, for football Class 2A, the State Championship Series consisted of the Regional Semifinal, the Regional Final, the State Semifinal, and the State Championship Final. *Id.* The State Championship Series games preceding the State Championship Final are also known as the "playoffs." *Id.* All FHSAA football State Championship Final games from 2007 to 2018 occurred at the stadium known as the Citrus Bowl (now known as Camping World Stadium) in Orlando, Florida. *Id.* ¶ 23. The Citrus Bowl was publicly owned during that time period. *Id.* The Central Florida Sports Commission ("CFSC"), now known as the Greater Orlando Sports Commission, is a "community partner" of the Citrus Bowl that works with the venue to book events at the stadium. *Id.* ¶ 24. However, the CFSC is not the operator of the Citrus Bowl. *Id.* The relationship between the CFSC and the Citrus Bowl is formalized contractually on an event-by-event basis. *Id.* The FHSAA and the CFSC entered into agreements in 2012 and 2015, as well as other years, for the FHSAA football

championships to be held at the Citrus Bowl. *Id.* ¶ 25. Copies of the agreements covering 2012 and 2015 have been filed at Docs. 142-30 and 142-31.

For football games, the FHSAA designates the PA announcer as a "bench official" who must "maintain complete neutrality at all times" and may "not be a 'cheerleader' for any team." Doc. 158 ¶ 26. The PA announcer for football games is not an FHSAA employee or contractor. *Id.* ¶ 27. For State Championship Series playoff games, the FHSAA required that the venue have a public-address ("PA") system. *Id.* ¶ 28. The FHSAA creates PA scripts for use at State Championship Series events. *Id.* ¶ 29. During the pre-game period of the football State Championship Final game, the Presentation of Colors, Pledge of Allegiance, and national anthem are traditionally broadcast over the PA system. *Id.* ¶ 30. The FHSAA does not select the national anthem performer. *Id.* The CFSC selected and hired the PA announcer for the FHSAA football State Championship Final games at the Citrus Bowl. *Id.* ¶ 31.

In 2012, University Christian School ("UCS") played against Dade Christian School in the 2012 FHSAA Class 2A Football State Championship Game, which was held at the Citrus Bowl. *Id.* ¶ 32. The PA script for the 2012 FHSAA Class 2A Football State Championship Game included a prompt stating: "University Christian and Dade Christian will lead a prayer over the PA system at this time. (This should take one minute or less.)" *Id.* ¶ 33. The PA script indicated that the prompt should be read with 30 minutes on the pre-game clock. *Id.* The script indicated that a sportsmanship announcement should be read with 33 minutes showing on the pre-game clock. *Id.*

The script indicated that an announcement regarding Junior Orange Bowl awards should be read with 28 minutes showing on the pre-game clock. *Id.* A copy of the PA script for the 2012 FHSAA Class 2A Football State Championship Game has been filed at Doc. 138-2 at 2–18.

During the 2015 football regular season, CCS played its home football games at Skyway Park in Tampa. Doc. 158 ¶ 34. That year CCS won all of its games and qualified for the Class 2A playoffs. *Id.* ¶ 35. In the 2015 FHSAA Class 2A Football State Championship Series, CCS won playoff games against (1) Northside Christian School, (2) Admiral Farragut Academy, and (3) First Baptist Academy. *Id.* ¶ 36. The participants in the 2015 Class 2A FHSAA Football State Championship Final game (the "2015 Final") were CCS and UCS. *Id.* ¶ 37. The FHSAA prepared the PA script for the 2015 Final. *Id.* ¶ 38. The FHSAA did not select, employ, hire, or pay the PA announcer at the 2015 Final. *Id.* ¶ 39. The FHSAA PA script for the 2015 Final included paid sponsor messages. *Id.* ¶ 40.

Before the 2015 Final, UCS asked the FHSAA for permission to broadcast a pre-game prayer over the PA system at the 2015 Final. *Id.* ¶ 41. The FHSAA denied this request. *Id.* Subsequently, on December 2, 2015, CCS Head of School Euler emailed FHSAA Executive Director Dearing requesting that the FHSAA permit broadcast of a pre-game prayer over the Citrus Bowl PA system. *Id.* ¶ 42; *see* Docs. 136-21, 142-18. UCS subsequently also emailed Dearing, supporting the request to broadcast a pre-game prayer over the PA system. Doc. 158 ¶ 43; Doc. 142-19. Dearing denied the request in an email. Doc. 158 ¶ 44; Docs. 136-22, 142-20. After the 2015

Final, Dearing sent a follow-up email further explaining his decision. Doc. 158 ¶ 45; Docs. 136-23, 142-21. UCS and CCS student athletes and coaches prayed together at the middle of the field before the 2015 Final. Doc. 158 ¶ 46. The prayer was not broadcast over the PA system. *Id.* Both schools also prayed on the field in the minutes following the 2015 Final. *Id.* ¶ 47. The prayer was not broadcast over the PA system. *Id.*

**B. Procedural History**

On February 3, 2017, the Magistrate Judge entered a report and recommendation recommending CCS's Motion for Preliminary Injunction be denied and FHSAA's Motion to Dismiss be granted. Doc. 50. Thereafter, the Court issued an order adopting the report and recommendation, denied the motion for preliminary injunction, granted the motion to dismiss, and granted CCS the opportunity to file an amended complaint. Doc. 57. CCS did not file an amended complaint, and instead, on June 20, 2017, appealed the Court's order of dismissal to the Eleventh Circuit Court of Appeals. Doc. 58. On November 13, 2019, the appellate court issued an Order, *Cambridge Christian School, Inc. v. Florida High School Athletic Association, Inc*., 942 F.3d 1215, 1247 (11th Cir. 2019), affirming dismissal of CCS's claims brought under the Florida Religious Restoration Act ("FRFRA") and for declaratory relief under the Establishment Clause, reversing dismissal as to the free speech and free exercise clause claims, and remanding to this Court for further proceedings. Doc. 73. Specifically, the Eleventh Circuit found that CCS plausibly alleged enough on its freedom of speech and freedom of religion claims to survive a Rule 12(b)(6) dismissal. *Cambridge Christian*

*Sch.,* 942 F.3d at 1252. After remand, the parties engaged in extensive discovery and thereafter filed motions for summary judgment (Docs. 136, 137), which are ripe for the Court's consideration. The motions have been fully briefed, with multiple exhibits and additional authority filed in support of the respective motions. *See* Docs. 135, 136-1–136-28, 138, 139, 142, 148, 149, 151, 152, 153, 154, 155, 157, 158.

## II. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the

court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## III. DISCUSSION

To understand what this case is about is to first recognize what it is not about. This case is not about whether two Christian schools may pray together at a football game. It is undisputed that CCS and UCS engaged in group prayer before and after the 2015 FHSAA Class 2A Football State Championship Final game. Indeed, players

and coaches from both teams, along with some officials, met at the 50-yard line of the Citrus Bowl to pray together before the game and again on the sidelines after the game. Doc. 142-51. But they were not permitted to deliver their prayer over the PA system during the pregame. The issue before the Court is whether the First Amendment required the FHSAA to grant the teams unrestricted access to the PA system to deliver the prayer over the loudspeaker during the pregame. Thus, the questions to be answered are whether the inability to pray over the loudspeaker during the pregame of the State Championship Final football game violated CCS's First Amendment rights to freedom of speech and free exercise of religion.[2] The Free Speech Clause of the First Amendment to the United States Constitution prohibits Congress from making any law "abridging the freedom of speech." The First Amendment also contains the Free Exercise Clause, which prohibits Congress from making any "law prohibiting the free exercise" of religion.[3] As discussed below, the Court concludes that the First Amendment does not apply because the speech at issue is government speech, but even if some portion of the speech is considered private speech, the Court finds no constitutional violation occurred.

### A. Freedom of Speech

---

[2] UCS declined CCS's request to participate in the lawsuit. Doc. 136-24 at 2. The stance of UCS's president was they were never denied the right to pray, only denied the right to use the microphone. *Id.*

[3] Although the First Amendment explicitly applies to the actions of Congress, the due process clause of the Fourteenth Amendment renders it equally applicable to the States. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1 (1996).

The first issue for the Court's consideration is whether the FHSAA violated CCS's First Amendment right to freedom of speech when it denied CCS's request to pray over the PA system prior to the 2015 FHSAA 2A Championship Final football game between CCS and another Christian school. The threshold question is whether the speech over the PA system is government speech or private speech. If the speech is government speech, the First Amendment does not apply and the inquiry goes no further. As discussed below, the pregame speech over the PA system[4] at the state-hosted Championship Final football game is government speech.

**Government Speech**

"The Free Speech Clause of the First Amendment 'restricts government regulation of private speech; it does not regulate government speech.'" *Mech v. Sch. Bd. of Palm Beach Cty.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467, (2009)); *see Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550,

[4] The Court focuses its analysis on pregame speech delivered over the PA system at a State Championship Final football game hosted by the FHSAA in a government-owned stadium. In so doing, the Court finds precedence in the Supreme Court's opinion in *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000). In concluding the speech at issue was government speech in *Santa Fe*, the Supreme Court specifically considered "the pregame invocations." *Id.* Although *Santa Fe* was an Establishment Clause case, the threshold question was the same—whether the speech was government speech or private speech. In making its determination, the *Santa Fe* Court confined its consideration to speech over the PA system during the "pregame ceremony" during the public school's football game. *Id.* at 303 ("The Santa Fe school officials simply do not 'evince either by policy or by practice,' any intent to open the [pregame ceremony] to 'indiscriminate use,' . . . by the student body generally.") (brackets in original) (internal citations omitted). The Supreme Court did not compare the pregame speech to speech occurring at other points during the game, such as during half time. Nor did the Court compare the football pregame invocations with speech occurring at other sports contests. Finally, the *Santa Fe* Court did not compare the pregame prayer over the PA system with speech written on banners, in programs, or by advertisers.

553 (2005) ("Government's own speech . . . is exempt from First Amendment scrutiny."). As described recently by the Eleventh Circuit, "[t]he First Amendment works as a shield to protect private persons from 'encroachment[s] by the government' on their right to speak freely, . . . not as a sword to compel the government to speak for them." *Leake v. Drinkard*, 14 F.4th 1242, 1247 (11th Cir. 2021) (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 566 (1995)). Thus, "[w]hen the government exercises 'the right to speak for itself,' it can freely 'select the views that it wants to express.'" *Mech.*, 806 F.3d at 1074 (quoting *Summum*, 555 U.S. at 467); *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213–14 (2015). "This freedom includes choosing not to speak and speaking through the removal of speech that the government disapproves." *Mech*, 806 F.3d at 1074 (citations, alterations, and quotation marks omitted).

In determining whether speech is government speech or private speech, courts consider three factors: "history, endorsement, and control." *Dean v. Warren*, 12 F.4th 1248, 1265 (11th Cir. 2021) (Pryor, C.J.) (citing *Cambridge Christian Sch.,* 942 F.3d at 1231). "These factors are neither individually nor jointly necessary for speech to constitute government speech. . . . But a finding that *all* evidence government speech will almost always result in a finding that the speech is that of the government." *Leake*, 14 F.4th at 1248 (11th Cir. 2021) (citations omitted) (emphasis in original).

The opinion in *Dean* is instructive. In support of a national movement intended to curb police brutality against African Americans and advance the cause of racial

justice, the plaintiff in *Dean*, a cheerleader at Kennesaw State University, kneeled during the pre-game national anthem at a university football game.[5] *Dean*, 12 F.4th at 1251. Thereafter, university officials told the cheerleaders they would not be allowed on the field during the anthem but instead would remain in the stadium tunnel. *Id.* at 1252. Dean sued alleging a deprivation of her First Amendment rights. After analyzing the three factors of history, endorsement, and control, the appellate court concluded that Dean engaged in government speech when she cheered in a team uniform at a football game on behalf of her public university. *Id.* at 1264. The court noted that the appearance of the university's endorsement of the message was even more apparent because Dean kneeled at the time of the pregame rituals, which are "inseparably associated with ideas of government." *Id.* at 1265 (quoting *Cambridge Christian Sch.*, 942 F.3d at 1233). "Because the Free Speech Clause does not restrict government speech," the court concluded, "Kennesaw State University did not violate [Dean's] First Amendment rights when it prevented her from kneeling on the field."[6] *Id.*

---

[5] The movement was sparked by the actions of Colin Kaepernick, a San Francisco 49ers quarterback, who refused to stand for the national anthem during the National Football League's 2016 season, choosing instead to kneel in protest of police brutality against African Americans. *Dean*, 12 F.4th at 1251.

[6] Chief Judge Pryor noted the potential absurd results if the First Amendment protected Dean's right to express herself in any manner she chooses while she is in uniform on the field. "By this logic, Dean would have a right to perform her own unapproved, self-choreographed cheer, to cheer for the opposing team, or to refrain from cheering at all. She would also have a right to stage a hunger strike, to hold up campaign posters for a political candidate, to entertain the crowd with expressive dance, to cut up the American flag, or to wear a leather jacket over her cheerleader uniform with the words 'f*** the draft' stitched onto the back." *Id.* at 1266.

The Court addresses each of the three factors below in the context of this case and concludes that all three factors strongly support a finding that pregame speech over the PA system at the championship finals football game hosted by the FHSAA at a state-owned venue is government speech. Thus, FHSAA did not violate CCS's First Amendment rights when it did not open up access to the PA system to allow CCS to deliver a prayer over the loudspeaker during the pregame.

*1. History*

"The first factor, history, 'ask[s] whether the type of speech under scrutiny has traditionally communicated messages on behalf of the government.'" *Dean*, 12 F.4th at 1265 (quoting *Cambridge Christian Sch.*, 942 F.3d at 1232). Considering the evidence before the Court on a fully developed record, the Court determines that this factor weighs in favor of a finding that speech over the PA system during the FHSAA Championship Final football pregame is government speech. Although the Eleventh Circuit initially thought this factor tipped in favor of CCS because of CCS's allegations that prayer occurred at the 2012 Championship Final game and prayer occurred at least at three playoff games in 2015, with the benefit of discovery, the picture is now clear. In the history of FHSAA State Football Championships, only one time has an FHSAA script (either in a finals game or a playoff game) ever mentioned prayer—the 2012 Championship Game. Despite CCS's claim that it prayed at the 2015 playoff games, prayers were not referenced or included in the FHSAA scripts of the 2015 playoff games, or any other year's football playoff or final game. *See* Docs. 136-13–136-17. Relying on CCS's Complaint, the Eleventh Circuit accepted CCS's allegations

regarding prayer occurring before three 2015 playoff games, but the appellate court questioned how closely the FHSAA administered or monitored the playoff games hosted by CCS. *See Cambridge Christian Sch.*, 942 F.3d at 1232. Evidence shows that the FHSAA does not choose the facility for playoff games. Doc. 136-2 at 6. The FHSAA does not send representatives to regular season or playoff games.[7] Docs. 136-10 ¶ 10; 110-8 ¶ 4; 136-3 at 7. There are more than 3,500 FHSAA High School State Championship Series contests. Doc. 142-9 at 7. The FHSAA did not have the resources to monitor regular season and playoff games. Doc. 136-10 ¶ 10. It is undisputed that CCS never requested permission from FHSAA to pray over the loudspeaker at the 2015 playoff games (Doc. 136-9 at 5), nor is there any evidence that the FHSAA knew that CCS was engaging in prayer over the PA system at the playoff games that CCS hosted. Docs. 136-2 at 7; 139-2 at 19; 103 at 4–5.

As for the single occurrence of prayer in the 2012 script, the Court is not persuaded that the one incident creates a "history" of private speech. While there is record evidence that prayer occurred in the 2012 Class 2A football championship final pregame (Docs. 136-5 at 6; 142-1 ¶ 9), the isolated incident of prayer against the backdrop of a decade's worth of football championship final scripts without any mention of prayer (*see, e.g.,* Docs. 136-13–136-17) is an aberration which cannot be

---

[7] The undisputed evidence shows that the FHSAA had a limited budget and approximately 25 full-time employees. Doc. 110-8 ¶ 3. Florida high schools participate in thousands of events in thirty sports during a school year. Doc. 25-1 ¶ 3. Thus, given its staffing and budgetary limitations, the FHSAA lacks the resources to monitor or attend on an official basis regular season events or playoff events other than championship finals. Doc. 136-10 ¶ 22; *see also* Doc. 110-8 ¶ 4.

relied upon to evidence a history of private speech. Indeed, at oral argument, the FHSAA acknowledged the 2012 prayer was permitted in error. CCS submits the transcript of Seth Polansky, former membership and website director, who testified that he recalls Dearing told him to include the prayer in the 2012 script. Doc. 139-10 at 14. Dearing disputes this and has testified that he does not know who from the FHSAA approved the prayer in 2012. Doc. 136-3 at 8. In any event, it is illogical to conclude that the one occurrence establishes the norm.

Relying on the playoff games in 2015, CCS argues that the occurrence of prayer was more than once because, according to CCS, it engaged in prayer at every playoff game it hosted in 2015. But CCS does not direct the Court to any evidence to show that FHSAA knew that CCS was delivering a pregame prayer over the PA during the 2015 playoff games, other than to state that the PA announcer at playoff games is a "bench official." However, the undisputed evidence reflects the PA announcer is not hired by the FHSAA, nor is the PA announcer employed by the FHSAA. Doc. 158 ¶ 39.

CCS further argues that the FHSAA's regulation of the playoff games supports that it administered and monitored the playoff games. As discussed above, the evidence does not bear this out. Although the FHSAA prepares scripts for the playoff games leading up to the State Championship Final, CCS's reliance on what occurred at the playoff games is not persuasive as to the analysis of whether there is a history of government speech at the State Championship Final game. Critically, the playoff games are hosted by one of the participating schools at a venue chosen by the

participating schools. This is factually distinguishable from speech occurring at the State Championship Final football game which is held at a neutral site and is hosted by the FHSAA and its partner host, in 2015 the Citrus Bowl. And as discussed above, while the FHSAA may regulate the playoff games, it did not monitor or attend the games, other than the championship game.

It is clear the 2015 FHSAA playoff scripts did not include a reference or provision for prayer in the PA script (Docs. 136-12), but CCS submits the declaration of Greg Froelich, who states that as the PA announcer for the 2015 playoff games, he delivered a prayer at all three playoff games over the loudspeaker. Doc. 142-7. As admitted by CCS representatives, however, no one from CCS requested permission from the FHSAA to say a prayer over the PA system at those events (Doc. 136-9 at 5), and it is undisputed that the FHSAA had no knowledge that the schools were praying over the PA system at those games. *See* Docs. 137 at 17; 142-7 ¶ 23 (2015 prayers delivered at the 2015 playoff games were unscripted, and not reviewed, edited, or preapproved by anyone, including the FHSAA). Additionally, there is no evidence that FHSAA representatives attended the playoff games. *See* Doc. 136-10 ¶ 22 (FHSAA lacks resources to monitor or attend playoff games on an official basis). FHSAA representative, Jamie Rohrer, states that regular season and early playoff games are hosted by member schools at venues of the school's choosing. Doc. 136-10 ¶ 4. The Court is unpersuaded that prayer occurring at the 2015 playoff games, without the FHSAA's knowledge, establishes a history of private speech at a State

Championship Final football game.[8] And the single incident of prayer at the 2012 State Championship Final football game cannot establish a history of non-government speech over the PA.

To the contrary, the history factor weighs in favor of a finding of government speech. Review of a decade of scripts from football championship finals (Docs. 136-13–136-17) shows the FHSAA traditionally used the PA system to communicate to the public. The speech over the PA system is completely scripted and the pregame speech includes communications such as a welcome message, a sportsmanship message, presentation of scholar-athlete awards, color guard introduction, Pledge of Allegiance, and introduction of the anthem singer. *See, e.g.,* Doc. 136-13 at 6–8, 23–25, 41–43, 59–61; *see also* Docs. 136-14; 136-15; 136-16; 136-17. These pregame rituals traditionally "associated with ideas of government" support a finding of government speech.

CCS argues that the FHSAA "routinely" permitted and broadcast prayers. Doc. 137 at 13. In support, CCS cites to cheerleader banners, athlete on-field interviews,

---

[8] CCS submits the declaration of its athletic director, Mark Butler, who states that at CCS's 2020 playoff games, just before the national anthem, the PA announcer led a prayer. Doc. 142-2 at 4. According to Bulter's declaration, CCS played two Christian schools in the 2020 playoff games—the November 13, 2020 playoff game hosted by Keswick Christian at Keswick's home field and the November 20, 2020 playoff game hosted by Seffner Christian Academy at King's Academy High School. *Id.* Like the 2015 playoff games, the 2020 playoff games were hosted by one of the participating schools at their home field or the host school's chosen venue. The playoff games were not hosted at a large state venue such as the Citrus Bowl. There is no evidence members of the FHSAA were present. Review of the FHSAA scripts for the playoff games in 2020 reflect no mention of prayer. *See* Doc. 138-31 at 34-40, 41-48.

FHSAA Facebook posts of athletes and their coaches engaged in prayer, and FHSAA social media messages wishing Merry Christmas and sending "thoughts and prayers." *Id.* at 13-15. CCS's argument and reference to these messages is unavailing, as that is not the type of speech at issue here.

To the extent CCS argues the speech over the PA is private speech because of the advertising sponsors, the Court disagrees. "When . . . the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages." *Johanns*, 544 U.S. at 562 (ruling that the message set out in beef promotions pursuant to the Beef Promotion and Research Act of 1985, 7 U.S.C. § 2901 et seq., was government speech even though the government solicited assistance from a nongovernmental source—various cattle farmer associations— in developing specific messages, and rejecting the associations' contention that the federal beef program did not qualify as government speech because it was funded by a targeted assessment of beef producers rather than by general revenues). Here, the overall message is specifically scripted by the FHSAA to convey the messages it wanted conveyed. The questions that left the appellate court wondering whether historically the PA system was being used by others during the pregame to convey their own messages has been answered, and it is a resounding "no." Based on the fully developed record, it is apparent the history factor supports a finding that the pregame PA speech at the FHSAA State Championship Final football game is government speech.

*2. Endorsement*

"The second factor, endorsement, 'asks whether the kind of speech at issue is often closely identified in the public mind with the government, or put somewhat differently, whether observers reasonably believe that the government has endorsed the message.'" *Dean*, 12 F.4th at 1265 (quoting *Cambridge Christian*, 942 F.3d at 1232–33) (citation and internal quotation marks omitted). The Eleventh Circuit previously found this factor weighed in favor of a finding of government speech. *Cambridge Christian Sch.*, 942 F.3d at 1234. After additional discovery, this conclusion is further supported by the record. As pointed out by the appellate court, this was a State-organized game classified as the "State" championship final. *Id.* at 1233. The PA system was part of the government-owned stadium. *Id.* Unlike the playoff games, there is no "host school" in the State Championship Final football game. Rather, the FHSAA—a state actor—is the host of the event. Significantly, the PA system was not used by anyone other than the PA announcer, except for the music played during the half time performance.[9]

[9] CCS's efforts to demonstrate there were no restrictions on the PA system during half time regarding the music or any other message is not supported by the record. The cheer coach testified it was known the music must be "G-rated." Doc. 136-6 at 3. She never played religious music. *Id.* There is no evidence the microphone was turned over to anyone who wanted to use the PA during half time for any reason other than to introduce the half-time show and play music for it. Doc. 136-10 ¶ 20. FHSAA's Rohrer states she cannot recall any situation in which musical accompaniments were inappropriate. *See id*. In Rohrer's experience, PA announcers have been professional and followed the script. *Id.* ¶ 12. Although not an improper use of the PA system, she recalls an instance in which inappropriate "filler music" was played over the PA system at a championship final game and a representative of the FHSAA requested that it be stopped, and it was. *Id.* ¶ 25.

Critically, the prayer requested by CCS would have come at the beginning of the game at the same time as the pre-game rituals of presentation of the color guard, singing of the national anthem, and recitation of the Pledge of Allegiance. *See Cambridge Christian Sch.*, 942 F.3d at 1233. The Eleventh Circuit found the pivotal question on the endorsement factor to be whether the speech would be "closely identified in the public mind with the government." *Id.* at 1234 (citing *Summum*, 555 U.S. at 472). The Court finds particularly persuasive, as did the appellate court, the fact that CCS sought to deliver the prayer over the PA during the same time as these pregame rituals that are "inseparably associated with ideas of government." *See Cambridge Christian Sch.*, 942 F.3d at 1233.

On appeal, the court noted that the PA Protocol provides for the possibility of "Messages provided by host school management." *Id.* As previously stated, however, there was no host school in the State Championship Final game. The FHSAA was the host. And discovery has confirmed that the host school "messages" referenced in the Protocol were not an opportunity for others to convey messages over the loudspeaker during the Championship Final game because there was no "host school." *See* Doc. 136-10 ¶ 19. Additionally, as noted by the appellate court, the Participant Manual does not indicate any room for announcements other than by the FHSAA. *Cambridge Christian Sch.*, 942 F.3d at 1234.

The Eleventh Circuit also questioned whether the advertisements read by the PA announcer were more in the form of "thank-yous" to the sponsors or presented in promotional terms. *Id.* First, to the extent that CCS points to other advertisements on

the jumbotron or banners lining the field as evidence of private speech, the Court notes the appellate court specifically rejected this argument, finding these types of messages to be irrelevant to the analysis before the court because CCS did not request to pray by means of a banner or by using the Jumbotron.[10] *See id.* at 1234 n.3.

As for the advertisements in the PA script, review of the 2015 Class 2A State Championship Final football game script reveals there is minimal reference to advertising or sponsors during the pregame. *See* Doc. 136-26. The PA announcer reads announcements about FHSAA-licensed souvenirs from Team IP, about the games being replayed by Bright House Sports Network, and inviting coaches and athletic directors to stop by the "Champion Suite" to view the new football uniform and gear offerings. *Id.* at 2, 8. Otherwise, the pregame speech consists of a sportsmanship message, scholar athlete awards, welcome message, color guard introduction, Pledge of Allegiance, anthem singer introduction, team introductions, coin toss, and officials' introduction. *Id.* at 2–8. The local sponsors are introduced and thanked starting during the first charged team time-out of the half. *Id.* at 8. Sponsor messages are included in each quarter. Speech occurring at other points during the game is less controlling.

CCS argues that the sponsorship messages are more than thank yous, and therefore cannot be government speech. Nothing about the references to sponsors in the pregame speech would take away from "observers reasonably believ[ing] that the

---

[10] The Court would add that discussions regarding topics or messages contained on FHSAA's website and in social media posts are similarly irrelevant to the issues before the Court.

government has endorsed the message." *Dean*, 12 F.4th at 1265. The endorsement factor weighs in favor of government speech.

*3. Control*

The third factor, control, "asks whether the relevant government unit maintains direct control over the messages conveyed through the speech in question." *Dean*, 12 F.4th at 1265 (quoting *Cambridge Christian*, 942 F.3d at 1234) (citation and internal quotation marks omitted). Given the paucity of allegations regarding control, the Eleventh Circuit assumed, in CCS's favor, that the State's control was limited. *Cambridge Christian Sch.*, 942 F.3d at 1235. The evidence now reveals that the FHSAA had significant control over the content of the speech, further supporting a finding of government speech.

The appellate court acknowledged the FHSAA controlled access to the microphone but was unclear whether the FHSAA controlled the content. *Id.* Discovery has confirmed that the PA scripts are created by FHSAA employees, and every word that goes into the PA scripts that the FHSAA provides to PA announcers at FHSAA sporting events is put there by an FHSAA employee. Doc. 136-10 ¶ 7. Every FHSAA sponsor must send their proposed text to the FHSAA before it is included in the script. *Id.* ¶ 11. Although CCS argues that the FHSAA never modified a sponsor's proposed text, the FHSAA nevertheless retains the ultimate authority to do so and would have exercised that right if necessary. *Id.* ¶ 12. As the FHSAA points out, its sponsors are generally familiar with appropriate sponsorship announcements and what is acceptable and appropriate for a high school event. *Id.*

The appellate court next questioned who made the announcements before or during the game or who would have been allowed had they requested. *Cambridge Christian Sch.*, 942 F.3d at 1235. Again, discovery has confirmed that only the PA announcer had access to the loudspeaker and the announcer was instructed to follow the FHSAA-written script, with the participating schools only having access to the PA system at half time to play a musical selection to accompany the half-time performance. Doc. 136-10. Prior to 2016, the FHSAA allowed the participating schools limited access to introduce the band at half-time, but that stopped in 2016. *Id.* ¶ 21. The FHSAA had the authority to reject a musical selection if inappropriate. *See id.* ¶¶ 24, 25.

FHSAA Administrative Procedures directed the PA announcer to follow the script and limit other announcements to only those referenced.[11] Specifically, the PA announcer was prohibited from ad-libbing in the form of "play-by-play," or "color commentary," and criticism of schools, players, coaches, or officials was prohibited. *See* Doc. 142-12 at 15–16. The control factor decidedly falls on the side of finding government speech. Thus, the Court concludes that CCS's freedom of speech claim necessarily fails because the First Amendment does not apply here where all three factors—history, endorsement, and control—support a finding of government speech.

[11] The types of limited announcements the PA announcer could make included those in the nature of an emergency (*i.e.*, paging a doctor, lost child), practical announcements (*i.e.*, vehicle lights left on), starting line-ups, player attempting or making a play, penalty as called by a referee, FHSAA souvenir merchandise and concession items for sale, announce substitutions and time-outs. Doc. 142-12 at 15–16.

**Private Speech**

Even if some of the speech conducted over the PA system at the 2015 2A State Championship Final football game could be classified as private speech, the FHSAA's viewpoint neutral regulation of the speech in the nonpublic forum was not unconstitutional.

*1. Forum Analysis*

Courts use a "forum analysis" to evaluate government restrictions on private speech that occurs on government property. *Walker*, 576 U.S. at 215 (citation omitted). As noted by the Eleventh Circuit, "the first critical step in the analysis is to discern the nature of the forum at issue, namely the stadium's public-address system." *Cambridge Christian Sch.*, 942 F.3d at 1236. "The Supreme Court has referred to four categories of government fora: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum." *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017) (citing *Walker*, 576 U.S. at 215–16). The parties here do not contend that the speech over the PA system constituted a traditional public forum or a designated public forum. Rather, at issue—if the speech is considered private—is whether the PA system at the Citrus Bowl during the State Championship Final football game is a limited public forum or a nonpublic forum.

CCS urges the PA system is a limited public forum.[12] However, as the appellate noted, the Supreme Court in *Santa Fe* specifically rejected this premise, holding that it was clear that a PA system at a public high school football game was not a limited public forum. *Cambridge Christian Sch.*, 942 F.3d at 1238 (citing *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 302 (distinguishing *Rosenburger*, 515 U.S. 819)). Nothing revealed in discovery changes the Eleventh Circuit's conclusion on this issue.

Based on the record before it, the Court finds that the Citrus Bowl's PA system is a nonpublic forum because the FHSAA did not open the PA system for use by the general public for any purpose. Like the school mailboxes in the *Perry Education Association* case, there is no indication that the Citrus Bowl PA system during the 2015 State Championship Final game was opened up for use by the general public, and thus the PA system is a nonpublic forum. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 47 (1983) (noting that "[p]ermission to use the [mail] system to communicate with teachers must be secured from the individual building principal [and there was] no court finding or evidence in the record which demonstrates that this permission has been granted as a matter of course to all who seek to distribute material"). Here, only the PA announcer had control of the microphone during the pregame except when the national anthem was sung. Further, any limited use by the cheerleading squad for its music at halftime did not open it up as a public forum because "selective access does

[12] A "'limited public forum' . . . exists where a government has 'reserv[ed a forum] for certain groups or for the discussion of certain topics.'" *Walker*, 576 U.S. at 215 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

not transform government property into a public forum." *Perry Educ. Ass'n*, 460 U.S. at 47; *see also Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390 (1993) (stating that "there is no question" that a government entity "may legally preserve the property under its control for the use to which it is dedicated." (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

"Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves." *Perry Educ. Ass'n*, 460 U.S. at 49. The Court turns next to an assessment of the reasonableness of the restrictions imposed.

*2. Content vs. Viewpoint Restriction*

"Public property which is not by tradition or designation a forum for public communication is governed by different standards." *Id.* at 46. Indeed, the Supreme Court recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Id.* (quoting *United States Postal Service v. Greenburgh Civic Ass'n*, 453 U.S. 114, 129 (1981)). "In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials

oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46 (citing *Greenburgh*, 453 U.S. at 131, n. 7). Even in a nonpublic forum, however, any restriction on speech must be viewpoint neutral. *Cambridge Christian Sch.*, 942 F.3d at 1240.

CCS contends that the restrictions imposed on its speech were unreasonable, based on viewpoint, and haphazardly applied. In support, CCS relies on *InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855 (8th Cir. 2021), for its argument that preclusion of CCS's prayer over the PA system at the State Championship Final football game final constituted improper viewpoint discrimination.

In *InterVarsity*, the Eighth Circuit found the University of Iowa's decision to de-register a Christian organization because it required its leaders to affirm statements of faith constituted viewpoint discrimination in violation of the First Amendment. Membership and participation in the University's chapter of InterVarsity was open to all students, but those who sought leadership roles were required to affirm a statement of faith, including "the basic biblical truths of Christianity." *Id.* at 861. Finding this requirement to obtain a leadership role to be in violation of the University's Human Rights Policy,[13] the University deregistered InterVarsity as a school organization.[14] In

[13] The University of Iowa's Human Rights Policy provides that "in no aspect of [the University's] programs shall there be differences in the treatment of persons because of race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the person of consideration as an individual, and that equal opportunity and access to facilities shall be available to all." *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 859 (8th Cir. 2021).

[14] The University of Iowa allows students to form organizations, referred to as RSOs ("Registered Student Organizations"). RSOs are voluntary special interest groups organized for educational, social, recreational, and service purposes. "RSOs get a variety of benefits,

a lawsuit filed by InterVarsity against the University of Iowa, the district court found, and the appellate court agreed, that while the University's Human Rights Policy was reasonable and viewpoint neutral, it was not so as applied to InterVarsity.

CCS's argument that the FHSAA similarly selectively applied its policies to CCS's speech misses the mark. *InterVarsity* is distinguishable from the instant case for at least two critical reasons. First, it is undisputed that the forum in *InterVarsity* was a limited public forum, which is not the case here. As discussed above, the Citrus Bowl PA system during the 2015 State Championship Final pregame constituted a nonpublic forum. Second, the *InterVarsity* court concluded that the University's application of its Human Rights Policy to religious organizations, but not secular ones such as sororities and fraternities, enforced its policy selectively. Here, no one else was permitted to speak over the PA system during the pregame except the announcer, and pursuant to a predetermined script, which did not include speech and viewpoints of other groups, organizations, or religions. Even though CCS points to Dearing's emails precluding the speech because it purportedly runs afoul of the Supreme Court's *Santa Fe* opinion, as the Eleventh Circuit pointed out, this was not a situation in which Jewish, Muslim or other religious messages were permitted, but Christian messages were not.[15] *Cambridge Christian Sch.*, 942 F.3d at 1242. There was no viewpoint discrimination, and at most, it was content based.

including money, participation in University publications, use of the University's trademark, and access to campus facilities." *InterVarsity*, 5 F.4th at 859.

[15] The Court is unpersuaded by CCS's argument that other "solemnizing" messages were permitted, but those from a religious viewpoint were not. First, most of the other messages

### 3. *Reasonableness of Restriction*

The last step in the analysis is to determine whether the content-based restriction is reasonable. The undisputed evidence shows that the FHSAA's "purposes in pregame festivities at football championship finals are to minimize administrative and logistical burdens, promote patriotism and respect for the United States and its symbols, to create an atmosphere of excitement and anticipation, and to adhere to the Association's traditions for football championship finals." Doc. 136-10 ¶ 5. The Eleventh Circuit recognized, and this Court agrees, that a bar on speech by the participating schools or others during the pregame "could reasonably serve the purpose of orderly administering the game and providing for the usual pregame ceremony." *Cambridge Christian Sch.*, 942 F.3d at 1246. However, the appellate court found troubling the purported inconsistent application of the prohibition, pointing to four instances of prayer at prior State series football games (the 2012 Championship Final and the three 2015 playoff games). *See id.* Evidence now shows that three of the four instances were unknown and unauthorized by the FHSAA. In that regard, the instances of prayer at the 2015 playoff games over the PA system were unknown to or not condoned by the FHSAA, whose employees would not have attended those

CCS points to are those found in different forms of speech, *i.e.*, social media posts and website messages, which are irrelevant to the speech at issue. Additionally, messages contained in scripts from other sports contests are not particularly insightful as very few venues for other Florida high school sporting events are as big and as public as the Citrus Bowl. Next, to the extent CCS points to the pregame speech including the national anthem, color guard, sportsmanship message, welcome message, and Pledge of Allegiance, as being solemnizing in nature, such pregame rituals, many of which are traditionally associated with government, further support the argument that the speech at issue is government speech.

games. Thus, it was only the isolated incident at the 2012 State Championship Final football game in which the schools were granted access to the PA system to deliver a prayer over the loudspeaker.

The reasonableness test is a "forgiving" one. *Cambridge Christian Sch.*, 942 F.3d at 1243 (citing *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018)). "Although there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Minn. Voters All.*, 138 S. Ct. at 1888. The FHSAA's restrictions on speech delivered over the PA system at the State Championship Final football game are reasonable and appropriate. Under the forgiving test articulated in *Minnesota Voters*, the one aberration in 2012 does not change the result that the restriction was not applied in a haphazard manner. Accordingly, the Court finds no freedom of speech violation. As no genuine issues of material fact exist, FHSAA is entitled to judgment in its favor on CCS's freedom of speech claim. CCS's Motion for Summary Judgment on this claim is due to be denied.

**B. Free Exercise Clause**

To state a claim under the Free Exercise Clause, a plaintiff must allege that he or she has a sincere religious belief, and that "the law at issue in some way impacts the plaintiff's ability to either hold that belief or act pursuant to that belief." *GeorgiaCarry.Org, Inc. v. Ga.*, 687 F.3d 1244, 1256-57 (11th Cir. 2012). In other words, the plaintiff must allege that the government impermissibly burdened a sincerely held religious belief. *Id.* (citing *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1294 (11th Cir.

2007)). Additionally, "[t]he Free Exercise Clause does not permit the State to confine religious speech to whispers or banish it to broom closets." *Chandler v. Siegelman*, 230 F.3d 1313, 1316 (11th Cir. 2000) (*Chandler II*). In the school setting, "the State [must] tolerate genuinely student-initiated religious speech," but may cross the line to improper state action if it "participates in or supervises the speech." *Chandler v. James*, 180 F.3d 1254, 1258 (11th Cir. 1999) (*Chandler I*).

CCS argues that communal prayer is a fundamental belief and practice of the CCS community. Doc. 137 at 42. CCS's current head of school, Shawn Minks, explains that communal prayer is one way that CCS implements its religious message of "glorify[ing] God in all that we do." Doc. 142-6 ¶¶ 9, 10. In discussing the importance of communal prayer and how it is integrated into CCS activities, Mr. Minks describes how teachers lead communal prayer before classes and activities, coaches lead communal prayer at the beginning and close of practice, school opens with communal prayer over the school's intercom, and weekly chapel services include opening and closing prayers. *Id.* ¶¶ 10–12. Other school events that open with communal prayer include sporting events, choir concerts, awards banquets, graduation ceremonies, drama performances, school board meetings, parent nights, and staff meetings. *Id.* ¶ 12. Additionally, parents engage in communal prayer through "Moms in Prayer" and "Dads in Prayer" groups that meet regularly at on-campus locations. *Id.* ¶ 13. At all regular season home games that he has attended, Mr. Minks delivers a pre-game prayer over the PA system before the national anthem. *Id.* ¶ 17. In a light favorable to CCS, praying together in the classroom and at school events on

campus is an important part of the school's religious practice and the education of its students.

The prayer at issue here, however, is not prayer at an event on the CCS campus or at an event hosted by CCS. The proposed prayer was to be delivered over the loudspeaker in the Citrus Bowl at a State Championship Final football game hosted by the FHSAA and the Citrus Bowl. It is undisputed that CCS and its opponent UCS were allowed to, and did, pray together at the center of the field both before and after the championship game. Doc. 142-51. Mr. Minks acknowledges that the teams met at the 50-yard line before the game to pray. Doc. 142-6 ¶ 27. Thus, the issue was not that the schools, their students, or their fans were precluded from praying; the issue, which is the gravamen of CCS's claims, is they were not given access to the microphone during the pregame in order to deliver a prayer over the loudspeaker.

CCS contends that not having access to the PA system frustrated their ability to pray together as a community. But, contrary to CCS's argument, communal prayer over a PA system is not the typical practice at events not hosted by CCS or not occurring on CCS's campus. The evidence shows that when visiting non-Christian schools, CCS defers to the home school's tradition and CCS would not request prayer over the PA system. Doc. 136-9 at 3–4. Mr. Minks testified that CCS has not requested to pray over the PA system at away games when playing non-Christian schools. *Id.* CCS prays as a team at away games against non-Christian schools but not over the PA system, and the fans and family members in attendance cannot hear the prayers. *Id.* at 4–5. It was acceptable to CCS to not pray over the loudspeaker when it played an away

game at a non-Christian school because, according to Former Head of School Tim Euler, "that's honoring the facilities that you go to." Doc. 136-5 at 8. Mr. Minks testified that CCS's right to exercise religious freedom has not been burdened by not praying over the PA system at away games. Doc. 136-9 at 3–4.

It is undisputed that CCS does not have a written policy regarding pregame communal prayer over a PA system (Doc. 136-6 at 4) and that CCS routinely played away football games without pregame communal prayer over the PA system (Doc. 136-25 at 2). As Mr. Euler testified, CCS would defer to the host school when playing away games. Doc. 136-5 at 3–4. Mr. Euler further testified he is not aware of CCS requesting to pray over the PA system at away games CCS played in 2015. *Id.* at 4–5. And CCS did not initially request to pray at the 2015 2A FHSAA State Championship Final football game. Rather UCS made the initial request to pray over the PA system during the pregame, and CCS subsequently joined in the request.

The Court's role is not to "drill too far down into 'belief' and 'sincerity'" to determine whether communal pregame prayer is a sincerely-held belief of CCS. *See Cambridge Christian Sch.*, 942 F.3d at 1248. However, on the instant record, it is undisputed that while CCS has a preference for engaging in communal pre-game prayer using the PA system at football games, there is no evidence to support that such pregame communal prayer is a long-standing practice and tradition for CCS. To the contrary, CCS continued to play football games throughout the 2015 season without pregame prayer delivered over the PA system at away games with non-Christian schools. The cheer coach states that she would pray with the cheerleaders, but no one

ever told her she should be praying with the parents or fans. Doc. 136-6 at 5–6. Her prayers with the cheerleaders before and after each practice and game occurred regardless of whether there was a PA system. *Id.* at 7-8. The athletic director sees no difference in not praying over the PA system at away games with non-Christian schools and not praying over the PA system at the 2015 2A State Championship Final football game, where neither CCS nor UCS were the host team. Doc. 136-25 at 2.

In support of its position, CCS argues that amplification through the PA system was the only means available to engage in communal prayer due to the size of the facility and because bullhorns were banned.[16] Doc. 153 at 15. This argument is less persuasive considering CCS's routine practice of not praying over the PA system at away games against non-Christian schools. CCS additionally argues that the state championship game is one of the most memorable experiences and for a religious community "that opens just about *every* group event with communal prayer, from the mundane to the momentous, it goes without saying that being denied communal prayer . . . constituted a substantial burden on the exercise of religion." Doc. 137 at 42–43 (emphasis in original). CCS relies on declarations from students and parents who champion the importance of praying together as a community. Docs. 142-3, 142-4, 142-5. Citing to the allegations of CCS's complaint about the importance of using a "loudspeaker at all home games and at away games" and the need for the use of a

[16] FHSAA disputes that "bullhorns" were banned, noting FHSAA administrative procedures prohibited whistles or noisemakers that mimic a game whistle, but not devices that amplified voices. Doc. 148 at 8; *See* Doc. 8-1 at 15.

loudspeaker at football games because of the size of the venue, the Eleventh Circuit accepted that the use of a loudspeaker was critical to CCS's tradition of communal prayer. *Cambridge Christian Sch.*, 942 F.3d at 1247. With a fully developed record, the Court finds CCS's claim of using a loudspeaker to pray at away football games to be contradicted by the record.

Specifically, the evidence does not support that prayer over the PA system occurred at "just about *every*" group event as claimed by CCS. As discussed, when CCS was not the host or the event was not on its campus, CCS was fully willing to defer to the host school. Neither CCS, nor UCS, were the host schools for the 2015 2A State Championship Final football game at the Citrus Bowl; it follows that CCS's standard practice should have been to defer to the host. Requesting access to the PA system at the Championship final, at which neither it nor UCS hosted, was actually inconsistent with its routine of deferring to the host.

The evidence demonstrates that while many types of events occurring at CCS (*i.e.*, theater performances, classes, athletic practices, parent meetings, school board meetings) are started with group prayer, the prayer does not have to occur over the PA system, and particularly for away games or those not hosted by CCS, it was acceptable for CCS to defer to the host school. The question before the Court is whether communal pre-game prayer is a protected "belief," rather than a mere "preference." On the facts of this case, the Court concludes that communal pregame prayer over the PA system is a preference of CCS's, not a deeply rooted tradition that rises to the level of a sincerely held belief.

Indeed, CCS did pray together with their opponent at the 50-yard line. A former CCS student and football player states that often after a football game, the team would pray with parents, teachers, classmates, and friends on the field or along the sidelines. Doc. 142-3 ¶ 13. There is no evidence before the Court that such sideline prayer could not have occurred at the 2015 Championship Final game. In fact, the evidence shows that the players did pray together after the game. It is evident that praying together is important to CCS, but nothing about the facts of this case demonstrates that delivering the prayer over the PA system is part of CCS's sincerely held religious beliefs. To the contrary, it was acceptable and routine for CCS to defer to the host school for away games. Further as stated by Mr. Minks, the inability to pray over the loudspeaker at away games did not burden CCS's right to exercise religious freedom (Doc. 136-9 at 3–4). *See, e.g., GeorgiaCarry.Org, Inc. v. Ga.*, 687 F.3d at 1257 ("all Free Exercise Clause challenges must include allegations that the law at issue creates a constitutionally impermissible burden on a sincerely held religious belief"). No evidence of burden exists here, as confirmed by CCS's Head of School. As no genuine issues of material fact exist, FHSAA is entitled to judgment in its favor on CCS's free exercise clause claim. CCS's Motion for Summary Judgment on this claim is due to be denied.

Accordingly, it is hereby

**ORDERED AND ADJUDGED**:

1. Defendant Florida High School Athletic Association's Motion for Summary Judgment (Doc. 136) is **GRANTED**.

2. Plaintiff Cambridge Christian School, Inc.'s Motion for Summary Judgment (Doc. 137) is **DENIED**.

3. The Clerk is directed to enter Judgment in favor of Defendant Florida High School Athletic Association and against Plaintiff Cambridge Christian School, Inc.

4. The Clerk is further directed to terminate any pending motions and deadlines and **CLOSE** this case.

**DONE AND ORDERED** in Tampa, Florida on March 31, 2022.

Charlene Edwards Honeywell
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CAMBRIDGE CHRISTIAN SCHOOL, INC.,**

**Plaintiff,**

**v.** **Case No: 8:16-cv-2753-CEH-AAS**

**FLORIDA HIGH SCHOOL ATHLETIC ASSOCIATION, INC.,**

**Defendant.**

---

## JUDGMENT IN A CIVIL CASE

**Decision by Court.** This action came before the Court and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of Defendant Florida High School Athletic Association and against Plaintiff Cambridge Christian School, Inc.

ELIZABETH M. WARREN,
CLERK

s/MB, Deputy Clerk

# CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders**: Courts of Appeals have jurisdiction conferred and strictly limited by statute:

(a) **Appeals from final orders pursuant to 28 U.S.C. Section 1291**: Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. Section 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. V. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. Section 636(c).

(b) **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b), Williams v. Bishop, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 201, 108 S. Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

(c) **Appeals pursuant to 28 U.S.C. Section 1292(a)**: Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions..." and from "[i]nterlocutory decrees...determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

(d) **Appeals pursuant to 28 U.S.C. Section 1292(b) and Fed.R.App.P.5:** The certification specified in 28 U.S.C. Section 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

(e) **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen V. Beneficial Indus. Loan Corp., 337 U.S. 541,546,69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F. 2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S. Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2. **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional. Rinaldo v. Corbett, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P.4(a) and (c) set the following time limits:

(a) **Fed.R.App.P. 4(a)(1)**: A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD - no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

(b) **Fed.R.App.P. 4(a)(3)**: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

(c) **Fed.R.App.P.4(a)(4)**: If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

(d) **Fed.R.App.P.4(a)(5) and 4(a)(6)**: Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

(e) **Fed.R.App.P.4(c)**: If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. Section 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3. **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. See also Fed.R.App.P. 3(c). A pro se notice of appeal must be signed by the appellant.

4. **Effect of a notice of appeal**: A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).